921 A.2d 954

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
BRIAN WAKEFIELD, DEFENDANT–APPELLANT.

Argued October 12, 2005—Decided May 7, 2007.

400

410

412

414

*Jay L. Wilensky* and *Mark H. Friedman,* Assistant Deputy Public Defenders, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney; *Mr. Wilensky* and *Robert A. Seelenfreund,* Assistant Deputy Public Defender, of counsel and on the briefs).

*Kristen M. Harberg,* Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey,* Attorney General of New Jersey, attorney).

*Roy B. Greenman* argued the cause for amicus curiae, Association of Criminal Defense Lawyers of New Jersey (*Budin, Greenman & Greenman,* attorneys).

Justice RIVERA–SOTO delivered the opinion of the Court.

Defendant Brian Wakefield pled guilty to two counts of capital murder and eleven other offenses arising out of the home-invasion robbery, assault, and murder of seventy-year-old Richard Hazard and his sixty-four-year-old wife Shirley Hazard in their Pleasantville, New Jersey home on January 18, 2001. At his penalty phase trial, a jury unanimously found all of the aggravating factors alleged by the State; rejected, in whole or in part, all of the mitigating factors claimed by defendant; determined beyond a reasonable doubt that the aggravating factors outweighed the mitigating factors; and sentenced defendant to death. The trial court later separately sentenced defendant on all of the non-capital crimes to which he pled guilty.

■ In this direct appeal, defendant raises fourteen assignments of error in respect of the penalty phase trial that resulted in his death sentence.[1] We hold that defendant's objections to his death sentence are without merit and, therefore, we affirm his convictions and sentences.

---

[1] Although defendant filed several pre-trial motions, among them motions to declare New Jersey's death penalty statute unconstitutional, to strike the aggravating factors noticed by the State, and to suppress defendant's pre-trial statements to the police, defendant did not preserve these issues for appeal. As a result, defendant has waived all claims in respect of his substantive guilt of the crimes to which he pled guilty. *State v. Crawley,* 149 *N.J.* 310, 316, 693 *A.2d* 859 (1997) ("Generally, a defendant who pleads guilty is prohibited from raising, on appeal, the contention that the State violated his constitutional rights prior to the plea." (citations omitted)). *See also State v. Knight,* 183 *N.J.* 449, 470–71, 874 *A.2d* 546 (2005) (citing *Crawley* and explaining that only three exceptions for waiver exist: review of denials of motions to suppress physical evidence on grounds of unlawful search or seizure; review of denials of admission to pretrial intervention programs under *R.* 3:28(g); and grounds preserved under a conditional or retraxit plea under *R.* 3:9–3(f)). Therefore, only defendant's challenges to the imposition of the death penalty remain viable for consideration.

## I.

## *FACTUAL AND PROCEDURAL BACKGROUND.*

### A.

█ Defendant made no factual representations at the plea hearing other than to admit his guilt of the crimes charged. A succinct summary of facts was tendered, however, by the prosecutor in lieu of defendant's allocution at the plea hearing: [2]

> [O]n January 18th of 2001, [the] Pleasantville Police Department responded to 300 Wellington Avenue in Pleasantville. Upon entering the house which they found unlocked, they encountered fires in different locations. There were two fires that they found on the first floor, [and] one fire that they found ... upstairs.
>
> As they were going through the upstairs, they found that a number of the bedrooms had been ransacked[,] that dresser drawers were pulled from the dressers[,] and the contents were emptied on the floor. After extinguishing the fires on the first and second floor[s], they discovered there was some additional fire in the basement.
>
> Upon extinguishing the fires in the basement, they discovered two bodies under debris. These bodies were burnt beyond recognition, but due to dental records, they were able to confirm that it was Shirley and Richard Hazard.
>
> Mr. Hazard was observed by the police and firemen with visible wounds to his head. There [were] puddles of blood around his head. He also had a melted garbage bag on the top part of his head. [T]he arson investigator was later able to determine that there were five fires set within the house, one in the upstairs, two on the first floor, [and] two in the basement. One of the areas of fire [was] the actual bodies of Mr. and Mrs. Hazard. The police also found that there were a number of alcohol bottles and cooking oils that were spilled on the floor that ... could be used as accelerants for the fire.
>
> [The] medical examiner was able to determine that both Mr. and Mrs. Hazard died of sharp and blunt force injuries. It was determined that the fire was not the cause of death, that the fire was post-mortem. It was also determined that

---

[2] Although, prior to accepting a guilty plea, the court must "question[ ] the defendant personally, under oath or by affirmation, and determin[e] by inquiry of the defendant and others, in the court's discretion, that there is a factual basis for the plea[,]" *R.* 3:9–2, that requirement is suspended in part in capital cases. *Ibid.* ("When the defendant is charged with a crime punishable by death, no factual basis shall be required from the defendant before entry of a plea of guilty to a capital offense or to a lesser included offense, provided the court is satisfied from the proofs presented that there is a factual basis for the plea.").

through relatives while [the] police and fire [personnel were] still on the scene that a car was missing, a car Mrs. Hazard drove: a 1994 Lincoln Continental.

About 7:20 p.m. the Lincoln Continental was found on Route 322 near Hamilton Mall in Hamilton Township. About 11:30 [p.m.] on that same date: the 18th, a cab driver[,] Olin Caldwell[,] walked into the Pleasantville Police Department, [and] indicated that on that day he had given a ride to somebody he knew as B–Love. B–Love was determined to be [defendant]. When [Caldwell] picked up [defendant], [defendant] had a bag of new clothes with him. [Defendant] later asked for Mr. Caldwell to rent him rooms at [a nearby Atlantic City casino hotel]. Mr. Caldwell agreed to do that. He rented the defendant three rooms at the [casino hotel]. When the defendant and Mr. Caldwell got to the [casino hotel], the defendant changed from the clothes that he was wearing into the clothes he had just purchased at the mall. He also made some purchases within the City [of Atlantic City].

Mr. Caldwell also observed [defendant] cashing in some old coins at a coin redemption center with the casino. Mr. Caldwell was suspicious of the defendant's behavior and later brought the clothes and some other property that [defendant] left in his cab to the Pleasantville Police Department[.] [T]he clothes included the jeans, two pairs of shoes, [and a] sweat-shirt. The jewelry included a pendant that said "number one grandmom." This pendant was later identified as belonging to Mrs. Hazard. Mr. Cladwell told the police that [defendant] was still at the [casino hotel].

The police ended up getting a search warrant and arresting [defendant at] approximately 6:13 a.m. in the morning of January 19th 2001. [Defendant] on that day of the 19th gave two taped statements to the police[,] and gave a taped statement on January 21st [in] the County Jail to the police. In his first statement [defendant] acknowledged being involved in the crimes, but denied committing any injuries to Mr. and Mrs. Hazard. [Defendant] indicated he met an individual he knew as Hype G also known as Gary Clemmons at the Woodlands in Pleasantville on that day. Mr. Clemmons asked [defendant] to be a lookout. [Defendant] indicated that he went to the [Hazard] residence. [Defendant] stayed about four houses down across the street as Mr. Clemmons went inside. He saw a person later determined to be Mr. Hazard open up the door as Mr. Clemmons entered.

. . . .

In this first statement [defendant] denied being involved in the actual assault on the victims, but he did acknowledge that he did assist in setting fires in a second statement, though he did acknowledge that he stabbed Mr. Hazard in the right side[,] which is consistent with an injury found by the medical examiner. [Defendant] did acknowledge that he threw Mrs. Hazard down [the] basement steps and repeatedly kicked her in the ribs. The injuries to the ribs are corroborated by the medical examiner's office. [Defendant] also acknowledged in the statement pouring gasoline on Mr. Hazard and lighting him on fire postmortem. The [third] statement basically acknowledges the same type of information regarding being involved in inflicting injuries to Mr. and Mrs. Hazard.

[T]he clothes that were turned over by Mr. Caldwell to the police department later was submitted for DNA analysis. In addition ... [defendant] did acknowl-

edge that these were the clothes he was wearing during the course of the crime to the police. And those clothes [showed] Shirley Hazard's blood on the left sneaker, Richard Hazard's blood on a jean, and Mr. Hazard's blood on the right sneaker. The odds [of a DNA comparative match] are in the billions [to one] on one and in [the] trillions [to one] on the other.

. . . .

[Defendant] did indicate that Mr. Clemmons was involved in these homicides. It turns out through independent witnesses that Mr. Clemmons was picking up his children from daycare at the approximate time of the homicides. So it's the State's position it was physically impossible for [Clemmons] to be involved in the crimes and, therefore, the defendant committed these crimes by his own conduct.

In sum, then, it is undisputed that defendant entered the Hazard home; he assaulted and killed Richard Hazard; he placed Richard Hazard's body in the basement and covered his head with a plastic garbage bag; when Shirley Hazard returned home from grocery shopping, defendant assaulted her and flung her down the basement steps; once in the basement, defendant further assaulted and killed Shirley Hazard; defendant ransacked the Hazard home for money and jewelry; in order to disguise his crimes, defendant set fire to the bodies and to several other places in the Hazard home; defendant stole Shirley Hazard's car; defendant went on a shopping and partying spree with the proceeds of his crimes; defendant was arrested the following morning; defendant confessed to his crimes; independent testimony, and physical and forensic evidence tied defendant to these crimes; and defendant admitted his guilt under oath.

B.

Based on those facts, on April 11, 2001, the Atlantic County grand jury returned a thirteen-count indictment charging defendant with two counts of knowing or purposeful murder by one's own conduct, in violation of *N.J.S.A.* 2C:11–3a(1) or (2); two counts of knowing or purposeful murder, in violation of *N.J.S.A.* 2C:11–3a(1) or (2); two counts of felony murder, in violation of *N.J.S.A.* 2C:11–3a(3); two counts of first-degree robbery, in violation of *N.J.S.A.* 2C:15–1; one count of second degree burglary, in violation of *N.J.S.A.* 2C:18–2; one count of second-degree aggra-

vated arson, in violation of *N.J.S.A.* 2C:17–1a; one count of third-degree possession of a knife with the purpose to use it unlawfully against the person or property of another, in violation of *N.J.S.A.* 2C:39–4d; one count of third-degree hindering apprehension or prosecution, in violation of *N.J.S.A.* 2C:29–3b(1); and one count of fourth-degree knowingly possessing a knife under circumstances not manifestly appropriate for such lawful uses as it may have, in violation of *N.J.S.A.* 2C:39–5d.

Because the indictment included charges of knowing or purposeful murder by one's own conduct that might implicate the imposition of the death penalty, *N.J.S.A.* 2C:11–3c, at defendant's arraignment the State served a notice of aggravating factors as a prerequisite for the imposition of the death penalty. *See N.J.S.A.* 2C:11–3c(2)(e) ("Prior to the commencement of the sentencing proceeding, or at such time as he has knowledge of the existence of an aggravating factor, the prosecuting attorney shall give notice to the defendant of the aggravating factors which he intends to prove in the proceeding."). The State alleged two aggravating factors in respect of the murder of Richard Hazard: that his murder was committed while defendant was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery and/or burglary, as provided in *N.J.S.A.* 2C:11–3c(4)(g); and that his murder was committed for the purpose of escaping detection, apprehension, trial, punishment or confinement for another offense, as provided in *N.J.S.A.* 2C:11–3c(4)(f). Because Richard Hazard was murdered before his wife Shirley Hazard, the two aggravating factors in respect of the murder of Shirley Hazard alleged by the State differed slightly from those alleged in respect of her husband: that her murder was committed while defendant was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit murder, robbery and/or burglary, as provided in *N.J.S.A.* 2C:11–3c(4)(g); and that her murder was committed for the purpose of escaping detection, apprehension, trial, punishment or confinement for another offense, as provided in *N.J.S.A.* 2C:11–3c (4)(f).

On September 8, 2003, defendant entered an unconditional plea of guilty on all counts of the indictment. Jury selection for defendant's penalty phase trial commenced immediately following defendant's guilty pleas, and continued for over twenty-seven nonconsecutive trial days thereafter, ultimately concluding on January 22, 2004. The jury was sworn on February 2, 2004, and the penalty phase trial started. Two days later, on February 4, 2004, and in response to *State v. Fortin (II)*, 178 *N.J.* 540, 843 *A.*2d 974 (2004), which had been decided the prior day, defendant moved to dismiss the aggravating factors listed by the State, principally claiming that the State's failure to present the aggravating factors to the grand jury, and the grand jury's failure to consider the same, violated his constitutional rights.[3] Based on *Fortin's* conclusion in respect of its prospective application, the trial court denied defendant's application, as well as defendant's motion for a stay of that determination pending an interlocutory appeal. That same day, defendant sought, and the Appellate Division granted, an emergent motion for a temporary stay pending his interlocutory appeal. Two days later, on February 6, 2004, and because jury selection had been completed, the jury had been sworn, and the taking of evidence had commenced, this Court denied defendant's motion for leave to appeal and dismissed defendant's motion for a stay pending appeal as moot, referencing the order of clarification issued that day in *Fortin:* "In any case in which the penalty phase of a capital case had begun before the issuance of

---

[3] In *Fortin (II)* we rejected the procedure endorsed in *State v. Martini (I)*, 131 *N.J.* 176, 222–28, 619 *A.*2d 1208 (1993), whereby the grand jury would return an indictment in which one or more charges rendered a defendant eligible for the death penalty but that penalty was not triggered until the State filed a separate notice of aggravating factors. Instead, we held that "our State Constitution requires that aggravating factors be submitted to the grand jury and returned in an indictment." *State v. Fortin (II), supra,* 178 *N.J.* at 646, 843 *A.*2d 974. We also determined that this requirement would be applied prospectively. *Id.* at 649, 843 *A.*2d 974 (applying retroactivity analysis, determining that *Fortin's* holding constitutes a "new rule" and defining that "[i]n all *future* cases, the State is required to submit the aggravating factors to the grand jury and specify in the indictment those factors it intends to prove at a penalty hearing." (emphasis supplied)).

the *Fortin* opinion, including any case in which the trial court had begun empanelling a jury, there is no requirement that the State present the aggravating factors to a Grand Jury." *Id.* at 656, 843 *A.*2d 974.

Defendant's penalty phase trial resumed on February 9, 2004 and continued until the late morning of March 4, 2004 when, after fifteen days of evidence and jury deliberations spanning the afternoon of March 3, 2004 and the morning of March 4, 2004, the jury unanimously determined beyond a reasonable doubt that the aggravating factors proven outweighed all of the mitigating factors presented. *See N.J.S.A.* 2C:11–3c(3)(a). As a result, the jury returned separate death sentences as to the murders of Richard and Shirley Hazard.

Specifically, the jury was unanimous in its separate findings concerning each of the aggravating factors: that the murder of Richard Hazard was committed while defendant was engaged in the commission of a burglary; that the murder of Richard Hazard was committed while defendant was engaged in the commission of a robbery; that the murder of Richard Hazard was committed for the purpose of escaping detection, apprehension, trial, punishment, or confinement, or another offense committed by defendant; that the murder of Shirley Hazard was committed while defendant was engaged in the commission of a burglary; that the murder of Shirley Hazard was committed while defendant was engaged in the commission of a robbery; that the murder of Shirley Hazard was committed while defendant was engaged in the commission of the purposeful and/or knowing murder of Richard Hazard; and that the murder of Shirley Hazard was committed for the purpose of escaping detection, apprehension, trial, punishment, or confinement, or another offense committed by defendant.

The jury's consideration and rejection of the seventeen mitigating factors pled by defendant is set forth in the following chart:

| Mitigating Factor | Vote (Yes/No) |
| --- | --- |
| Age of defendant at the time of the murders | 0/12 |

| | |
|---|---|
| That defendant did not plan or premeditate the murders | 7/5 |
| The defendant has pleaded guilty and accepted responsibility for his conduct | 0/12 |
| That defendant is remorseful for his participation in the crime | 0/12 |
| That defendant was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution | 0/12 |
| That defendant's capacity to appreciate the wrongfulness of his conduct, or to conform his conduct to the requirements of the law was significantly impaired as a result of mental disease or defect or intoxication, but not to a degree sufficient to constitute a defense to prosecution | 0/12 |
| That defendant was subject to emotional and physical neglect at the hands of his family | 3/9 |
| That defendant was subject to extended physical abuse at the hands of his family | 1/11 |
| That defendant was raised in an environment where domestic violence, substance abuse and criminal activity were pervasive | 7/5 |
| That defendant began abusing drugs and alcohol at a young age as a means of self-medication in an effort to escape from a history of neglect and abuse | 0/12 |
| That defendant was raised in a home without structure, boundaries or positive role models which he could emulate | 6/6 |
| That defendant was under the influence of mental or emotional disturbance insufficient to constitute a defense to prosecution | 0/12 |
| That defendant's capacity to appreciate the wrongfulness of his conduct, or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication, but not to a degree sufficient to constitute a defense to prosecution | 0/12 |
| That defendant suffers from neurological dysfunction | 3/9 |
| That defendant suffered from traumatic brain and head injuries he sustained as a child | 0/12 |
| That the State agencies responsible for protecting children from parental abuse and/or neglect did not succeed in protecting defendant | 1/11 |
| Any other matter or circumstance one or more jurors has identified as a mitigating factor | 0/12 |

The trial court individually polled each juror, and each juror responded that he or she was satisfied beyond a reasonable doubt that the aggravating factors proven outweighed all of the mitigating factors, and that his or her vote was accurately reflected on the verdict form. Neither counsel for the State nor for defendant requested any additional polling of the jury.

After the jury was excused, and as required by law, *N.J.S.A.* 2C:11–3c(3)(a), the trial court sentenced defendant to death. Defendant moved to set aside the death verdict, alleging prosecutorial misconduct in summation and that the verdict was against the weight of the evidence. The trial court denied those post-trial applications and sentenced defendant on the non-capital crimes to which defendant had pled guilty. Finding there were no mitigating factors applicable and that there were "a number of very weighty aggravating factors to be taken into account[,]" *see generally N.J.S.A.* 2C:44–1a and b (enumerating aggravating and mitigating factors relevant to non-capital sentencing determinations), the trial court sentenced defendant to an aggregate maximum term of imprisonment of fifty-five years, an aggregate minimum term of imprisonment of thirty-four years, an aggregate mandatory ten-year parole term, and the payment of several statutorily defined penalties and assessments.

As provided by *N.J.S.A.* 2C:11–3e and *Rule* 2:–1(a)(3), defendant filed a direct appeal of his death sentence to this Court. We granted leave to the Association of Criminal Defense Lawyers of New Jersey to appear as *amicus curiae.*

## II.

### *INFLAMMATORY EVIDENCE.*

#### A.

Defendant claims that his death sentence cannot be sustained because "the State was permitted to introduce vast amounts of

highly inflammatory evidence that was unnecessary for either proof of the alleged aggravating factors or refutation of claimed mitigating factors." Defendant's allegations of "highly inflammatory evidence" fall into four distinct categories: portions of defendant's statements to the police; evidence in respect of the crimes themselves; photographs of the crime scene; and evidence of defendant's post-crime behavior. Underlying these claims is defendant's contention that his unconditional guilty plea to all of the crimes for which he stood charged obviated any need for the State to prove any of those facts. As a result, defendant contends that his guilty pleas entitled him to the added benefit of limiting the State's proofs in the penalty phase trial exclusively to a sanitized version of the enumerated aggravating factors.

The State disagrees. According to the State, the proper standard for admissibility of evidence in a death penalty phase trial is whether the evidence is relevant to the aggravating and mitigating factors. The State contends that all proofs presented in respect of penalty were relevant to the aggravating and mitigating factors before the penalty phase jury and, therefore, were admissible.

## B.

In *State v. Josephs*, 174 *N.J.* 44, 116, 803 *A.*2d 1074 (2002), we "reaffirm[ed] the principle that the only evidence admissible in the penalty phase is evidence relevant to the aggravating and mitigating factors." Earlier that same Term, we explained that

> In general, a trial court is afforded considerable latitude regarding the admission of evidence, and is to be reversed only if the court abused its discretion. In a capital sentencing trial, admissible evidence includes that evidence relating to the aggravating and mitigating factors at issue. In assessing the probative value and the risk of undue prejudice under *N.J.R.E.* 403, the trial court has discretion to make appropriate determinations and will be reversed only if the trial court's ruling was so wide of the mark that a manifest denial of justice resulted.
>
> [*State v. Nelson*, 173 *N.J.* 417, 470, 803 *A.*2d 1 (2002) (citations and internal quotation marks omitted).]

It is against that standard of admissibility that defendant's claims must be gauged.

### 1. *Defendant's statements to the police.*

 Defendant alleges that six specific portions of his statements to the police should have been withheld from his death penalty jury. These are: (1) defendant's unprompted description that, after hitting Shirley Hazard in the head with a blunt object, stabbing her repeatedly, and throwing her down the basement steps, defendant kicked her several times in the ribs with a force akin to that applied by a professional football place kicker; (2) defendant's explanation that, when accosted by the Hazards' dog, defendant beat the dog into submission using an oversized wooden spoon in order to quiet him; (3) defendant's statement that, after the crimes, he was hungry so he drove in Shirley Hazard's car to a local fast-food restaurant for a meal; (4) defendant's description of his post-crime shopping spree with the proceeds stolen from the Hazards; (5) defendant's description of how, after the shopping spree, he rented several rooms at an Atlantic City casino hotel for a party; and, (6) defendant's statement that, during that party, he had sex with "three or four girls."

The trial court, in its instructions to the jury, addressed defendant's concerns:

> It's important for me to here note that although there are guilty pleas to these offenses, guilty pleas in and of themselves are insufficient to prove any aggravating factor. They are insufficient in and of themselves and there must be other evidence to establish it.
>
> . . . .
>
> During the State's presentation to you in its opening remarks, the State discussed [defendant's] alleged conduct after the commission of the crimes.
>
> [The prosecution] argued that [defendant] celebrated after the crimes, threw a party, ate at [a fast-food restaurant] and there was other conduct described. This alleged conduct is not an aggravating factor and, accordingly, this conduct cannot be used by you to determine if the death penalty is appropriate in this case. While evidence of [defendant's] spending can be used by you, if you feel it is credible evidence that a robbery occurred and that [defendant] obtained proceeds from that robbery, his alleged conduct cannot be used for any other purpose.
>
> You're specifically instructed that you cannot consider his spending as evidence that [defendant] is a bad person and, thus, more worthy of the death penalty.
>
> To repeat, it is only the aggravating factors alleged by the State that can be considered to determine whether [defendant] should be sentenced to death. If you

determine that any of the aggravating factors exist beyond a reasonable doubt, they can be the only factors used by you to determine the appropriate penalty.

And the only factors you can consider as weighing in favor of, or tending to favor, a death sentence are the aggravating factors that I'm now going to define to you or for you and then only if such factor has been proven beyond a reasonable doubt.

After explaining the aggravating factors alleged by the State in its notice, the trial court instructed the jury that

The State alleges that it has proven the existence of the aggravating factors in question beyond a reasonable doubt. As I told you, the aggravating factors are not established by the defendant's guilty plea to knowing or purposeful murder. Nor were they established from the defendant's guilty plea to burglary or robbery or any of the other offenses to which—or for which he entered guilty pleas.

In light of both the aggravating and mitigating factors at issue before the penalty phase jury, each of defendant's challenged statements was relevant because each of those statements "ha[d] a tendency in reason to prove or disprove any fact of consequence to the determination of the action." *N.J.R.E.* 401. Applying that minimal standard, the statements concerning the force with which defendant kicked the prostrate body of Shirley Hazard had a tendency in reason to prove that either or both murders were knowing and purposeful. Also, the beating of the Hazards' dog to quiet him clearly had a tendency in reason to prove defendant's purpose of escaping detection or apprehension. *N.J.S.A.* 2C:11–3c(4)(f). Finally, the statements concerning defendant's post-crime conduct had a tendency in reason to prove not only the aggravating factor in respect of escaping detection or apprehension, but also the mitigating factor of whether defendant was remorseful for his crimes. In sum, defendant's statements in respect of his assault on Shirley Hazard, his beating the Hazards' dog to silence him, and his post-crime activities were relevant.

 Assessing relevance, however, is only the first half of the necessary inquiry in respect of admissibility; the second half of that inquiry requires an application of the balancing test of *N.J.R.E.* 403: "[R]elevant evidence may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue

delay, waste of time, or needless presentation of cumulative evidence."

> That test requires the trial court to exclude evidence if its probative value is substantially outweighed by the risk of undue prejudice. Evidence claimed to be unduly prejudicial is excluded only when its probative value is so significantly outweighed by its inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the issues in the case. Moreover, the mere possibility that evidence could be prejudicial does not justify its exclusion. Additionally, certain types of evidence, including evidence of motive or intent, require a very strong showing of prejudice to justify exclusion. [*State v. Koskovich*, 168 *N.J.* 448, 486, 776 *A.*2d 144 (2001) (citations, internal quotation marks and editing marks omitted).]

It cannot be contested that defendant's own statements concerning his conduct, both during and after his crimes, were poignantly probative of his actions, particularly in respect of the determination of the quantum of punishment to be imposed for those actions. Each statement spoke directly to the depravity with which defendant committed his crimes and the utter lack of remorse that characterized his post-crime behavior.

For those reasons, the application of *Evidence Rule* 403's balancing test to the statements challenged by defendant leads to the conclusion that the admission of those statements did not "have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the issues in the case[,]" *ibid.*, and, for that reason, their probative value was not substantially outweighed by the risk of undue prejudice. We, therefore, reject defendant's challenge to the admissibility of his statements to the police in the context of his death penalty sentence.

### 2. *Evidence of the underlying crimes.*

Defendant's second evidentiary challenge addresses the proofs of the crimes themselves tendered by the prosecution during the penalty phase trial. In defendant's view, the fact that he pled guilty to all of the crimes for which he stood charged removed any need for the introduction of any of the substantive proofs concerning those crimes. Thus, defendant concludes, the introduction of proofs concerning the crimes to which he pled

guilty was inflammatory and prejudicial. The State replies that, in the context of the aggravating factors—that is, that the death penalty was appropriate because the murders occurred either during the commission of the crimes of robbery and burglary of both Richard and Shirley Hazard or the murder of Richard Hazard, or because the murders occurred in order to avoid detection of or apprehension for the crimes defendant committed—the admission in evidence of the facts of the underlying crimes was proper.

Defendant's unqualified and unrestricted admission of guilt for the murders of Richard and Shirley Hazard did not, standing alone, provide him the procedural advantage of barring proofs of those crimes as part of the State's case for the imposition of the death penalty. The standard for admissibility of these facts remained whether the facts were relevant and whether their probative value was substantially outweighed by their undue prejudicial effect. The facts of defendant's underlying crimes of robbery, burglary, murder, and hindering apprehension all are directly relevant to his penalty phase trial because each has a tendency in reason to prove the presence of aggravating factors and the absence of mitigating factors. In that context, the probative value of those facts was not substantially outweighed by their undue prejudicial effect. Therefore, the trial court properly admitted proofs of defendant's underlying crimes as part of his penalty phase proceeding.

3. *Crime scene photograph.*

█ Defendant objects to the introduction of a photograph of the crime scene, repeating again his claim that, because he pled guilty to those offenses, the photograph was unduly prejudicial. The State responds that the trial court properly exercised its discretion and admitted one single photograph showing the debris-covered bodies of Richard and Shirley Hazard and their locations in the basement of the Hazards' home.

█ As we have noted,

we have repeatedly expressed our concern about the admissibility of crime-scene and autopsy photographs in capital cases. Although as a general rule the admissibility of photographs of a crime victim rests in the trial court's discretion, the need to balance the ostensible relevance of such evidence against the likelihood of jury prejudice is especially critical in the penalty phase of a capital case.

[*State v. Bey (III)*, 129 *N.J.* 557, 609, 610 *A.*2d 814 (1992), *supplemented by,* 137 *N.J.* 334, 645 *A.*2d 685 (1994), *cert. denied,* 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995) (citations and internal quotation marks omitted).]

As *Bey (III)* recognizes, the admissibility of a crime scene photograph in a capital case implicates a three-step analysis: is the photograph relevant; is it unduly inflammatory; and did its admission into evidence have the capacity to cause an unjust result. *Ibid.*

Here, a single photograph was introduced by the State. That photograph shows only a debris-strewn area within which a largely indecipherable body lies, and any injuries to the body, or the location or condition of the second body, are not visible. It corroborated both defendant's statements of what occurred in the Hazards' home as well as the testimony of those who responded to the fire and subsequently discovered the murdered bodies of Richard and Shirley Hazard. As corroboration, the photograph was relevant because it had a tendency in reason to establish the presence or absence of the aggravating or mitigating factors. In addition, as an examination of the photograph reveals, the photograph was not unduly inflammatory and its probative value was not significantly outweighed by any undue prejudicial effect. In light of the foregoing, it cannot be said that the admission of this photograph into evidence had the capacity to cause an unjust result. We therefore conclude that the admission of this single photograph simply was not error. *See Bey (III), supra,* 129 *N.J.* at 609, 610 *A.*2d 814.

4. *Defendant's post-crime behavior.*

■ Defendant contends that everything that happened after he left the Hazards' home was irrelevant because he pled guilty to the crimes themselves. The State counters that defendant's post-crime activities were relevant to the presence of aggravating and

the absence of mitigating factors in the case. We agree with the State.

As admitted in defendant's several statements to the police, the post-crime events are as follows. On January 18, 2001, after robbing and murdering the Hazards, burglarizing their home, and deliberately setting fire to the Hazards' home in five separate locations, defendant left the Hazards' home in Mrs. Hazard's car. Defendant was observed driving that stolen car by the husband of one the Hazards' grandchildren, a description that matched the one defendant himself gave of how he was dressed at the time. Defendant first drove to a fast-food restaurant, because he was hungry. Defendant then decided to purchase certain music to listen to while he drove Mrs. Hazards' stolen car. On his way to the shopping mall, the car stalled and defendant abandoned it. While walking the remainder of the way to the shopping mall, defendant drank and discarded a bottle of champagne he stole from the Hazards' home; defendant also discarded the keys to the car he stole from the Hazards' home.[4] Once at the shopping mall, defendant purchased new clothing and jewelry. Defendant then called for a cab to drive him around. The cab arrived and first took defendant to his mother's house. Defendant offered some of the jewelry he stole from the Hazards' home to his mother, but she rejected it; defendant then discarded that jewelry in a dumpster nearby his mother's home.[5]

Defendant had the cab driver drive defendant to an Atlantic City casino hotel. Along the way, defendant had the cab driver stop so defendant could make additional purchases. Once at the casino hotel's parking garage, defendant changed into the clothes he had just purchased because the clothes he was wearing had the Hazards' blood on them. When defendant went to discard the

---

[4] The police recovered both the discarded champagne bottle and discarded car keys from the locations where defendant claimed he discarded them.

[5] The police also recovered that jewelry from the dumpster defendant described.

clothes he had just removed, the cab driver requested defendant's permission to keep those clothes and, with defendant's consent, the cab driver placed the clothes in the trunk of the cab. At defendant's request, the cab driver rented three rooms in the casino hotel and assisted defendant in the purchase of alcohol, which was used to stock a bar in the room defendant was to occupy.[6] At the casino hotel, defendant exchanged a number of coins he had stolen from the Hazards into paper currency. The cab driver then drove defendant around Atlantic City, where defendant purchased marijuana and collected some friends for the party at defendant's rooms in the casino hotel. Once back at the casino hotel, defendant "had sex with three or four girls[,]" fell asleep, woke up in the bathtub, and climbed into bed.

Meanwhile, the cab driver discussed the events of earlier that day with some of his fellow cab drivers. As a result of that discussion, the cab driver decided to report his suspicions to the police. Because the cab driver originally had picked defendant up in the vicinity of Pleasantville, New Jersey, the cab driver went to the Pleasantville Police Department, reported his suspicions concerning defendant, handed defendant's discarded clothing to the police, and told the police where defendant claimed to have discarded the keys to the Hazards' stolen car, and where defendant could be found.

Based on the information provided by the cab driver, as corroborated by the crime scene and defendant's clothes, the police secured both an arrest warrant as well as a search warrant for the hotel room defendant then occupied. The police arrested defendant at his casino hotel room early the next morning. When the police woke defendant, arrested him and advised him that he was being placed under arrest for a double-murder/arson, defendant's sole concern was why his new clothes appeared to have been casually tossed in the bathtub.

---

[6] Defendant's purpose in renting these hotel rooms was to throw a party for his friend, "my boy, Samar Smiley."

Defendant claims that, because he pled guilty to the underlying crimes charged, none of those proofs should have been admitted. The State contends that the majority of defendant's challenged statements were separately corroborated and, thus, inherently credible. In respect of the remaining challenged statements—that defendant "had sex with three or four girls" and that defendant's sole concern on being awakened by the police was for the condition of his new clothes—the State asserts that those proofs provide a motive for robbery and that, in any event, no contemporaneous objection was made to the testimony concerning defendant's statements upon awakening in the police's presence.

Although not all of those items of proof bear the same degree of relevance to the aggravating and mitigating factors in this case, none of them is irrelevant. Thus, evidence concerning defendant's consumption of the champagne stolen from the Hazards' home corroborated his commission of felony murder, an aggravating factor, *see N.J.S.A.* 2C:11–3c(4)(g), and at least one of the Hazards' children confirmed that the Hazards had in their home a bottle of champagne from the same vintner as the one recovered by the police. Also, proofs of defendant's shopping spree, hotel room rentals, alcohol and drug purchases, and partying all provide motive for the robbery of Richard and Shirley Hazard. Thus, the relevance of these proofs is established.

Furthermore, we find that the probative value of those proofs is not substantially outweighed by their undue prejudicial effect. We reiterate that "[e]vidence claimed to be unduly prejudicial is excluded only when its 'probative value is so significantly outweighed by its inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation' of the issues in the case." *State v. Koskovich, supra,* 168 *N.J.* at 486, 776 *A.*2d 144 (citing *State v. Thompson,* 59 *N.J.* 396, 421, 283 *A.*2d 513 (1971)). Also, " '[t]he mere possibility that evidence could be prejudicial does not justify its exclusion[,]' " *id.* (quoting *State v. Morton,* 155 *N.J.* 383, 453–54, 715 *A.*2d 228 (1998), *cert. denied,* 532 *U.S.* 931, 121 *S.Ct.* 1380,

149 *L.Ed.2d* 306 (2001)), and that "[s]ome types of evidence require a very strong showing of prejudice to justify exclusion. One example is evidence of motive or intent." *State v. Covell,* 157 *N.J.* 554, 570, 725 *A.*2d 675 (1999).

Because we find that evidence of defendant's post-crime behavior was relevant to the aggravating and mitigating factors in this death penalty phase trial, and because we further find that its probative value is not substantially outweighed by its undue prejudicial effect, we reject defendant's challenges to the admission of the post-crime evidence.

## C.

On the whole, then, it cannot be said that any of what defendant claims is "highly inflammatory evidence"—either portions of defendant's statements to the police; evidence in respect of the crimes themselves; photographs of the crime scene; and evidence of defendant's post-crime behavior—that should have been excluded from consideration by the death penalty phase jury. On the contrary, we hold that all of those proofs were relevant to the aggravating and mitigating factors in this case, that the probative value of those proofs was not substantially outweighed by their claimed unduly prejudicial effect, and that the trial court's determinations admitting such proofs were not "so wide of the mark that a manifest denial of justice resulted." *State v. Nelson, supra,* 173 *N.J.* at 470, 803 *A.*2d 1 (quoting *State v. Brown,* 170 *N.J.* 138, 147, 784 *A.*2d 1244 (2001)). We, therefore, reject defendant's challenges to his death sentence based on the admission of allegedly "inflammatory" evidence.

## III.

### *PROSECUTORIAL MISCONDUCT/PROSECUTORIAL ERROR.*

#### A.

Defendant next alleges that there was prosecutorial misconduct throughout the penalty phase trial—during opening statements, at

trial and during summation—sufficient to require that his death sentence be vacated. Specifically, defendant alleges twelve separate categories of prosecutorial misconduct: (1) improper vouching; (2) engaging in argument during opening statement; (3) disparagement of defense counsel; (4) unwarranted comments and accusations; (5) obstruction of the defense's examination of defendant's cousin; (6) mention of a report prepared by a non-testifying defense expert; (7) equating the death penalty with justice; (8) explanation that the jury should not "feel guilty" about imposing a death sentence; (9) mischaracterization of the penalty phase as concerning what defendant "deserved;" (10) comments concerning defendant's age; (11) name-calling; and (12) improperly focusing on defendant's character.

The State claims that there was no prosecutorial misconduct here and, in any event, that much of what defendant complains of on appeal was addressed by the trial court by way of a curative instruction.

For purposes of analysis, we have divided defendant's contentions into three general categories—objections to the State's opening statement; objections arising during the evidentiary stage; and objections to the State's summation—and we address each separately.

### B.

Our jurisprudence requires that prosecutors act in accordance with certain fundamental principles of fairness. It was long ago recognized that

> The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

> It is fair to say that the average jury, in a greater or less[er] degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.
>
> [*Berger v. United States*, 295 *U.S.* 78, 88, 55 *S.Ct.* 629, 633, 79 *L.Ed.* 1314, 1321 (1935).]

Echoing those precepts, we too have explained that "[a] prosecutor may be zealous in enforcing the law but he must nevertheless refrain from any conduct lacking in the essentials of fair play, and where his conduct has crossed the line and resulted in foul play, the reversal of the judgment below will be ordered." *State v. Siciliano*, 21 *N.J.* 249, 262, 121 *A*.2d 490 (1956).

Thus, we have defined the role of a prosecutor similarly:

> It is but a truism that prosecutors, as lawyers, are engaged in an oratorical profession. As such, and in consonance with our adversarial method of ascertaining the truth, we properly afford counsel on both sides latitude for forceful and graphic advocacy. Our countenance of a certain measure of verbal flair is, however, tempered by the command that prosecutors are charged not simply with the task of securing victory for the State but, more fundamentally, with seeing that justice is served. Absolute adherence to this duty is stringently compelled in capital cases where the penalty is death. Accordingly, prosecutors should not make inaccurate legal or factual assertions during a trial and ... must confine their comments to evidence revealed during the trial and reasonable inferences to be drawn from that evidence.
>
> [*State v. Reddish*, 181 *N.J.* 553, 640–41, 859 *A*.2d 1173 (2004) (citations and internal quotation marks omitted).]

In sum, we acknowledge that "[p]rosecutors may fight hard, but they must also fight fair." *State v. Pennington*, 119 *N.J.* 547, 577, 575 *A*.2d 816 (1990).

 For those reasons, we gauge the consequences of prosecutorial misconduct or error differently. We "evaluat[e] the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial" and conclude that "prosecutorial misconduct is not grounds for reversal of a criminal conviction unless the conduct was so egregious as to deprive defendant of a fair trial." *State v. Papasavvas (I)*, 163 *N.J.* 565, 625, 751 *A*.2d 40 (2000) (quoting *State v. Timmendequas (I)*, 161 *N.J.* 515, 575–76, 737 *A*.2d 55 (1999), *cert. denied*, 534 *U.S.* 858, 122 *S.Ct.* 136, 151

*L.Ed.*2d 89 (2001) (citations omitted)). Thus, "[t]o justify reversal, the prosecutor's conduct must have been 'clearly and unmistakably improper,' and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." *Ibid.* Also, "the Court should consider "whether defense counsel made a timely and proper objection, whether the remark was withdrawn promptly, and whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." Ibid. Next, "[the] court must also decide whether the prosecutor's misconduct constitutes grounds for a new trial . . . because, in order to justify reversal, the misconduct must have been so egregious that it deprived the defendant of a fair trial." *State v. Smith,* 167 N.J. 158, 181, 770 A.2d 255 (2001) (citations and internal quotation marks omitted). In sum, "to warrant a new trial the prosecutor's conduct must have been clearly and unmistakably improper, and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." *Id.* at 181–82, 770 A.2d 255 (citations and internal quotation marks omitted). It is in that context that we consider defendant's prosecutorial misconduct or error claims.

## C.

1. *Objections to the State's Opening Statement.*

a. *Improper vouching.*

■ In the course of his opening statement to the death penalty jury, the prosecutor stated that "[t]he State does not seek the death penalty on a routine basis. It is not something that we do lightly. The State seeks the death penalty when the State believes the facts call for it." Defendant claims that "[t]his is a textbook example of prohibited vouching, in that it amounts to the prosecutor invoking the authority and presumably superior knowledge and experience of the State to provide the jury with reasons, above and beyond the evidence, to arrive at the verdict desired by the State: death."

The State remarks that the contextual basis for defendant's objection is important because the statements were made on the heels of an extensive jury *voir dire* during which the death penalty phase jurors were subjected to a number of disturbing questions concerning the death penalty. Thus, the reason for that comment, the State asserts, was to explain the link between the lengthy and rigorous jury selection process to which each of those jurors had been subjected and the decision making task the selected jurors were being asked to perform. The State further notes that "[t]he prosecutor did not lead the jury to believe that he had a personal or official belief that defendant deserved a sentence of death based on something beyond the evidence[,]" and that he focused the jury's attention on the proofs to be adduced in the trial, saying that the jury was to determine the matter "based upon what you hear in this courtroom." Finally, the State observes that the trial court denied defendant's motion for a mistrial based on the prosecution's opening statement, explaining that:

> With respect to a motion for mistrial, I would deny it at this point in time. I do feel that in light of what was said, either for purposes of clarity as to what is or is not an issue, for purposes of a curative instruction[ ], some curative instructions are necessary as a result of the opening. I would start with *RPC* 3.4 [7] and it [is] the Court's estimation that both counsel ran afoul of 3.4 in their openings stating their beliefs. I will probably give an instruction with respect to that. . . .
>
> I will before we proceed further deal with the 3.4 issue.

The trial court then immediately instructed the jury as follows:

> If during the course of either opening any counsel referred to their personal opinion or personal belief, that is not a proper aspect of presentation and counsel's belief or counsel's opinion is not evidence and is indeed not proper argument either. So to the extent there was any such argument or presentation made, it should be disregarded by you and you should allow that to play no role in any determination which you make.

Applying the test set forth above, we agree with the trial court's appraisal and handling of defendant's objection to the State's opening statement. Because they had the potential of injecting an

---

[7] Specifically, *RPC* 3.4(e) provides that "[a] lawyer shall not . . . in trial, . . . state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused[.] . . ."

element that was factually outside the jury's ken, the prosecutor's comments trod close to the prohibited expression of a personal opinion, raising matters irrelevant to the death penalty phase jury's task. However, although the State's comments may have stretched the bounds of relevance, the trial court promptly and effectively dealt with those comments via a curative instruction. Thus, when "we consider the tenor of the trial and the responsiveness of counsel and the court to the improprieties when they occurred[,]" *State v. Papasavvas (I), supra,* 163 *N.J.* at 625, 751 *A.*2d 40 (quoting *State v. Timmendequas (I), supra,* 161 *N.J.* at 575, 737 *A.*2d 55 (citation omitted)), we conclude that, even if the prosecutor's comments could be termed questionable, they were not sufficiently severe, and the potential prejudicial effect on defendant's right to a fair trial was so slight, the relief requested by defendant is unwarranted. We find no basis for reversal in respect of defendant's claim that the prosecutor impermissibly vouched for the State's request for the imposition of the death penalty in the course of its opening statement.

 That said, we again emphasize our long-standing rule that "it is improper for the prosecutor to declare his individual or official opinion or belief of a defendant's guilt in such manner that the jury may understand the opinion or belief to be based upon something which he knows outside the evidence." *State v. Thornton,* 38 *N.J.* 380, 398, 185 *A.*2d 9 (1962) (citation omitted). The rationale supporting that rule is straightforward: "in the minds of jurors such statements may add the weight of the prosecutor's official and personal influence and knowledge to the probative force of the evidence adduced," and such added weight may "creat[e] the possibility that the jurors consciously or unconsciously might adopt the prosecutor's view without applying their own independent judgment to the evidence." *Ibid.*

b. *Engaging in argument during opening statement.*

 Defendant points to ten separate instances during the prosecution's opening statement that defendant claims constituted

improper argument. Highlighting the specific language defendant claims is particularly improper, those are:

- "This aggravating factor recognizes the evil of killing a witness to a crime. A person, *a criminal makes a decision that his freedom, his liberty is more important than the life of his victim* or of a witness he is subject or eligible for the death penalty."

- "The Hazards aren't here to tell us how they were *victimized,* so the crime scene tells us how that occurred."

- *"You're going to hear his trying to bring in Clemmons in [what] was the first of many, many lies he told through the course of this investigation."* 8

- "Stolen property was only found on [defendant]. The Hazards[']s blood, their DNA was found on his clothes. No other evidence suggests anybody else was involved in these crimes. *This was an attempt by defendant to minimize his role, his responsibility for these* crimes."

- "From [the fast-food restaurant] he goes to a store . . . *and I'm not making this up,* the reason he goes there is because he can't drive, doesn't like to drive without listening to music so he goes to the [store] to try to get some music."

- "In his first statement the only thing the defendant says he does is act as a lookout, pours some alcohol to help accelerate the fire. He never claims that he inflicted any injuries upon Mr. or Mrs. Hazard. *This is his first self-serving statement."*

- *"[The police] are concerned about his self-serving statements* because he tells the police how scared he was, but the next thing he is doing is going on a shopping spree, so the police want to talk to him some more."

- *"The defendant has trouble keeping his lies straight about the involvement of Gary Clemmons."*

- "The police then move on to speaking about what had occurred in relation to the crime, and the defendant, again, volunteers to write, and he draws some diagrams for the police. He draws diagrams of what happened in the house. He draws things about outside the house where he actually checks where he was standing three or four houses down, not really being the look out and being unfamiliar with the area he doesn't realize that there's no—*he is not being honest, but, again, they don't confront him in the interview,* they just let him tell his story."

---

8 In several of his statements to the police, defendant asserted that he was not alone in committing the crimes against the Hazards. Instead, defendant variously claimed that he was either just a lookout or an accomplice of Gary Clemmons. None of the physical or forensic evidence tied Clemmons to the crime and, more importantly, Clemmons had an air-tight alibi for the time the crimes were committed: he was registered in a sign-in sheet as collecting his children from daycare, and the daycare workers positively and unmistakably confirmed that Clemmons was the person who picked up his children at daycare at the same time that defendant was committing his crimes.

- "Now the police—considering this is a double murder and they want to find out everybody who is responsible—look for Gary Clemmons. *It's not like they just decided that they're not going to do anything, and within 20 seconds Gary Clemmons voluntarily walks into the Major Crimes Unit* in Northfield and indicates that he was picking up his children in Atlantic City at 4:20 on the day of the crime. The police go down to Atlantic City and talk to two of the daycare workers, speak to them and they remember Mr. Clemmons, they remember him interacting well with his children, so they did investigate when he told them about Clemmons."

According to defendant, those statements exceeded the proper scope of opening statements and, hence, require that defendant's death sentence be vacated.

The trial court twice instructed the jury that the parties' opening statements were not evidence. The State explains that the majority of the comments objected to by defendant constituted representations of what the State intended to, and in fact did, prove at the penalty phase trial and that, in any event, none of the comments made by the prosecutor in his opening statement require reversal.

 The scope of the State's opening statement is limited to the "facts he intends in good faith to prove by competent evidence." *State v. Hipplewith*, 33 *N.J.* 300, 309, 164 *A.*2d 481 (1960) (citing *State v. Haines*, 103 *N.J.L.* 534, 138 *A.* 203 (Sup.Ct.1927)); *State v. Ernst*, 32 *N.J.* 567, 577, 161 *A.*2d 511 (1960), *cert. denied*, 364 *U.S.* 943, 81 *S.Ct.* 464, 5 *L.Ed.*2d 374 (1961) (holding that, in opening statements, "[a] prosecutor should, as the trial court ruled, limit himself to a statement of what he will prove and not anticipate his final argument."); *see also State v. Walden*, 370 *N.J.Super.* 549, 558, 851 *A.*2d 758 (App.Div.), *certif. denied*, 182 *N.J.* 148, 862 *A.*2d 56 (2004) (" 'A prosecutor's opening statement should provide an outline or roadmap of the State's case. It should be limited to a general recital of what the State expects, in good faith, to prove by competent evidence.' ")(quoting *State v. Torres*, 328 *N.J.Super.* 77, 95, 744 *A.*2d 699 (App.Div.2000)). Therefore, we gauge prosecutorial misconduct or error thusly:

[T]he test for determining whether prosecutorial misconduct constitutes reversible error is whether the misconduct was so egregious that it deprived defendant of

a fair trial. The goal that rule seeks to foster is that juries [will] ... reach a verdict and impose a penalty without inordinate exposure to unduly prejudicial, inflammatory commentary. Although we impose a greater burden on prosecuting attorneys than defense attorneys on that issue, [i]t is well-established that prosecuting attorneys, within reasonable limitations, are afforded considerable leeway in making opening statements and summations.

[*State v. DiFrisco (II)*, 137 *N.J.* 434, 474, 645 *A.*2d 734 (1994) (citations and internal quotation marks omitted).]

So informed, we address defendant's contentions of improper argument constituting prosecutorial misconduct or error in respect of the prosecution's opening statement.

The highlighted comments fairly can be characterized as a recital, albeit with some limited yet permissible rhetorical leeway, of the aggravating factors the State intended to prove. Those comments also responded to the implausibility of the excuses defendant tendered in his various statements to the police, statements the prosecution intended to introduce in its case-in-chief. Thus, those comments do not, whether singly or in the aggregate, suffice to satisfy defendant's burden of demonstrating that the "conduct [by the prosecutor] was so egregious that it deprived defendant of a fair trial[,]" *State v. Ramseur*, 106 *N.J.* 123, 322, 524 *A.*2d 188 (1987), particularly in light of the curative instruction provided by the trial court at the close of opening statements. We therefore reject defendant's challenge that the prosecution's opening statement contained impermissible argument.

2. *Objections arising during the evidentiary stage.*

a. *Disparagement of defense counsel.*

 Defendant alleges that, at several points during the evidentiary stage of the penalty phase trial, the State accused the defense of discovery violations. According to defendant, those accusations constituted disparagement of defense counsel of the type condemned in *State v. Nelson*, 173 *N.J.* 417, 461, 803 *A.*2d 1 (2002). Defendant complains of four separate instances when defendant claims his counsel was disparaged by the State, each of which deals exclusively with cross-examination questions regard-

ing the timing of required discovery disclosures from defendant to the State.

The State responds that none of the questions accused defendant or his counsel of discovery violations and that the prosecution never accused defendant or defense counsel of collusion in the presentation of defendant's witnesses. In respect of the first instance claimed as error by defendant—when the State cross-examined defendant's traumatic brain injury expert concerning "a computer printout that the State received last week"—the State notes that defendant's focus on the timing of the disclosure is belied by the trial court's conclusion that "I don't see the time of receipt of significance in the question posed to the witness."

In respect of the second instance of error claimed by defendant—when the prosecutor noted in his cross-examination of defendant's brother that the basis of his cross-examination was that he "received today another detailed statement"—the State explains that defendant specifically requested that the trial court instruct the jury that "the comments of the Prosecutor with respect to suggesting that [the defense] had done something improper with this material is inappropriate and should be disregarded." Abiding by that request, the trial court instructed the jury that

when we broke for recess the Court was dealing with a legal issue, which essentially centers around discovery obligations. Essentially, under our practice within limits each side is obliged to turn all their information over to the other side, and I made a determination that there was no delay or no impropriety in [the defense] turning over the information with respect to the supplemental report. Accordingly, you should disregard [the prosecutor's] comments with regard to it.

Defendant neither objected to, nor requested any addition or modification to, this curative instruction.

The third instance involved the State's cross-examination of defendant's expert in clinical neuropsychology. Highlighting a discrepancy between the raw data supporting that expert's report and the language in the report itself, the State sought to determine that the discrepancy only became clear when the State subpoenaed the expert's raw data. Defendant objected, but the

trial court deemed the prosecution's questioning proper, ruling that:

What this witness may have chosen to withhold may be relevant on the issue of credibility and meet the credibility relevance, so I will allow cross-examination as to whether he was initially willing to turn it over if that's where the Prosecutor wants to go and whether it took a subpoena to get it. And then counsel are free to make the arguments that counsel chooses to make from there.

With regard to the mistrial, in light of what I have said, I would deny the application for a mistrial. I will invite an instruction with respect to the purpose of this, what it is for and what it is not, on the issue of credibility. I'll tell the jury something to that effect when they get back in, but if there's anything further, counsel, that will be addressed.

Upon the jury's return to the courtroom, the trial court issued the following curative instruction:

An issue has arisen, and I'll give you some instructions with respect to it. The comments with regard to discovery being provided or information being provided[,] I'll instruct you that there has been no discovery violation on behalf of defense counsel or the defendant[,] that there has been no violation of any duty they owed to either the Court or to opposing counsel.

Having said that, you will perhaps—and you have heard some information and may hear further cross-examination as to when and the circumstances under which the so-called raw data were supplied. That would be before you for a limited purpose and a limited purpose only, and that would be for your purpose in assessing any credibility issues or any credibility determinations that you would make concerning the testimony of this witness.

Again, defendant did not object to or request any addition to or modification of this curative instruction.

Defendant's final instance of counsel disparagement arises in the context of the direct examination of defendant's capital mitigation specialist. During that examination, defendant's capital mitigation specialist described conversations she had had with defendant's mother. The State objected, noting that it had not been provided any information in respect of those conversations. The trial court explained to defendant that he had a continuing obligation to provide witness statements and, in the absence of statements, witness summaries. As a result, the trial court issued an additional curative instruction:

Yesterday, at the close of business, issues arose with respect to a continuing discovery obligation. And out of your presence the Court dealt with some further matters with respect to it; after that I am satisfied that no attorney in this case

> endeavored to mislead or consciously fail[ed] to follow what they thought was the appropriate obligation of counsel. Rather, we have as you know a hotly contested matter where each side is advocating from their position. Accordingly, whatever happened should not prejudice any side on that. I have taken the responsibility, as is my responsibility, to make sure that the discovery obligations are clear. I think they are clearly understood at this point in time and we're ready to proceed.

That instruction, which also was accepted by defendant without objection, marks the end of defendant's objections to the State's questions concerning when and under what circumstances these defense witnesses—defendant's traumatic brain injury expert, brother, clinical neuropsychology expert, and capital mitigation specialist—disclosed to the prosecution matters properly subject to discovery obligations.

 An overarching principle guides any inquiry into whether a prosecutor may disparage defense counsel: "[P]rosecutors are prohibited from casting unjustified aspersions on the defense or defense counsel." *State v. Nelson*, 173 *N.J.* 417, 461, 803 *A.*2d 1 (2002) (citing *State v. Frost*, 158 *N.J.* 76, 86, 727 *A.*2d 1 (1999)). As with each of defendant's earlier claims of prosecutorial misconduct or error, however, the issue for resolution is two-fold: whether the prosecutor committed misconduct, and, if so, "whether the prosecutor's conduct constitutes grounds for a new trial." *State v. Smith*, 167 *N.J.* 158, 181, 770 *A.*2d 255 (2001). We have explained that, in order to meet the second part of that test, "the misconduct must have been 'so egregious that it deprived defendant of a fair trial.' " *Ibid.* (citations omitted). Stated differently, "[t]o warrant a new trial the prosecutor's conduct must have been clearly and unmistakably improper, and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." *Id.* at 181–82, 770 *A.*2d 255 (citations and internal quotation marks omitted).

We do not read those three cross-examination questions or one objection posed by the State as an assault on defense counsel. On the contrary, in each instance, the prosecution properly sought to question a witness in respect of materials either recently disclosed or not disclosed at all to the State. Therefore, to the extent that line of questioning or objection raises credibility issues concerning

recent fabrication or bias, interest or prejudice, *see generally* *N.J.R.E.* 607 ("[A]ny party including the party calling the witness may examine the witness and introduce extrinsic evidence relevant to the issue of credibility . . . ."), the questions and objection are proper. *See, e.g., State v. Silva,* 131 *N.J.* 438, 442, 621 *A.*2d 17 (1993) (holding that "if a witness appears to know of the charges and would naturally be expected to have come forward with the alibi testimony, the witness may be cross-examined about those circumstances of nondisclosure"); *State v. Josephs,* 174 *N.J.* 44, 127, 803 *A.*2d 1074 (2002) ("In assessing the worth of the defense's case, the jury is entitled to 'consider whether it was receiving a full picture, as interest and bias are always relevant.' " (quoting *State v. Timmendequas (I),* 161 *N.J.* 515, 594, 737 *A.*2d 55 (1999), *cert. denied,* 534 *U.S.* 858, 122 *S.Ct.* 136, 151 *L.Ed.*2d 89 (2001))).

Furthermore, even if we were to credit defendant's allegations and condemn the State for implying that the defense was derelict in its discovery obligations, we nevertheless conclude that the State's conduct in posing the complained-of questions and objection does not rise to the level where it can be considered "so egregious that it deprived the defendant of a fair trial." *State v. Frost,* 158 *N.J.* 76, 83, 727 *A.*2d 1 (1999); *see also State v. Pennington,* 119 *N.J.* 547, 566, 575 *A.*2d 816 (1990) ("[T]he test by which we shall evaluate the prosecutor's misconduct is whether it was so egregious as to deny defendant a fair trial."); *State v. Ramseur,* 106 *N.J.* 123, 322, 524 *A.*2d 188 (1987) (same). Therefore, we reject defendant's claim that the State disparaged defense counsel or that, even if so construed, that the State's actions warrant a new death penalty phase trial.

b. *Unwarranted comments and accusations.*

In respect of five separate instances during the penalty phase trial, defendant next claims that the State engaged in what defendant characterizes as "unwarranted comments and accusations—in plain terms, cheap shots—that distorted the record and greatly prejudiced the defendant." First, defendant contends

that, in respect of defendant's expert in the area of traumatic brain injury, the State improperly focused on the expert's fees and failure to treat defendant by inquiring why that physician did not treat defendant. Second, defendant alleges that, in the cross-examination of defendant's clinical neuropsychiatrist, the State also focused on the limitations of the physician's engagement: as solely an expert witness for hire and not as a treating physician.

Third, defendant complains that the State improperly examined on re-cross the director of the Atlantic County Youth Advocate Program[9] who, years before, had been assigned to work with defendant. In defendant's view, the State's inquiries as to what programs were in fact available to defendant after the witness was no longer responsible for defendant's care were not properly in response to the witness's admission on re-direct examination that she "should have pushed harder" on defendant's behalf when he was under the witness's care. This, defendant claims, "represents an especially low form of attack: casting aspersions on the witness'[s] sincerity and dedication by forcing her to acknowledge that she 'did not follow up with [defendant]' after leaving the job which was the basis for her contact with him." Fourth, defendant asserts that the prosecutor's rejoinder to the social worker who was retained on defendant's behalf to conduct a social history investigation of defendant was improper. Specifically, in response to the witness's statement to the prosecutor that she did not "feel comfortable relying on what [the prosecutor was] saying[,]" the prosecutor quipped that "the feeling is mutual, ma'am."

---

[9] According to this witness, the Atlantic County Youth Advocate Program was primarily funded through the New Jersey Division of Youth and Family Services (DYFS) and was designed to foster family unification and to keep youngsters out of the juvenile justice system. DYFS, formerly part of the Department of Human Services, was the State agency charged with the "care, custody, guardianship, maintenance and protection of children" in New Jersey. *N.J.S.A.* 30:4C–2(a). As part of a comprehensive overhaul of the provision of children and family services, effective July 1, 2006, the tasks performed by DYFS were transferred to the newly-created Department of Children and Families. *L.* 2006, *c.* 47, §§ 1 to 205 (codified at *N.J.S.A.* 9:3A–1 to –7. 1).

Finally, defendant argues that, in the cross-examination of defendant's developmental psychologist, who had a particular expertise in youth violence, the State improperly questioned the psychologist on the basis that his "orientation is not to focus on the injustices that the murderer committed, but the injustices that he experienced." Defendant also claims that the cross-examination of the developmental psychologist based on his prior writings in respect of the attacks on September 11, 2001 were gratuitous, inappropriate and inflammatory. The challenged question and answer were:

Q: Even in the context of the September 11th terrorist attacks, you wanted to uncover the injustices that the terrorists may have suffered, correct?

A: I want to understand everyone who commits a violent act. And terrorists have a developmental history. It is worth trying to understand it, particularly if you want to prevent it in the future.

Defendant contends that this exchange was aggravated by the fact that it had been reported in the newspaper that defendant was a Muslim.

The State asserts that "the prosecutor properly cross-examined [defendant's traumatic brain injury expert and clinical neuropsychiatrist] concerning their fees and their relationships with defendant because these matters were relevant to their partiality, bias, and motive, and hence, their credibility." In respect of the cross-examination of defendant's youth advocacy worker, the State argues that its questions focusing on the services made available to defendant after he was no longer in that worker's care were designed to challenge factually that witness's opinion, elicited by defense counsel, that defendant "was failed by" DYFS.

The State does concede that its rejoinder to the social worker who was retained to conduct a social history investigation of defendant that the "feeling is mutual[,]" that is, that the prosecutor similarly did not "feel comfortable relying on what [the witness was] saying[,]" was unnecessary. The State asserts, however, that the comment was brief, was intended to respond to those instances where the witness claimed that, without verification, she was unwilling to accept the factual premise of any questions posed by

the prosecutor, and was the subject of the following colloquy and curative instruction:

[Defense Counsel]: Judge, I object.

[The Prosecutor]: Judge, she said that two or three times. She made that reference to me.

[Defense Counsel]: He has indicated two times in front of the jury and this witness of things that are on the records that were not in the records, so she said I don't feel comfortable relying on it, I want to look at my report. The fact the feeling is mutual is an inappropriate commentary. She wanted to look through her own records. I don't think she said anything disparaging to the Prosecutor.

[The Prosecutor]: I took it differently.

[Defense Counsel]: I don't think it matters how he takes it. It is inappropriate, and I object to that.

The Court: Subject to that interpretation it is inappropriate comment of counsel and should be disregarded by the jury, and if counsel feels that [there are] inappropriate comments being made by the witness[,] that matter can be addressed to the Court for resolution.

The State notes that defendant neither requested further relief nor objected to the curative instruction given.

Finally, the State asserts that its cross-examination of defendant's developmental psychologist was proper because "[t]he prosecutor was entitled to cross-examine this witness about his extreme philosophical positions and professional opinions because they were relevant to his bias, interest, and partiality." The State also remarks that, "the fact that defense counsel indicated that he was going to move for a mistrial on this ground, but then never did and instead pursued an entirely different objection demonstrates that in the context of this trial, defense counsel did not believe that the prosecutor's question was improper or that it prejudiced defendant's right to a fair trial."

 Our review of the examination of these witnesses leads to the conclusion that the cross-examination of each of defendant's traumatic brain injury expert, clinical neuropsychiatrist, and developmental psychologist was proper inasmuch as it was geared towards developing whether each of these witnesses was biased or partial in favor of defendant, or whether any of these witnesses bore an interest in the litigation. We have made clear that

[a] prosecutor may suggest to the jury that the defense's presentation of the evidence was unbalanced and incomplete. A prosecutor's statements on the deficiency of a defendant's defense and the inferences to be drawn therefrom are permissible as long as they are grounded in the record. In assessing the worth of the defense's case, the jury is entitled to consider whether it was receiving a full picture, as interest and bias are always relevant.

[*State v. Josephs*, 174 *N.J.* 44, 127, 803 *A.*2d 1074 (2002) (citations and internal quotation marks omitted).]

Applying that standard, we hold that the cross-examination of defendant's traumatic brain injury expert, clinical neuropsychiatrist, and developmental psychologist properly addressed these witnesses' biases, interest and partiality and, hence, was proper.

Defendant's objection to the cross-examination of the youth advocacy worker also is unpersuasive. That witness testified that, in her opinion, defendant "was failed by" DYFS, a matter made relevant by defendant's claim in mitigation that "the State agencies responsible for protecting children from parental abuse and/or neglect did not succeed in protecting defendant." [10] In that context, cross-examination designed to elicit the knowledge this witness had of the services that in fact were offered to defendant after he was no longer directly in her care was crucial to the issue defendant himself placed in issue: the degree to which the State had failed defendant in his upbringing, a mitigating factor submitted by defendant under the "catch-all" mitigating factor provided in *N.J.S.A.* 2C:11–3c(5)(h) ("Any other factor which is relevant to the defendant's character, or record or the circumstances of the offense."). Furthermore, as opinion testimony, that witness was particularly susceptible to cross-examination.

We have made clear "[t]hat the credibility of a witness may be impeached on cross-examination is well settled [and that t]he scope of cross-examination is a matter resting in the broad discretion of the trial court." *State v. Martini*, 131 *N.J.* 176, 255, 619 *A.*2d 1208 (1993) (citations omitted). Further, in respect of the cross-examination of an expert, we have held that "an expert

---

[10] That mitigating factor was rejected by the trial jury by an 11–to–1 vote.

witness is always subject to searching cross-examination as to the basis of his opinion...." *Id.* at 259, 619 *A.*2d 1208 (citations and internal quotation marks omitted). In that context, we have held:

> That "the scope of cross-examination is a matter for the control of the trial court and an appellate court will not interfere with such control unless clear error and prejudice are shown" is well settled. *State v. Murray,* 240 *N.J.Super.* 378, 394 [573 *A.*2d 488] (App.Div.), *certif. denied,* 122 *N.J.* 334, 585 [*A.*2d 350] (1990). In addition, "an expert witness is always subject to searching cross-examination as to the basis of his opinion." *Glenpointe Assocs. v. Twp. of Teaneck,* 241 *N.J.Super.* 37, 54 [574 *A.*2d 459] (App.Div.), *certif. denied,* 122 *N.J.* 391[, 585 *A.*2d 392] (1990). To determine the credibility, weight and probative value of an expert's opinion, one must question the facts and reasoning on which it is based. *Johnson v. Salem Corp.,* 97 *N.J.* 78, 91 [477 *A.*2d 1246] (1984).
>
> [*Id.* at 263–64, 619 *A.*2d 1208.]

 We address the State's concession that the prosecutor's rejoinder to the social worker who was retained to conduct a social history investigation of defendant that the "feeling is mutual[,]" that is, that the prosecutor similarly did not "feel comfortable relying on what [the witness was] saying[,]" albeit unnecessary, did not deprive defendant of a fair trial for the following reasons: the comment was brief; the comment was intended to respond to those instances where the witness claimed that, without verification, she was unwilling to accept the factual premise of any questions posed by the prosecutor; and the comment was the subject of an immediate curative instruction.

To be sure, in this specific respect and in this context, we find the prosecutor's conduct to be, at the very least, "unnecessary." However, we also acknowledge that defendant's penalty phase trial was feverishly contested, and emotions ran high throughout the proceedings. In that framework, we recognize that

> we must not be so idealistic as to close our eyes to the realities of human nature as they are continually portrayed during our trial process. Each criminal trial is a swiftly moving dramatic contest which often evokes strong emotions in the participants. The charged atmosphere created frequently makes it arduous for the prosecuting attorney to stay within the orbit of strict propriety.
>
> [*State v. Bucanis,* 26 *N.J.* 45, 56, 138 *A.*2d 739 (1958).]

However unfortunate the exchange between the prosecutor and defendant's social worker may have been, we cannot ascribe to

this limited and immediately corrected instance the far-reaching implications defendant seeks. We instead hold that, although the prosecutor's gratuitous comment is worthy of disapproval, and is to be avoided, the exchange was not "so egregious as to deprive defendant of a fair trial" because that comment could not have "substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." *State v. Papasavvas (I)*, 163 *N.J.* 565, 625, 751 *A.*2d 40 (2000) (quoting *State v. Timmendequas (I)*, 161 *N.J.* 515, 575, 737 *A.*2d 55 (1999), *cert. denied*, 534 *U.S.* 858, 122 *S.Ct.* 136, 151 *L.Ed.*2d 89 (2001) (citations omitted)).

c. *Obstruction of the defense's examination of defendant's cousin.*

■ Defendant next objects to what he perceives as the prosecution's intentional obstruction of his cousin's direct examination. Defendant called his cousin [11] to the stand to plead for his life. At its core, defendant's complaint is that, although he ultimately was able to secure from his cousin all of the testimony he sought in an uninterrupted manner, defendant views the prosecution's earlier objections during her testimony as "unvarnished obstruction, in an evident attempt to circumvent the trial court's allowance of the testimony by impeding its delivery." In response, the State claims that "the prosecutor made appropriate, good faith objections to the testimony of defendant's cousin ... when her plea for mercy exceeded the permissible scope of relevant mitigating evidence [because defendant's cousin], in connection with requesting the jury to spare defendant's life, ... began discussing the difficulties of her own childhood."

The exchange on which defendant bases this objection bears setting forth in full:

---

[11] At the time of trial, defendant's cousin had been homeless for three years and was on medication for depression.

[Defense Counsel # 1]: If you had the opportunity, as I think you have at this point, to ask [the] jury to do something in terms of their decision, what would you like to say to the jury?

[The Witness]: To allow [defendant] to live because he hasn't really lived. He hasn't had a life growing up. None of us did.

[The Prosecutor]: You Honor, I'm going to object I think it has gone—

[Defense Counsel # 2]: I would object to him interrupting this witness after the Court already made a ruling indicating that she would be allowed to do it.

[The Prosecutor]: She's talking about her life, that is not relevant.

[Defense Counsel # 2]: Judge, Judge—

[The Prosecutor]: This Counsel is [Defense # 1's] witness.[12]

[Defense Counsel # 2]: Judge, I would like to finish my objection.

The Court: She may finish her answer.

[Defense Counsel # 1]: Judge, quite frankly I think it was inappropriate, and I will address this—for [the prosecutor] to interrupt this after the side-bar, I think was done deliberately to take her off—

The Court: I would ask counsel not to get into personalities. There was a ruling as to the subject matter that did not preclude whether the scope of the ruling was exceeded so—but I have ruled she may finish her answer.

[The Witness]: None of us did really. Uhm ... at least he is able to eat three meals a day; finish school—

[The Prosecutor]: Your Honor, this goes—Judge, I need to approach. This is—

[Defense Counsel # 1]: Judge, you made a ruling. And I think that we're supposed to be bound by the rulings that this Court made. And I would ask that the prosecutor be bound by the rulings as we are and let this witness finish her answer. He keeps interrupting the plea[ ] for life which is done, I submit, deliberately so that it doesn't have the import it would have.

[The Prosecutor]: The witness can't say whatever she wants. She is limited to what she can say.

The Court: I would agree, and you have the right to object on that subject matter. And my ruling on it is that the scope of the Court's ruling hasn't been exceeded yet, in any event.

Immediately following that exchange, the witness provided her very brief testimony on this point without interruption.

We agree with the trial court that the State properly sought to enforce the limitation placed on the scope of this witness's testimony, that is, that her testimony was to be limited to the claimed

---

[12] Because defendant was represented in his death penalty phase trial by two counsel, the trial court had barred a "tag-team" approach and had ordered that only one counsel could address a specific matter or witness at a time.

mitigating factor that defendant was raised in a home without structure, boundaries or positive role models which he could emulate, a mitigating factor also presented under the "catch-all" provision of *N.J.S.A.* 2C:11–3c(5)(h). When there is a reasonable and good faith expectation that a witness's answer to a question will exceed what is deemed proper under the circumstances, no party is required to sit idly by and allow impermissible testimony to be spread on the record. On the contrary, to the extent possible, the obligation of an advocate is to avoid trying to undo what may be impermissibly done as "[t]he failure to object promptly to questionable comments, although not fatal, may ofttimes result in not having the benefit of the trial court's exercise of its remedial powers on the propriety of the statements in issue[,]" *State v. Williams,* 113 *N.J.* 393, 452 n. 14, 550 *A.*2d 1172 (1988), and "[t]he courts have always had the obligation of preventing a jury, at least on objection, from hearing inadmissible evidence[,]" *State v. Phelps,* 96 *N.J.* 500, 515 n. 3, 476 *A.*2d 1199 (1984).

d. *Mention of a report prepared by a non-testifying defense expert.*

In its cross-examination of defendant's clinical neuropsychiatrist, the State referenced the report prepared by that expert. The following exchange then took place:

[The Prosecutor]: Did you know other people would be relying on your report?

[The Witness]: Of course.

[The Prosecutor]: Did you know that Dr. Gary Glass relied on your report, the defense psychiatrist?

[Defense Counsel # 2]: Can we be heard, please?

The Court: Counsel may approach.

Defendant objected to any reference to Dr. Glass, claiming that defendant "may never call Dr. Glass, and it is improper for him to be throwing names in front of this jury." The trial court then ruled as follows:

The issue, as I see it, is a narrow one. You have asked on cross-examination whether he anticipated that others would be relying on his report, and he got an

affirmative answer to that. You're now refining it with respect to Dr. Glass. The defense says Dr. Glass may or may not testify. He probably will, he might not, I guess is the fairest statement. I can't pin them down, but I have to act in a context—that's the context in which I act. You have got this witness'[s] anticipation of reliance, and if Glass comes on you can ask him whether he relied upon it.

The State made no further reference to Dr. Glass,[13] and defendant sought no curative instruction requesting that the jury disregard any mention of Dr. Glass.

Although satisfied with that resolution then, defendant now claims that "[b]y this maneuver, the State conveyed to the jury that the defense had consulted an expert but would not present him, with the clear implication that the defense was hiding an unfavorable opinion from the jury." Although it made no contemporaneous request for a jury instruction of any sort, defendant now claims that the trial court "did nothing to negate or correct the implication of the question[ ] that was asked."

Our review of this single, fleeting question and answer, in the context in which these events occurred, requires that we reject the result advanced by defendant. We fail to see how asking defendant's neuropsychiatrist whether he knew that another doctor had relied on the neuropsychiatrist's report results in the "clear implication that the defense was hiding an unfavorable opinion from the jury" as alleged by defendant. We are most persuaded by the fact that, at the time defendant objected to the question and the trial court sustained that objection, defendant did not seek a curative instruction. In the absence of a request for a contemporaneous curative instruction at trial, defendant's present complaint in respect of the absence of a curative instruction will not be heard. *See, e.g., State v. Bucanis,* 26 *N.J.* 45, 57, 138 *A.2d* 739 (1958) ("In most instances, under our system of jurisprudence, the onus is upon the lawyer to safeguard his client . . . through means available in the trial court. Defense counsel is not ordinarily free to scrutinize the record at his later leisure and to secure reversals

---

[13] The State, in its summation, made an inadvertent reference to Dr. Glass; the prosecutor immediately corrected himself and defendant did not object to this obvious slip.

upon the basis of what he thus discerns as error, unless it definitely comes within the scope of our plain error rule as we have interpreted it.").

### 3. *Objections to the State's Summation.*

■ We recently held that, "while a prosecutor's summation is not without bounds, '[s]o long as he stays within the evidence and the legitimate inferences therefrom the Prosecutor is entitled to wide latitude in his summation.' " *State v. R.B.*, 183 *N.J.* 308, 330, 873 *A.*2d 511 (2005) (quoting *State v. Mayberry*, 52 *N.J.* 413, 437, 245 *A.*2d 481 (1968), *cert. denied*, 393 *U.S.* 1043, 89 *S.Ct.* 673, 21 *L.Ed.*2d 593 (1969)). We underscored that " '[a] prosecutor may comment on the facts shown by or reasonably to be inferred from the evidence. There is no error so long as he confines himself in that fashion. Ultimately it was for the jury to decide whether to draw the inferences the prosecutor urged.' " *Ibid.* (quoting *State v. Carter*, 91 *N.J.* 86, 125, 449 *A.*2d 1280 (1982) (citations omitted)). Isolating small portions of the prosecutor's summation, defendant claims he was denied a fair trial. We disagree. When read in its entirety, the fair import of the State's closing argument is that the prosecutor exhorted the jury to arrive at its decision, beyond a reasonable doubt, by balancing the aggravating and mitigating factors. We therefore reject all of defendant's challenges to the State's summation.[14]

### a. *Equating the death penalty with justice.*

Defendant alleges that, in its summation, the State equated the imposition of the death penalty with the exaction of justice.

---

[14] Responding to defendant's motion for a mistrial following the State's summation, the prosecutor explained that much of what he argued in summation was "quoted from other cases that say you can say these things." We note in passing that, in respect of many of the closing argument instances challenged by defendant, the specific words to which defendant objects in fact are either identical or strikingly similar to arguments previously challenged and upheld by this Court.

Specifically, defendant complains of the following passages at the beginning of the State's summation:

> I thank you for your attention and your service in this case. At this moment I'm humbled with the responsibility to ask for justice on behalf of Richard and Shirley Hazard. We've seen their photographs to see how they once were, but they are not here. So I'm privileged to ask for justice.
>
> ....
>
> I'm sure you have an idea of the things I'm going to say. You probably have an idea of the things I'm going to ask you to do and based upon what we heard in this courtroom, I submit you know what your answers should be.
>
> You know what your answers must be. Based upon these Aggravating Factors this [d]efendant has gone too far. He has gone too far over the line. Society is entitled to make laws to protect citizens, to punish people who break those laws. Laws that talk about what a person can do and what a person can't do. I suggest the [d]efendant, based on these Aggravating Factors, has crossed that line beyond a reasonable doubt.

Defendant also complains of the following passage at the conclusion of the State's summation:

> From what we heard had occurred in that house [we] couldn't imagine worse nightmares. Who could have the stomach to watch what [defendant] did on video tape if there's a video tape available. He did it, he carried it out and he did it purposely and consciously. We suggest that the Aggravating Factors call out for death. [Defendant] says choose life. [Defendant] chose death twice over.
>
> You are not responsible for the choices that [defendant] made. Your commitment is to follow the law and render the truth. Only the twelve of you can do justice. Only the twelve of you can recognize the Aggravating Factors. Only the twelve of you can have the courage to make the right decision in this case. [The] State suggests the right decision is death.
>
> We ask you, as you promised that you would, to follow your oath. Follow the instructions of the Court wherever, wherever they may lead. You gave that commitment and we know how you've been following this case and we expect that you will do so.
>
> Despite [defendant's] total disregard of life, liberty, justice, he' s received a fair trial. Members of the community will judge him on his behavior. Unlike Richard and Shirley Hazard, he receives justice. I ask you to impose the death penalty because it is the only sanction that will serve truth and justice. I urge you to impose it.

Defendant argues that the "equation of death with 'justice' violates the noted prohibitions against encouraging a death verdict on the basis of a duty to society, as does the insinuation that jurors who did not vote to impose death would not be following their oaths."

The State responds that "[t]he overriding and unmistakable message was that the jury should sentence defendant to death based on evidence actually produced concerning aggravating and mitigating factors[,]" and that the prosecutor argued to the jury that "the jurors [should] 'not feel guilty' for following their oaths, and to have the courage to follow the court's legal instructions, 'wherever they may lead.' " According to the State, "[t]he prosecutor did not tell the jurors that they would violate their oaths if they failed to return a death verdict, but instead emphasized that the jurors must faithfully apply the law as instructed by the court, whatever the result."

Ruling on defendant's motion to set aside the death sentence, the trial court considered and rejected this argument. The trial court distinguished between what the prosecutor argued in summation in this case from those at issue in *State v. Pennington*, 119 *N.J.* 547, 575–76, 575 *A.*2d 816 (1990), and held that

[t]he references by the prosecutor were unrelated to the substantive issues in the case. They were not extensive, they were not inflammatory—it was the second sentence of his closing argument—and would not reflect any "intention[ ] 'to divert the jury from the material facts as to the worthiness of the victim[.]' " *State v. Marshall[ (I)*, 123 *N.J.* 1, 162, 586 *A.*2d 85 (1991) (quoting *State v. Pennington*, 119 *N.J.* 547, 571, 575 *A.*2d 816 (1990)) ].

The State is allowed under *State v. [Muhammad*, 145 *N.J.* 23, 678 *A.*2d 164 (1996) ], to make appropriate comment with respect to the uniqueness of the victims in balancing those issues against the non[-]statutory aggravating factors as the jury was instructed. So I don't find any overreaching by the prosecutor with regard to that. And I don't conclude that the prosecutor in anyway turned the victim impact evidence into non[-]statutory aggravating factors. Rather, the Court concludes that the prosecutor's conduct was not clearly and unmistakably improper so as to result in any substantial prejudice to the defendant or fundamental right to have a jury fairly assess the persuasiveness of the case; that simply doesn't exist here.

. . . .

There was no suggestion, the Court holds, that the jurors would violate the oaths. At issue here [are] the statements made by the prosecutor that, [t]he juror[s] should not feel guilty for what they are about to do if they were following their oaths. . . . The prosecutor's comments did not cross the bounds of propriety by telling the jurors that they needed a sense of courage to impose the death penalty. Instead here the prosecutor's statement emphasized to the jury that they should deliberate with courage and dignity, such encouragement is not inconsistent, I would hold, with our capital jurisprudence. The prosecutor's comments rein-

forced to the jurors that they have a grave task and did not in any way impermissibly minimize or otherwise prejudice the jury's decision making process.

. . . .

With regard to the argument [in respect of] defendant's lack of remorse, the prosecutor did comment on what was argued to be a lack of remorse and, accordingly, the absence of that as any appropriate mitigating factor. . . . The prosecutor responded[,] and I would hold[,] the appropriate way as to whether or not there was any true remorse. Upon the defendant placing remorse at issue, the State did not deprecate what the defense was doing, but [the State] deprecated the quality, the significance of the remorse in the closing argument[,] and that's appropriate.

. . . .

The prosecutor here in no way of course, in the Court's estimation, in anyway sought to diminish the jury's responsibility. The prosecutor I think said these words: You are not responsible for the choices that he made. Your commitment is to follow the law and render the truth. Only the 12 of you can do justice. Only the 12 of you can recognize aggravating factors.

In this particular case I would hold that there were no inferences from the statements which [the prosecutor] made that the prosecutor was in any way diminishing any of the jurors' responsibilities. I would say, rather, in the context of what he said, he did the opposite: he focused on the serious nature of their responsibilities.

We agree with the trial court's careful and thoughtful analysis. As we noted in respect of a similar challenge where the prosecutor uttered almost the exact words used by the State in this case,[15] the prosecutor's comments

did not jeopardize defendant's right to a fair trial and to individualized sentencing. Unlike the prosecutor whose statement we objected to in *State v. Purnell*, 126 *N.J.* 518, 545 [601 *A.2d* 175] (1992), the prosecutor did not tell the jury that the only way to demonstrate courage would be to vote for death. To the contrary, he urged the jurors to have the courage to render a verdict in accordance with the evidence, however the verdict turned out. Specifically, he told them at one point during summation, "whatever your verdict is, we will all leave this courtroom with our

---

[15] In *State v. DiFrisco (II)*, the prosecutor argued to the jury that "only twelve of you can do justice. Out of twelve of you only twelve of you can recognize aggravating factors and only twelve of you can stand up, with the courage, stand up and make the right decision. The only correct decision here is the death penalty. Thank you." 137 *N.J.* 434, 475, 645 *A.2d* 734 (1994). By comparison, the prosecutor here argued to the jury that "[o]nly the twelve of you can do justice. Only the twelve of you can recognize the Aggravating Factors. Only the twelve of you can have the courage to make the right decision in this case. [The] State suggests the right decision is death."

heads held high." Moreover, the statements did not urge the jury to send a message to society, nor did they scare the jury into believing that a death sentence was needed to protect society from a man like defendant. See *[State v.] Rose*, 112 *N.J.* [454,] 521 [548 *A.*2d 1058] [ (1988) ] (criticizing prosecutor's statement to "send a message" to society); *[State v.] Ramseur*, 106 *N.J.* [123,] 321 [524 *A.*2d 188] [ (1987) ] (condemning prosecutor's statement that suggested that jury should impose death penalty "to protect society from crime"). We are satisfied that that statement by itself, or in conjunction with other statements, *see State v. Kelly*, 97 *N.J.* 178, 218 [478 *A.*2d 364] (1984) (stating that sum of statements may amount to reversible error, even where one would not by itself), was not so egregious as to warrant reversal.

[*State v. DiFrisco (II)*, 137 *N.J.* 434, 476, 645 *A.*2d 734 (1994).]

b. *Explanation that the jury should not "feel guilty" about imposing a death sentence.*

■ Defendant also takes issue with the following portion of the State's summation:

> You're not going to hear any discussion from me or from the Court about whether or not we should have a death penalty or not. Whether it's appropriate in our society. That's not what we're here for. We're here to apply the law of the State of New Jersey. The death penalty is the law of the State of New Jersey. So whether you agree or disagree with the death penalty, that's not the issue here.
>
> Do not feel guilty for what you are about to do in this courtroom. What you're doing is following your oath, doing your job.

In defendant's view, "the prosecutor's exhortation that the jury not 'feel guilty for what [it was] about to do' is merely the flip side of the illegitimate 'courage' argument."

In response, the State argues that "the prosecutor properly reminded the jurors to abide by their oaths to follow the law. He told the jurors to 'not feel guilty' for following their oaths, and to have courage to follow the court's legal instructions 'wherever they may lead.' " By way of contrast, the State notes that "[t]he prosecutor did not tell the jurors that they would violate their oaths if they failed to return a death verdict, but instead emphasized that the jurors must faithfully apply the law as instructed by the court, whatever the result."

We reject the notion that the State's summation was improper. In light of the mitigating factors claimed by defendant—the overwhelming majority of which sought mitigation of defendant's

confessed crimes based on elements of defendant's life, *supra*, 190 *N.J.* at 424–25, 921 *A.2d* at 969–70 (2007)—it was fitting and proper for the State to remind the jurors that they need not "feel guilty" if they returned a death sentence.

c. *Mischaracterization of death penalty phase as concerning what defendant "deserved."*

Defendant challenges a portion of the prosecutor's summation claiming that "the prosecutor thereby encouraged the jury to believe that imposing a death sentence was a matter of deciding what the defendant 'deserved.' " The closing argument language challenged by defendant follows on the heels of the State's argument that the jury need not "feel guilty" if it returned a death sentence and, placed in context, is as follows:

> Just so there's no misunderstanding, the death penalty is a greater punishment than life without parole. Some people may think maybe life without parole is the worse sentence. The law says it is not. The death penalty is the maximum sentence [defendant] can receive. So when it's all said and done, if you think [defendant] deserves the maximum sentence, he should get the death penalty. If you think he deserves the minimum sentence, he should receive some form of life imprisonment. [You] can't say he deserves the maximum sentence and give him life without parole. That can't be done based upon what the Judge tells you what the maximum sentence is here.

> Some of you may be thinking even though he deserves the maximum sentence, life imprisonment would be a greater punishment, a greater hell because every day he would think about what he did. You have heard about [defendant] and that would be a mistake because while he looks like an ordinary person, he thinks differently. He has no guilt. He has no guilt. So thinking that he will be thinking about what he did every day for the rest of his life is a mistake.

In response, the State argues that "the prosecutor used the word 'deserves' as a means of discussing the 'appropriate' sentences for defendant based on the aggravating and mitigating factors." In the State's view, "[t]he prosecutor's use of the word 'deserves' in this context could not possibly have encouraged the jury to impose death on the basis of 'revulsion,' or any other impermissible ground, particularly because the prosecutor did not use that word in conjunction with any discussion of defendant's 'unsympathetic' qualities."

We cannot give this portion of the State's closing argument the construction advanced by defendant. In our view, the prosecutor in summation properly asked the jury to weigh the proofs before it in their relevant context: the aggravating and mitigating factors identified by the State and defendant. *State v. Papasavvas (I),* 163 *N.J.* 565, 628, 751 *A.*2d 40 (2000) ("In capital sentencing each juror must individually determine whether each mitigating factor exists, and then individually decide whether the aggravating factors outweigh the mitigating factors beyond a reasonable doubt. The death penalty is imposed only if the jurors unanimously agree that the aggravating factors outweigh the mitigating factors.") (citations omitted). Read in its proper context, the prosecutor's argument in summation in respect of whether defendant "deserved" the death penalty was innocuous and, therefore, no error is present.

### d. *Comments concerning defendant's age.*

*N.J.S.A.* 2C:11–3c(5)(c) provides that, among the "mitigating factors which may be found by the jury or the court [is] . . . [t]he age of the defendant at the time of the murder[.]" Defendant was twenty-three years old when he committed the crimes to which he pled guilty and for which he was sentenced to death. As a result, defendant listed his age among the mitigating factors to be considered by the death penalty phase jury and, in his summation to the jury, defendant argued that his age should be a mitigating factor because defendant was only twenty-three at the time of the murders, because defendant's maturity had been adversely affected by his upbringing, and because his adolescent development had been interrupted by several incarcerations.

Defendant contends that the State's summation distorted the nature of that factor when the State argued that

[The defense] suggests you should give [defendant's age at the time of the murders of Richard and Shirley Hazard] some weight. We ask you, in deciding whether that has any weight, that you compare [defendant with] people in his peer group, people that are twenty-three years old. I would suggest that out of the

people who are serving their country in Iraq, putting their lives on the line, a number of them are under twenty-three years old.

I would suggest that people outside of that scenario that are twenty-three years old, that they're law-abiding. They work. They take care of their family. I suggest age is not a Mitigating Factor that should hold much, if any, weight.

What about the psychological age[,] maybe that means something because of his upbringing. He knew right from wrong and his experiences, the Judge is going to tell you, should play into it, experiences. Well, we know he started to get in trouble at a young age. He knew the consequences of getting in trouble. He knew getting in trouble[,] from experience[,] will land you in jail. He knew it. He didn't care. Consider that when you consider age.

Defendant asserts that "[t]o contrast the defendant with generalizations concerning other people of the defendant's age is, in fact, to argue that age, per se, is not relevant, because others of the same age are doing good or great things." He also argues that "by implying that only chronological age matters, the argument served to preclude consideration of relative maturity." Defendant concludes by claiming that "the introduction of Iraq in this context, to explicitly contrast the defendant with the most admirable people of his chronological age, is highly inflammatory." According to defendant, the prejudice he suffered as a result of the State's "distortion" of this mitigating factor is readily evident in the jury's unanimous rejection of that mitigating factor.

The State responds that "the prosecutor's comments were a direct and measured response to defense counsel's closing arguments regarding defendant's relative youth." As interpreted by the State, "[t]he prosecutor never suggested that defendant's age, *per se*, was not relevant." By way of contrast, the State argues that the prosecutor's "comments suggested the exact opposite— that defendant's age was indeed a relevant consideration, but that in this particular case it did not carry much, if any weight, given the magnitude of his crimes and his ability to distinguish right from wrong." The State notes that " 'the prosecutor was free to depreciate the significance of defendant's mitigating evidence' by comparing him to his peers[.]" *State v. Bey (III)*, 129 *N.J.* 557, 621, 610 *A.*2d 814 (1992), *supplemented by* 137 *N.J.* 334, 645 *A.*2d 685 (1994), *cert. denied*, 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995) (quoting *State v. Marshall (I)*, 123 *N.J.* 1, 164, 586

*A.*2d 85 (1991), *supplemented by,* 130 *N.J.* 109, 613 *A.*2d 1059 (1992), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993)). The State concludes that "the prosecutor appropriately focused the jury's attention on defendant's chronological age, as well as on his experiences and maturity, in urging the jury to reject defendant's age as a mitigating factor, or at least give it little weight."

Following the State's summation and defendant's motion for a new trial, the trial court rejected defendant's accusation that the State "distorted" the age mitigating factor. Denying defendant's motion for a mistrial immediately before the jury charge, the trial court held that "my understanding of the prosecutor's arguments is that his comments that were objected to were made in [the] context [of discussing the mitigating factors], so I would hold that it is within the bounds of fair comment." More specifically, denying defendant's motion for a new trial, the trial court held as follows:

> With regard to the arguments concerning defendant's age, this case and what occurred here [are] quite distinct from *State v. Bey.* For example, in *State v. Bey,* the prosecutor said, contrary to what the law is, Quote: So age, per se, is just not relevant. End quote. The Court does hold that age per se is relevant, and the statute makes it clear that age per se has some relevance.

> Here what the prosecutor did was endeavor to compare the defendant to his peers and was not telling the jury to reject age per se but was making an argument as to what weight and effect that should have on the jury's balancing process.

We have interpreted mitigating factor "c(5)(c) as requiring juries to consider both chronological age and maturity in determining the applicability of the age mitigating factor to relatively young defendants." *State v. Bey (III), supra,* 129 *N.J.* at 613, 610 *A.*2d 814. We have cautioned, however, that "the statutory language makes clear that juries should give greater weight to a defendant's chronological age." *Ibid.* As the State correctly notes, the comparison of defendant with those in his age cohort serving in the armed forces stationed in war zones abroad also was proper. *Id.* at 621, 610 *A.*2d 814 (endorsing comparison between eighteen-year-old defendant and "the fifty thousand people who are sta-

tioned in Saudi Arabia in our military, many of them are eighteen").

We fail to see how the prosecution's comments concerning defendant's age at the time of the murders in any way distorted the jury's application of the mitigating factor claimed by defendant under *N.J.S.A.* 2C:11–3c(5)(c). On the contrary, we embrace the trial court's reasoning when it held that "what the prosecutor did was endeavor to compare the defendant to his peers[,]" that the prosecutor "was not telling the jury to reject age *per se* [,]" but that, instead, the prosecutor "was making an argument as to what weight and effect that should have on the jury's balancing process." In that context, defendant's claim of "distortion" of the age mitigating factor must be rejected.

### e. *Name-calling.*

 Defendant asserts further prosecutorial misconduct or error in the State's summation claiming that the prosecution engaged in impermissible name-calling when he argued that "[f]rom what we know about [defendant] and Shirley and Richard Hazard, this is the case of the wolf taking the lives of the two helpless sheep and the facts cry out for death." Distinguishing the conduct we roundly condemned in *State v. Pennington,* 119 *N.J.* 547, 576–77, 575 *A.*2d 816 (1990), the State replies that "the prosecutor, on one single, isolated occasion, alluded to the 'wolf and sheep' metaphor to collectively refer to defendant and the victims" and that, in doing so, "[t]he prosecutor did not unfairly single-out and demean defendant with a degrading epithet, nor did this remark substantially prejudice defendant's fundamental right to have the jury fairly evaluate the merits of his defense."

We have explained that

[b]y no stretch of the imagination can it be said that describing defendant as a "coward," "liar," or "jackal" is not derogatory.... It is not fair to employ degrading epithets such as "[a] cancer," and "parasite upon society," "animal," "butcher boy," "young punk," "hood," "punk," and "bum[.]" ... Epithets are especially egregious when, as here, the prosecutor pursues a persistent pattern of misconduct throughout the trial.

[*State v. Pennington, supra,* 119 *N.J.* at 577, 575 *A.*2d 816 (citations omitted).]

We have also condemned references to a defendant as the "guest of honor," an "equal opportunity shooter," and, in respect of an African–American capital defendant, a "brother." *State v. Long,* 119 *N.J.* 439, 484, 575 *A.*2d 435 (1990). We have, therefore, "caution[ed] prosecuting attorneys that derogatory name-calling will not be condoned[,]" and we have "admonish[ed] prosecutors to be circumspect in their zealous efforts to win convictions." *State v. Williams,* 113 *N.J.* 393, 456, 550 *A.*2d 1172 (1988).

That said, the proper yardstick in this context remains whether the prosecutor's statement was improper and, if so, "whether the misconduct 'was so egregious that it deprived defendant of a fair trial[ ]' [including the] penalty phases of a capital trial[.]" *State v. Pennington, supra,* 119 *N.J.* at 565, 575 *A.*2d 816 (citations omitted). When measured against that standard, the prosecution's single metaphor comparing the relationship between defendant and his murdered victims to that of "the wolf taking the lives of the two helpless sheep" did not violate the proscription against name-calling and simply does not rise to the level where defendant's right to a fair trial is implicated. Therefore, we reject defendant's claim that the State engaged in impermissible name-calling.

f. *Improper focus on defendant's character.*

Again isolating discrete statements in the State's summation, defendant argues that, in three instances, "[t]he prosecutor further diverted the jurors from their proper function, and greased the skids towards aggravating factors and away from mitigating factors, by focusing the juror's attention toward the non-issue of the defendant's character." Placed in their respective context, defendant complains of the following highlighted statements:

> Now we heard from the testimony of the Hazard children, what that house represented to Richard and Shirley. It was home. It was about family. It's about safety. It's about children. What did that home represent to [defendant]? We suggest that home represented only an opportunity, an opportunity to take, an

opportunity to steal, an opportunity to destroy. He didn't look at that home as other people looked at it. This home was a way for [defendant] to get the things that he wanted. Whether taking a car, getting something to eat, buying new clothes, buying new jewelry, renting a hotel room for his friends. That's what this home represented to [defendant].

*Because in [defendant's] world everything is about him.* This isn't the case— something else we ask you to consider. This isn't a case where [defendant] chose to burglarize a home, an empty home. He wants surpri[s]e by the occupants. We suggest that [when defendant] chose, that he chose to burglarize an occupied home and why he did that was because it made this crime easier for him.

. . . .

How does it relate to Mrs. Hazard? Again, Mr. Hazard and Mrs. Hazard are separate Aggravating Factors. We talked about her coming home for the last time. [We s]uggest that [defendant] had some advanced notice. She wasn't able to get her groceries down that she had bought. She was assaulted from behind. What does [defendant] do to try and obtain the property of Shirley Hazard, to obtain the valuables? First of all, he picks her up, looks her in the eye and carries her over to the basement and throws her down the basement steps. *Doesn't he realize this is a human being? He doesn't care.* It's all about the property. He gets downstairs he follows her down there and she's in a ball. She's curled up. Must be in pain and for some reason he stretches her out, pulls her over to where her husband is, who has the [plastic] garbage bag [over his head]. Imagine she looks over and sees her husband with a garbage bag over his head. Defendant decides he's going to inflict some more violence upon her, but before he can do that, the dog, the loyal family dog sees what is happening and has a response that a dog would have. Goes over and starts barking or growling and [defendant] has a dilemma here. What do I do? I don't want to get bitten. Thinking, how do I solve this dilemma? He runs upstairs, gets that wooden spoon and starts to beat the dog with it. He knows what's going on here. He's thinking. It's not a seizure.

. . . .

What happens at that time [when defendant writes a letter to his friends after he has been arrested]? [Defendant] suggests that he is upset. Starts banging his head again. He's banging his head. I'm going to Ancora [a State psychiatric facility]. I'll put on the act of despondent, talking about suicide. This letter is written before Sergeant Bennett gets down there. He's going to Ancora. Two and a half days after the murder.

*I suggest that all human beings have some kind of light in them, some kind of compassion, some kind of remorse. [Defendant] never had the light. It is out.* He's incapable of remorse. He's not going to be remorseful today, one year from now or sixty years from now, he's not going to have any remorse.

[ (emphasis supplied).]

In defendant's view, "[s]uch trial by invective is improper, particularly in light of the State's declining to claim the depravity aggravating factor" under *N.J.S.A.* 2C:11–3c(4)(c).

The State responds by pointing out that "defendant's contention that his character was a 'non-issue' is starkly contradicted by his urging that mitigating factor (5)(h)—which permits the jury to consider 'any other factor which is relevant to the defendant's character or record or to the circumstances of the offense'—was applicable." The State emphasizes that "[h]ere, where defendant alleged 14 separate (5)(h) mitigating factors, certain aspects of his character certainly were at issue, and the prosecutor was entitled to comment on them in his summation."

Taken in context, each of the challenged comments was fair comment in response to defendant's presentation. In respect of the first challenged comment, that in defendant's "world everything is about him[,]" the State's reference was to the burglary of the Hazard home to which defendant pled guilty and which formed an explicit part of the aggravating factors urged by the State. In respect of the second challenged comment of whether, while he was brutalizing Mrs. Hazard, defendant "realize[d] that this is a human being" and that he did not care, as well as the third comment that defendant does not have the "light" of compassion or remorse in him, we hold that, because defendant placed his character at issue by virtue of several of the mitigating factors he placed before the jury, it is entirely relevant, and proper, for the prosecution to respond as it did. In sum, we hold that none of the challenged comments improperly placed defendant's character in issue and, hence, defendant's objections thereto are unavailing.

## IV.

### JURY INSTRUCTIONS ON REASONABLE DOUBT.

#### A.

Acknowledging the bedrock importance of the reasonable doubt standard to our system of criminal justice and for the avoidance of charging mistakes, we have adopted the following definition of reasonable doubt:

> The government has the burden of proving the defendant guilty beyond a reasonable doubt. Some of you may have served as jurors in civil cases, where you were told that it is necessary to prove only that a fact is more likely true than not true. In criminal cases, the government's proof must be more powerful than that. It must be beyond a reasonable doubt.
>
> A reasonable doubt is an honest and reasonable uncertainty in your minds about the guilt of the defendant after you have given full and impartial consideration to all of the evidence. A reasonable doubt may arise from the evidence itself or from a lack of evidence. It is a doubt that a reasonable person hearing the same evidence would have.
>
> Proof beyond a reasonable doubt is proof, for example, that leaves you firmly convinced of the defendant's guilt. In this world, we know very few things with absolute certainty. In criminal cases the law does not require proof that overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If, on the other hand, you are not firmly convinced of defendant's guilt, you must give defendant the benefit of the doubt and find him not guilty.
> [*State v. Medina*, 147 *N.J.* 43, 61, 685 *A.*2d 1242 (1996), *cert. denied*, 520 *U.S.* 1190, 117 *S.Ct.* 1476, 137 *L.Ed.*2d 688 (1997).]

In so doing, we cautioned that our trial courts "will better serve the interest of justice if they do not attempt additional definitions of 'reasonable doubt.' Consequently we direct trial courts not to deviate from the definition contained in this opinion. The failure to adhere to the definition, over an objection, runs the risk of reversible error." *Ibid.* The requirement that the State shoulder its burden of proof beyond a reasonable doubt applies not only to the guilt phase of a capital murder trial, but also to the State's burden of proving that the aggravating factors outweigh any mitigating factors in the death penalty phase of a capital murder case. *State v. Biegenwald (II)*, 106 *N.J.* 13, 62, 524 *A.*2d 130 (1987) (holding that, in order to sustain death sentence, "as a matter of fundamental fairness the jury must find that [the] aggravating factors *outweigh* [the] mitigating factors, and this balance must be found beyond a reasonable doubt").

The trial court's instructions to the jury concerning reasonable doubt admittedly did not track, word for word, the instruction we adopted in *State v. Medina.* Defendant claims that the differences between the *Medina* charge and the one given by the trial court are significant and require a new death penalty trial. The State counters that the trial court in fact instructed the jury on

the concept of reasonable doubt twice, once preliminarily and then again when charging the jury; that the differences between the two charges are irrelevant; and that, in any event, defendant did not object to either charge as given and cannot demonstrate that the charges as given constitute plain error, that is, that they were "clearly capable of producing an unjust result[.]" *R.* 2:10–2.

## B.

After the jury was sworn but before the parties delivered their opening statements, the trial court issued preliminary instructions to the jury; these were reviewed in advance with the State and defendant. Among them were the following preliminary instructions concerning reasonable doubt:

> The burden of proving each element of the aggravating factors charged beyond a reasonable doubt rests upon the State. That burden never shifts to the defendant. It is not the obligation or duty of the defendant to prove that the aggravating factor or factors charged are not true. The Prosecutor must prove its case by more than a mere preponderance of evidence and yet not necessarily to an absolute certainty. The State has the burden of proving the aggravating factor or factors charged beyond a reasonable doubt.

> Some of you may have served as jurors in civil cases where you were told that it was necessary to prove only that a fact is more likely true than not true. Here the State's proofs must be more powerful than that, must be beyond a reasonable doubt. And a reasonable doubt is an honest and reasonable uncertainty in your minds about the existence of the aggravating factor or factors and/or the balance to be given after you have given full and impartial consideration to all of the evidence. A reasonable doubt may arise from the evidence itself or from a lack of evidence. It is a doubt that a reasonable person hearing the same evidence would have. Proof beyond a reasonable doubt is proof that leaves you firmly convinced of a given proposition.

> Now, in this world we know very few things with absolute certainty. The law doesn't require proof that overcomes every possible doubt but does require proof that leaves you firmly convinced of the proposition in question.

Defendant did not object to these instructions.

Again, at the close of the evidence, the trial court reviewed its proposed final charge with both defendant and the State. Both parties declared themselves satisfied with the portion of the charge addressing reasonable doubt. As a result, the trial court charged the jury on reasonable doubt as follows:

As I told you and as I'll remind you, the defendant does not have the burden of proving a mitigating factor or that he should be permitted to live. The ultimate burden rests upon the State to convince you beyond a reasonable doubt that the death penalty is the fitting and appropriate punishment in this case.

So the first burden of proof the State has is to show by evidence beyond a reasonable doubt that at least one of the alleged aggravating factors exists.
. . . .

Now, the second burden of proof which the State has is to show by the evidence beyond a reasonable doubt that any aggravating factors unanimously found by the jury outweigh the mitigating factor or factors beyond a reasonable doubt.

The State has the burden of proving the existence of any charged aggravating factors beyond a reasonable doubt.

Now, some of you may have served as jurors in civil cases where you were told that it was necessary to prove only that a fact is more likely true than not true. In criminal cases the State's proofs must be more powerful than that. It must be beyond a reasonable doubt.

Now, a reasonable doubt is an honest and reasonable uncertainty as to the presence of an aggravating factor or as to the result of the balancing of the factors in that balancing process existing in your minds after you have given full and impartial consideration to all of the evidence. A reasonable doubt can arise from the evidence itself or from a lack of evidence. It is a doubt that a reasonable person hearing the same evidence may have.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced as to the presence of the aggravating factor or as to the result of the balancing of factors process as I'll further describe that to you.

Now, in this world we know very few things with absolute certainty and in criminal cases the law does not require proof that overcomes every possible doubt. You must perform your duty separately for each murder. That means that your decision about the form of punishment for one murder shall not affect your decision about the form of punishment for the other murder.

Again, defendant did not object to these instructions.

### C.

▮▮▮▮▮ We address first whether, in the absence of a contemporaneous objection, defendant has properly preserved for appellate review his objections to the trial court's instructions on reasonable doubt. In this context, our court rules specifically provide that "a party, at the time the ruling or order is made or sought, shall make known to the court specifically the action which the party desires the court to take or the party's objection to the action taken and the grounds therefor." *R.* 1:7–2. *Rule* 1:7–2

also makes clear that "no party may urge as error any portion of the charge to the jury or omissions therefrom unless objections are made thereto before the jury retires to consider its verdict[.]" *See also* R. 1:8–7(a) ("Objections to the instructions to the jury shall be in accordance with *R.* 1:7–2.").

■ We have explained that the failure to object to a jury instruction requires review under the plain error standard. *State v. Bunch,* 180 *N.J.* 534, 541, 853 *A.2d* 238 (2004). That "requires demonstration of 'legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.' " *State v. Chapland,* 187 *N.J.* 275, 289, 901 *A.2d* 351 (2006) (quoting *State v. Hock,* 54 *N.J.* 526, 538, 257 *A.2d* 699 (1969), *cert. denied,* 399 *U.S.* 930, 90 *S.Ct.* 2254, 26 *L.Ed.2d* 797 (1970)). We have emphasized that "[t]he alleged error is viewed in the totality of the entire charge, not in isolation[,]" and that "any finding of plain error depends on an evaluation of the overall strength of the State's case." *Ibid. State v. DiFrisco,* 137 *N.J.* 434, 491, 645 *A.2d* 734 (1994). *See also State v. Chew,* 150 *N.J.* 30, 82, 695 *A.2d* 1301 (1997) ("Because defendant did not object to the challenged instruction he has waived any challenge to the instruction on appeal. *R.* 1:7–2. This Court may reverse only if it finds 'plain error.' *R.* 2:10–2.").

Defendant was afforded repeated opportunities to object to the trial court's iteration of the reasonable doubt jury instruction. Yet defendant interposed no such objection. We review defendant's present complaints under the plain error standard.

■ "Because the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof, reasonable-doubt instructions must be considered in their entirety. Only those instructions that overall lessen the State's burden of proof violate due process." *State v. Medina, supra,* 147 *N.J.* at 51–52, 685 *A.2d* 1242 (citations and internal quotation marks omitted). For that reason, we reject

defendant's piecemeal dissection of the trial court's reasonable doubt charge. A comparison between the *Medina* reasonable doubt charge and the reasonable doubt instructions twice given by the trial court as a whole yields the conclusion that the differences between the two lie in two minor areas: the jury instruction on reasonable doubt given by the trial court modified the *Medina* instruction solely to tailor it to a penalty phase determination, as opposed to a determination of guilt, and the trial court's instruction did not include the last two sentences of the *Medina* charge. Clearly, the former differences—modification of the *Medina* charge to tailor it to a penalty phase trial—do not amount to a substantive distinction. The latter difference, the deletion of the last two sentences of the *Medina* charge, requires closer examination.

The closing sentences of the *Medina* charge instruct the jury as follows:

> If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If, on the other hand, you are not firmly convinced of defendant's guilt, you must give defendant the benefit of the doubt and find him not guilty.
> [*State v. Medina, supra,* 147 *N.J.* at 61, 685 *A.*2d 1242.]

Had the trial court sought to tailor these sentences for use in a penalty phase trial, those sentences would have read as follows:

> If, based on your consideration of the evidence, you are unanimously convinced that the aggravating factors(s) proven to exist outweigh the mitigating factor(s) beyond a reasonable doubt, you must so indicate and the court will sentence defendant to death. If, on the other hand, you are unanimously satisfied that the aggravating factor(s) proven to exist fail to outweigh the mitigating factor(s) beyond a reasonable doubt, or that you cannot agree on punishment, you must so indicate and the court will sentence defendant to life imprisonment without the possibility of parole.

Our comparison of these non-parallel versions leads us to conclude that the omission of these sentences from the charge did not slant the jury toward either choice: a death verdict, or the imposition of a sentence of life imprisonment without parole. Moreover, the verdict sheet specifically required that the penalty phase jury make one—and only one—of these determinations as the jury's verdict. Reading, then, the trial court's charge as a whole, the absence of these two sentences at the conclusion of the

reasonable doubt charge, standing alone, was insufficient to carry defendant's burden of demonstrating that the reasonable doubt instructions issued by the trial court in any way lessened the State's burden of proof. Hence, no due process violation exists, and we do not sustain defendant's complaint in respect of the trial court's reasonable doubt instructions to the jury.[16]

That said, nothing in this ruling is to be interpreted to lessen the obligation of our trial courts to hew precisely to the reasonable doubt language we expressly approved in *Medina*. For the avoidance of doubt, we re-emphasize our earlier caveat: "trial courts [are] not to deviate from the definition contained in [that] opinion [and t]he failure to adhere to the definition, over an objection, runs the risk of reversible error." *Supra*, 147 *N.J.* at 61, 685 *A.*2d 1242.[17]

## V.

## "PRESUMPTION OF LIFE" INSTRUCTION.

Equating "a presumption of life" in a death penalty phase trial with the constitutionally mandated presumption of innocence in criminal cases, defendant urges that we overrule that portion of *State v. Rose*, 112 *N.J.* 454, 545, 548 *A.*2d 1058 (1988), where we held that there was "no basis in the Capital Punishment Act, or in any principle of federal or state constitutional law, that would

---

[16] To the extent the reasonable doubt instruction set forth in *Medina* may differ from the reasonable doubt instruction set forth in *The Trial Judges Bench Manual for Capital Causes* (1999 ed.), the language required by *Medina* controls. We refer any such differences to the Model Criminal Jury Charge Committee for correction and resolution, if needed.

[17] In light of our consistently uniform jurisprudence governing appellate review of jury instructions, we see no need to adopt defendant's suggestion that any deviation from the precise reasonable doubt instruction language of *Medina* should trigger a *per se* rule of reversal. Our trial courts must retain the discretion to adapt canons of law for application to the circumstances pending before them, and a *per se* rule, akin to the one advanced by defendant, does not advance that purpose.

require the instruction approved in *[State v.] Biegenwald [ (II),* 106 *N.J.* 13, 524 *A.*2d 130 (1987),]* to be supplemented by a statement that the defendant is entitled to a 'presumption' against the death penalty." *See also State v. Moore,* 122 *N.J.* 420, 484, 585 *A.*2d 864 (1991) ("[N]o principle of state or federal constitutional law requires an instruction on any such presumption against the death penalty." (internal quotation marks omitted)). Relying on *Apprendi v. New Jersey,* 530 *U.S.* 466, 120 *S.Ct.* 2348, 147 *L.Ed.*2d 435 (2000), *Ring v. Arizona,* 536 *U.S.* 584, 122 *S.Ct.* 2428, 153 *L.Ed.*2d 556 (2002), and *State v. Fortin (II),* 178 *N.J.* 540, 843 *A.*2d 974 (2004), defendant asserts that "evolving Eighth Amendment jurisprudence and recent developments in both federal and State constitutional law ... supply the 'basis' that was missing at the time of the *Rose* and *Moore* decisions, and necessitate the instruction."

The State responds by noting that defendant neither requested such an instruction below nor objected to its absence from the jury charge. For that reason, the State contends, defendant's late insistence that the trial court had a *sua sponte* obligation to charge the penalty phase jury that defendant was entitled to a presumption of life must be gauged under the plain error standard. Finally, the State observes that no New Jersey case, and no jurisdiction in the United States that has not otherwise statutorily incorporated it, has required a presumption of life instruction.

Earlier, in *State v. Marshall (I),* 123 *N.J.* 1, 152, 586 *A.*2d 85 (1991), *supplemented by,* 130 *N.J.* 109, 613 *A.*2d 1059 (1992), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993), we rejected the argument defendant advances here: "Defendant raises as plain error the trial court's failure to instruct the jury that defendant was entitled to a presumption against the death penalty. We considered and rejected the identical argument in *State v. Rose,* [112 *N.J.* 454, 545, 548 *A.*2d 1058 (1988) ], and adhere to our ruling in that case." However, *Apprendi, Ring* and *Fortin* may have changed how aggravating factors are to be viewed by the finder of fact. In *State v. Martini,* 131 *N.J.* 176, 225, 619 *A.*2d

1208 (1993), we held that that aggravating factors are the functional equivalents of elements of a crime that, therefore, must be proven beyond a reasonable doubt. The question then becomes whether, just as a presumption of innocence applies to the elements of a crime, a presumption of life attaches to a death penalty phase jury's consideration of aggravating factors.

"[T]he presumption of innocence and the equally fundamental principle that the prosecution bears the burden of proof beyond a reasonable doubt [are] logically separate and distinct." *Taylor v. Kentucky*, 436 *U.S.* 478, 483, 98 *S.Ct.* 1930, 1934, 56 *L.Ed.*2d 468 (1978) (citing *Coffin v. United States*, 156 *U.S.* 432, 458–61, 15 *S.Ct.* 394, 404–05, 39 *L.Ed.* 481 (1895)). We also adhere to the view that "an instruction on the presumption [of innocence] is one way of impressing upon the jury the importance of [reaching its verdict based solely on the proofs adduced at trial,]" *id.* at 486, 98 *S.Ct.* 1930, and that it serves as a "safeguard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt[,]" *id.* at 487, 98 *S.Ct.* 1930 (citation and internal quotation marks omitted). We also have explained that "[a]n instruction to the jury on the presumption of innocence is often required in order to keep the State's burden of proof fully weighted and firmly in place." *State v. Ingenito*, 87 *N.J.* 204, 214, 432 *A.*2d 912 (1981).

That said, we need not reach the question whether a "presumption of life" instruction is required in a death penalty phase case. Even assuming such an instruction was either advisable or compulsory, the trial court, in addition to its charge to the jury that the State bore the burden of proof beyond a reasonable doubt, specifically instructed the jury that

> our Legislature has given you as a jury, and to each of you individually, the responsibility of deciding whether [defendant] is to be put to death or is to be subjected to imprisonment in the New Jersey State Prison System. That term will be either life imprisonment without the possibility of parole or life imprisonment of which a minim[um] of 60 years must be served before [defendant] is eligible for parole. The term of years to be imposed will be based on whether you find any aggravating factors to exist. If you find that an aggravating factor exists, and

[defendant] is not sentenced to death, then the punishment will be life imprisonment without the possibility of parole.

Although the trial court did not, in so many words, instruct the jury that it must presume a sentence of life imprisonment, it did instruct the jury that a death sentence could be reached only if (1) the jury found the existence of an aggravating factor beyond a reasonable doubt, and (2) the aggravating factor outweighed any mitigating factors. Moreover, defendant neither requested a "presumption of life" instruction nor objected to the instructions as given. Considering the jury charge as a whole, as we must, it cannot be said that the State's burden of proof ever shifted; it remained squarely with the State. Thus, under these circumstances, we see nothing in defendant's submission to justify the prophylactic change defendant seeks. In the end, we reject defendant's claim that he was entitled to a *sua sponte* instruction on the presumption of life.

## VI.

### *GRAND JURY REVIEW AND APPROVAL OF AGGRAVATING FACTORS.*

Defendant next contends that the failure to submit the aggravating factors to the grand jury violated his constitutional rights and, therefore, the rule of *State v. Fortin (II)*, 178 *N.J.* 540, 646, 843 *A.*2d 974 (2004), "should be afforded at least 'pipeline' retroactivity." However, for the reasons amply expressed in *State v. Fortin (II), supra,* 178 *N.J.* at 647–50, 843 *A.*2d 974, the requirement that aggravating factors and capital "triggers" must be submitted to the grand jury is to be given prospective application only. *See supra,* 190 *N.J.* at 422 n. 3, 921 *A.*2d at 968 n. 3 (2007).

## VII.

### *TENDER OF PHOTOGRAPHS OF DEFENDANT'S PARENTS.*

As a means of depicting the manner in which he was raised, defendant, on three separate occasions, sought to introduce

two photographs—one of his mother and one of his father—sent to him from his parents in Florida while he was incarcerated in Atlantic County awaiting trial, well after the facts that gave rise to defendant's prosecution. Defendant claims that these photographs, with the legends inscribed on the reverse of each photograph, "show the parents' indifference to their son's situation." Tethering the admissibility of these photographs to the mitigating factors relevant to his upbringing, and relying on the relaxed standard of admissibility attendant to death penalty proceedings, defendant claims it was error to refuse to admit the tendered photographs. In response, the State focuses on the requirements of *N.J.S.A.* 2C:11–3c(2)(b) and asserts that the photographs were neither relevant nor reliable and, hence, the trial court properly rejected them.

*N.J.S.A.* 2C:11–3c(2)(b) provides, in part, that "[t]he defendant may offer, without regard to the rules governing the admissibility of evidence at criminal trials, reliable evidence relevant to any of the mitigating factors." *See also State v. McDougald*, 120 *N.J.* 523, 549, 577 *A.*2d 419 (1990) ("In order to ensure that the jury imposes death only when the individual defendant is deserving of the punishment, the defense is allowed to introduce evidence in the penalty phase, that lies outside the rules of evidence."). By its own terms, then, that statute requires the satisfaction of a two-pronged test for admissibility of evidence tendered by a defendant in respect of mitigating factors during a death penalty phase trial: the proofs tendered must be reliable, and they must be relevant to one or more of the mitigating factors.

We have described the application of *N.J.S.A.* 2C:11–3c(2)(b) as follows:

[W]hen there is any doubt about admissibility of mitigating evidence, that doubt should be resolved in the defendant's favor. Evidence that fails the admissibility test under the strict rules of evidence should be admitted if relevant, and the shortcomings go to the weight of the testimony, properly relegating to the adversarial process the task of separating the wheat from the chaff. The trial court ultimately retains discretion to exclude evidence if its probative value is substantially outweighed by its speculative nature and the risk of confusion.

[*State v. Timmendequas (I)*, 161 *N.J.* 515, 630, 737 *A.*2d 55 (1999), *cert. denied,* 534 *U.S.* 858, 122 *S.Ct.* 136, 151 *L.Ed.*2d 89 (2001) (citations and internal quotation marks omitted).]

Here, the trial court balanced the probative value of these photographs against their speculative nature and the attendant risk of confusion they might engender. Ultimately, the trial court excluded the photographs for the following reasons:

Before the Court on additional grounds is an application to admit into evidence two photographs, one of the defendant's mother, the other of what I'll refer to as his father, there's an issue with regard to that but there's also proofs with respect to that.18 The photographs in question were taken and provided to the defendant post-homicide and were sent to him while he was in the county jail. For [the] reasons which follow I deny their admission, and I would incorporate by reference my prior determinations in this case.

Now, I will be the first to agree that the photographs are not particularly flattering. You have [defendant's mother] exhaling what? You don't know. It is obviously smoke. You have [defendant's father] pictured [with] what I previously described in the photograph[,] it is a cigar. It does not appear what is available as part of the picture to be a modified cigar in a sense of a blunt which ... is slit open and marijuana added. It's a small relatively thin cigar that he is smoking and I don't see in the photograph [any] indication that the cigar was the subject of modification with respect to CDS.

The purpose is to allow a jury to come to a conclusion with respect to the defendant's parents. It has little or no relevance in that respect because of its post-homicide nature.

The jury has heard a lot of testimony about the parents, about the upbringing and the like. What they are smoking or not smoking and whether they are high or not, any period in time after the defendant's incarceration for this offense has limited relevance, highly limited relevance. I guess you could argue that the conduct continued.

I would hold under the circumstances that it adds nothing and would sustain the objection.

No doubt, the simpler path would have been for the trial court to admit these photographs in evidence and allow the parties to argue their relevance and probative value to the jury; defendant could have argued that the photographs depicted the indifference with which he was raised, while the State could have argued that

---

18 There was an unresolved doubt whether the man identified as defendant's father was in fact his biological father. In any event, there was no doubt that the man identified as defendant's father was the person who, along with defendant's mother, raised defendant.

the photographs were irrelevant because they depicted recent events, without any link to defendant's upbringing. Moreover, because the point defendant sought to make with these photographs—that his upbringing left a great deal to be desired—had been extensively covered by other proofs properly before the jury, and because the photographs themselves were inconclusive of the point defendant sought to establish, any refusal to admit those photographs was harmless. *State v. Timmendequas (I)*, 161 *N.J.* at 631–32, 737 *A.*2d 55.

## VIII.

### *USE OF VICTIM IMPACT STATEMENTS.*

#### A.

■ Defendant raises two separate but related complaints in respect of the State's use of victim impact statements. First, defendant argues that "[t]he State presented victim impact evidence that far exceeded the bounds set by the Court for such evidence, in terms of length, content, and emotional and inflammatory nature." Second, defendant asserts that the State's victim impact evidence "was bolstered by a deliberate and improper demonstration by members of the victims' family group." In defendant's view, the aggregate of these failings require that defendant's death sentence be vacated and a new penalty trial held.

The State responds that the trial court "appropriately exercised its discretion when it made extensive revisions to the statements and determined that the final versions were admissible under *State v. Muhammad*, 145 *N.J.* 23, 678 *A.*2d 164 (1996)." The State also noted that "the trial court appropriately exercised its discretion when, at defense counsel's request, it issued a curative instruction and ameliorated any possible prejudice that could have resulted from the spectators' departure from the courtroom."

B.

The admissibility of victim impact statements in a capital case is of both constitutional and statutory dimension. *N.J. Const.* art. I, ¶ 22 ("Victim's Rights Amendment"); *N.J.S.A.* 2C:11-3c(6) (victim impact statement statute). *See also N.J.S.A.* 52:4B-34 to -49 ("Crime Victim's Bill of Rights"). Acknowledging, however, a potential for abuse, we have taken great care in defining the proper scope of admissible victim impact statements. *See generally State v. Muhammad, supra,* 145 *N.J.* at 47-48, 54-55, 678 *A.*2d 164 (explaining requirements for admissibility of victim impact statements, and setting procedural limitations for their use). *See also State v. Koskovich,* 168 *N.J.* 448, 497-99, 776 *A.*2d 144 (2001) (explaining application of Victim's Rights Amendment and victim impact statement statute).

The trial court scrupulously followed *Muhammad's* guidelines. Once defendant asserted reliance on the "catch-all" mitigating factor set forth in *N.J.S.A.* 2C:11-3c(5)(h) ("[a]ny other factor which is relevant to the defendant's character or record or to the circumstances of the offense."), but before the start of the penalty phase trial, the State notified defendant of the prosecution's intention to use victim impact statements. Defense counsel were provided the names of the victim impact witnesses the State intended to call so as to afford defendant the opportunity to interview the witnesses prior to their testimony. Further, only one survivor per victim was permitted to testify in respect of "each victim's uniqueness as a human being and to help the jurors make an informed assessment of the defendant's moral culpability and blameworthiness." The proposed victim impact statements were reduced to writings. The trial court then conducted a *Rule* 104 hearing and, after three separate efforts, the proposed victim impact statements were substantially redacted so that each was "factual, not emotional, and ... free of inflammatory comments or references[ ]" and "to ensure that its probative value is not substantially outweighed by the risk of undue prejudice or mis-

leading the jury." [19] As an additional prophylactic step, the trial court required that the victim impact statements be read first outside the presence of the jury so the trial court could gauge both the content and the delivery of the statements. Also, the trial court provided the required limiting instructions to the victims' family. Finally, the trial court ruled that "any comments about the victim impact evidence in ... summation should be strictly limited to the previously approved testimony of the witness."

In light of the foregoing, we reject defendant's assertions on appeal and we hold that, in each instance, the trial court's admission of the victim impact evidence and the State's use of that victim impact evidence was proper.

## C.

Defendant raises a related issue in respect of the victim impact evidence at the penalty phase trial. As noted earlier, *supra*, 190 *N.J.* at 453–55, 921 *A.*2d at 988–90 (2006), defendant contends that the State improperly interrupted defendant's presentation of mitigation evidence from defendant's cousin, a contention we have rejected. In the context of his cousin's direct testimony, defendant interposes an additional, separate objection based on the following. Immediately after her direct testimony was concluded, defense counsel noted on the record, albeit after the fact, that during the last portion of defendant's cousin's testimony, several

---

[19] The victim impact statement in respect of Richard Hazard, prepared by Mr. Hazard's son, Michael, spoke of Mr. Hazard's childhood and adolescence; Mr. Hazard's career in the United States Navy; Michael's and his siblings upbringing in the Hazard home; family events and celebrations in the Hazard home; Mr. Hazard's interests, hobbies, education, career, and community volunteer work; Mr. Hazard's relationships with his wife, children, grandchildren, and family pets; and the effect of Mr. Hazard's murder on his family. The victim impact statement in respect of Shirley Hazard, prepared by Mrs. Hazard's daughter, Helen, spoke of Mrs. Hazard's childhood, marriage to and relationship with Mr. Hazard; how Mrs. Hazard raised her family on a tight budget while Mr. Hazard was stationed abroad with the Navy; Mrs. Hazard's dedication to her family; Mrs. Hazard's reputation and kindness; Mrs. Hazard's fight against breast cancer; and the impact of Mrs. Hazard's murder.

members of the victims' family rose from their seats and left the courtroom. Defense counsel, conceding that no restrictions had been placed on the comings and goings of members of the public, requested that the trial court instruct all present that they were to remain seated until the witness's testimony was completed or a recess was called by the trial court. Defense counsel also requested that the jury be instructed that the victims' family's exodus from the courtroom was inappropriate and that no regard should be given to that event.

The trial court agreed in both respects and immediately instructed the jury as follows:

> Members of the jury, three persons just got up and walked out of the courtroom. I don't know whether you saw that or didn't see it, certainly I did and others did. Whatever their motive for getting up and walking out should play no role in your deliberation and should have no impact on your evaluation of this witness's testimony, if that was intended as some form of nonverbal comment on the witness's testimony, that would be inappropriate nonverbal comment and should be disregarded.

The cross-examination of defendant's cousin commenced following that instruction. Once that cross-examination was completed and the jury had left the courtroom, the trial court addressed the persons in the audience and instructed them as follows:

> Let me just say this to the persons who were spectators in the courtroom: an issue arose about a group of you getting up and leaving during the course of that witness's testimony. I haven't walked a mile in your shoes; I'm not, through God's grace, a family member of a victim, so I'm not sitting there in your shoes, but I have a job to do and the attorneys have a job to do. And my job is to see that things are fair to both sides. And any type of nonverbal comment, if that was intended as nonverbal comment, it is inappropriate during the course of any witness's testimony. So what I'm going to direct—obviously, it is a public courtroom, you have a right to be here and are welcomed to be here, but absent some kind of emergency, I'm going to direct that persons remain until a recess or until there is a break.

After that instruction was given to the public, the prosecutor spoke with members of the victims' family and later addressed the trial court:

> [The Prosecutor]: I want to put something on the record, what was talked about right before [your Honor] went off the bench. In speaking with the family, they had been told by members of the office and myself that if something got too upsetting, instead of making a scene in court which we didn't want to do, taint the

jury, that they should probably leave. In the courtroom it probably wouldn't have been a problem, they could have slipped out the back door, but here where they are seated and went all the way through—

The Court: So it was an upsetment issue? Is that what you are saying after you discussed it?

[The Prosecutor]: Yes, Judge.

[Defense Counsel # 1]: Well, I can certainly be sympathetic to that. I would ask then that the prosecutor let the family know what it is that they can anticipate relating to testimony because I think the timing of that was really problematic. She had testified for the whole time and it was kind of our conclusion and our one opportunity to plead for [defendant's] life, and to have people walk out in the middle of it is problematic so . . . .

The Court: Well, it is emotional for all concerned. It is emotional for the witness. It is emotional for the family who are here, so you have to have some understanding of that. So all I will do is direct that to the extent you are able to acquaint the family members with the anticipated testimony, and if they perceive there is [a] problem—

[The Prosecutor]: Judge, I wasn't aware that [defendant's cousin] was going to plead for [defendant's] life.

The Court: Fair enough. All right.

Although defendant requested and received an immediate curative instruction to the jury and a separate instruction to the victims' family—and interposed no contemporaneous objection to either—defendant now claims that the fact that several members of the victims' family left the courtroom during defendant's cousin's testimony was a "deliberate and improper demonstration by members of the victims' family group" that "bolstered" the victim impact evidence adduced by the State. In response, the State notes that, for the first time on appeal, defendant seeks to causally relate the victim impact evidence with the instance of three members of the victims' family exiting the courtroom while defendant's cousin pleaded for defendant's life. The State notes that the event involving defendant's cousin's testimony occurred more than one week before the State presented its victim impact evidence, and that defendant did not so object when the State presented its victim impact evidence.

 Central to the obligations of a trial court is the responsibility to insure that the jury remain fair and impartial throughout the proceedings. *State v. Bey,* 112 *N.J.* 45, 75 [548 *A.2d* 846] (1988) (*Bey I*). The

> jury's impartiality is significantly threatened by extraneous influences arising from contact with non-record facts. *Id.* at 74–76 [548 *A.*2d 846] (citation omitted). The determination of whether the appropriate response is a curative instruction, as well as the language and detail of the instruction, is within the discretion of the trial judge "who has the feel of the case and is best equipped to gauge the effect of a prejudicial comment on the jury in the overall setting." *State v. Winter,* 96 *N.J.* 640, 647 [477 *A.*2d 323] (1984) (citations omitted).
>
> [*State v. Loftin (I),* 146 *N.J.* 295, 365–66, 680 *A.*2d 677 (1996).]

In *State v. Loftin (I),* we rejected a claim that a spectator's outburst "amounted to victim impact evidence[.]" *Id.* at 366, 680 *A.*2d 677. Here, in contrast, there was no "outburst." Instead, the record discloses only the fact of three members of the victims' family simply walking out of the courtroom during the testimony of a defense witness. Upon defendant's application, the trial court immediately cautioned both the jury and the spectators. The record explains that these events were not intended as a form of silent protest, but to avoid an outburst "if something got too upsetting[.]" In this context, defendant's claim that these events were intended to "bolster" the State's victim impact evidence via "a deliberate and improper demonstration" lacks any support in the record and, hence, we reject it.

## IX.

### ESCAPE DETECTION AGGRAVATING FACTOR—N.J.S.A. 2C:11c(4)(f).

Defendant next contends that the escape detection aggravating factor is unconstitutionally vague and further asserts that it was not supported in the evidence in this case. We reject both contentions.

*N.J.S.A.* 2C:11–3c(4)(f) provides that among the aggravating factors the jury can consider is whether "[t]he murder was committed for the purpose of escaping detection, apprehension, trial, punishment or confinement for another offense committed by the defendant or another[.]" We have twice considered—and rejected—the claim that this aggravating factor is either unconstitutionally vague or overbroad. *State v. Papasavvas (I),* 163 *N.J.*

565, 619, 751 *A.*2d 40 (2000); *State v. Harvey*, 151 *N.J.* 117, 226, 699 *A.*2d 596 (1997). No different result obtains here.

We also reject defendant's contention that the jury's unanimous finding of the escape detection factor was not supported by sufficient evidence. Specifically, among the aggravating factors alleged by the State were that the separate murder of each of Richard Hazard and Shirley Hazard was committed for the purpose of escaping detection, apprehension, trial, punishment, or confinement, for another offense committed by defendant. Once the State concluded its case-in-chief in respect of the aggravating factors, including the escape detection aggravating factor, defendant moved to dismiss them, alleging that the State had failed to present evidence sufficient to support them.

The trial court denied defendant's motion. Applying the long-observed standard concerning the sufficiency of the State's evidence, that is, "whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt[,]" *State v. Reyes*, 50 *N.J.* 454, 459, 236 *A.*2d 385 (1967) (citing *State v. Fiorello*, 36 *N.J.* 80, 90–91, 174 *A.*2d 900 (1961), *cert. denied*, 368 *U.S.* 967, 82 *S.Ct.* 439, 7 *L.Ed.*2d 396 (1962)), the trial court recounted several items of evidence adduced by the State and noted that "[u]nder the totality of the circumstances there is sufficient circumstantial evidence to allow a fact finder to resolve this issue." When defendant renewed his motion at the close of the State's rebuttal evidence, the trial court again denied that application, noting that

[t]here's been no material change, as I recall the proofs and the status of proofs between the time that that motion was originally made as the State's direct case has been presented and now, and as a consequence, the determination now is and will be the same and for the reasons which I've given at the time applying the *State versus Reyes* criteria a reasonable jury could conclude, beyond a reasonable doubt—

. . . .

Backing up to *State versus Reyes*, giving to the State the benefit of the doubt on all proofs and legitimate inferences that can be drawn therefrom, a reasonable jury could conclude, beyond a reasonable doubt, that the Aggravating Factor has been proven.

So I deny the application.

Our independent review of the proofs adduced by the State in respect of the escape detection factor, whether direct, circumstantial or inferential, leads us to conclude that the rationale, analysis and conclusions of the trial court are unassailable: the State's evidence in its entirety, together with all reasonable inferences therefore, was more than sufficient for a reasonable jury to conclude, beyond a reasonable doubt, that defendant committed the murders of Richard and Shirley Hazard with "the purpose of escaping detection, apprehension, trial, punishment or confinement for another offense committed by the defendant[.]" *N.J.S.A.* 2C:11–3c(4)(f). We therefore reject defendant's challenges to the application of the escape detection aggravating factor to his death penalty phase trial.

## X.

### *OBJECTIONS TO THE STATE'S REBUTTAL PROOFS.*

#### A.

 Defendant next claims that the trial court erred in permitting the State's psychiatrist to testify in rebuttal as to certain statements defendant made to him in the course of a psychiatric evaluation. The specific statements defendant complains of are that, "in relating the details of the crime to him, the defendant had told [the State's rebuttal psychiatrist] both that [defendant] had kicked Mrs. Hazard twice *after* asking her where the money was, and that he did not know where the knife he had stabbed Mrs. Hazard with had come from." By way of contrast, defendant notes that, "[i]n his statements to the police, the defendant had not stated that he had kicked Mrs. Hazard to obtain an answer as to money from her, and had maintained that [his alleged accomplice] had given him the knife." The State responds that its psychia-

trist's testimony "was proper rebuttal to defendant's evidence regarding the purported existence of ... mitigating factors [c(5)(a) and c(5)(d) [20]], and the trial court appropriately issued two limiting instructions concerning the jury's use of that evidence." Thus, the State concludes, "[t]he trial court's evidentiary ruling was sound."

During the direct examination of the State's psychiatrist's rebuttal testimony, defendant objected to certain statements attributed to defendant in the psychiatrist's report. The trial court allowed the psychiatrist to testify to those statements, subject to two conditions: that the testimony be limited to defendant's "factual recitation of before the crime and after the crime" and that the jury be instructed that this testimony "is not being offered and cannot be considered by them as evidence on the existence of aggravating factors but only on whether a mitigating factor has been rebutted and to understand [the State's psychiatrist's] opinions and conclusions as to that issue." The trial court then issued the following cautionary instruction to the jury:

> Members of the jury, to understand my instructions that I'm about to give you, you have to understand where we are in the case at this point in time. You heard the State's direct proofs, you've heard the defense's direct case with regard to proofs with regard to the mitigating factors and to the extent that there was, in your recollection as well, any challenge to the aggravating factors. So we've had, State direct, defense direct, we're now on State rebuttal and that is before you and is going to be before you for a very limited purpose.
>
> This is not the opportunity for the State to reinforce claimed aggravating factors or establish new aggravating factors or to offer evidence on the existence of aggravating factors. It is not and cannot be used by you for that purpose. Rather, as [the State's psychiatrist] said at the beginning of his testimony, his purpose here was a limited one and that was to examine the defendant for a limited

---

[20] *N.J.S.A.* 2C:11–3c(5)(a) provides that, among "[t]he mitigating factors which may be found by the jury or the court [is that t]he defendant was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution[.]" *N.J.S.A.* 2C:11–3c(5)(d) provides that, among "[t]he mitigating factors which may be found by the jury or the court [is that t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired as the result of mental disease or defect or intoxication, but not to a degree sufficient to constitute a defense to prosecution[.]"

purpose and offer an opinion on the issues of extreme ... let me get the exact words because I keep forgetting it ... but defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired as a result of mental disease or defect or intoxication, or that defendant was under the influence of extreme mental or emotional disturbance.

So it's before you not—can't be used by you on the issue of whether aggravating factors exist or not, but to, on the State's behalf, offer evidence in rebuttal for your consideration, determination and evaluation as to whether or not those mitigating factors exist. So it is only before you and can only be used by you on the issue of the existence of mitigating factors.

Defendant did not object to this cautionary instruction.

The next day, the trial court again addressed the State's rebuttal psychiatric testimony in its charge to the jury:

And you'll recall during the testimony of [the State's rebuttal psychiatrist] that an issue arose concerning aspects of his testimony and I'll remind you of the limitations upon the way you may use the testimony from [the State's rebuttal psychiatrist] regarding what was told to him in the course of his interview of [defendant]. As I told you then and as I'll remind you now, rebuttal testimony was not the opportunity for the State to reinforce claimed aggravating factors or to offer evidence on the existence of aggravating factors. It cannot be used by you for that purpose. Rather, as [the State's rebuttal psychiatrist] said at the beginning of his testimony, he examined the defendant for a limited purpose: to offer an opinion on the issue of whether the defendant was under the influence of extreme mental or emotional disturbance or whether defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired as a result of mental disease or defect or intoxication.

So thus this evidence is before you only on the issue or the existence of mitigating factors and for no other purpose[, and it is] specifically not usable in the establishment of any alleged aggravating factor.

Defendant also did not object to this charge.

## B.

It is a central tenet of our jurisprudence that we "rel[y] upon the ability of jurors to faithfully follow a trial judge's instructions in deliberating on a defendant's guilt, and, in the capital context, the appropriate sentence." *State v. Muhammad,* 145 *N.J.* 23, 52, 678 *A.*2d 164 (1996). We acknowledge that "[w]hile there is no way to assure that a jury adheres scrupulously to the mandate of a limiting instruction, there is no reason to

believe that jurors will not act responsibly in performing their duty." *Ibid.* On the contrary, "[t]he entire structure of the penalty phase of capital cases is premised on the belief that jurors will use evidence only for its proper purpose." *Ibid.* In the context of instructions concerning the admissibility of evidence, we provide that "a trial court's evidentiary rulings are entitled to deference absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment." *State v. Brown,* 170 *N.J.* 138, 147, 784 *A.*2d 1244 (2001) (citation and internal quotation marks omitted). Thus, "an appellate court should not substitute its own judgment for that of the trial court, unless the trial court's ruling was so wide of the mark that a manifest denial of justice resulted." *Ibid.* (citation and internal quotation marks omitted).

Applying those standards, we reject defendant's attack on the statements made by the State's rebuttal psychiatrist for several, interrelated reasons. First, the complained of statements were those of defendant himself, statements that were otherwise admissible hearsay pursuant to *N.J.R.E.* 803(b)(1). Second, defendant's statements to the State's rebuttal psychiatrist concerning defendant kicking one of the victims and the location from which defendant secured the knife he admittedly used to kill both victims certainly were relevant to defendant's claimed mitigating factors. *See N.J.R.E.* 401 (" 'Relevant evidence' means evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action."). Finally, we note the diligence with which the trial court twice—once when the proofs were adduced and again in its final charge to the jury—cautioned the jury as to the appropriate use of that testimony, instructions we must presume the jury strictly observed.

In light of the foregoing, the trial court's exercise of discretion to allow these statements was neither an abuse of discretion, nor a "clear error of judgment," nor "so wide of the mark that a manifest denial of justice resulted." We therefore reject defendant's challenge to the admission of his statements to the State's rebuttal psychiatrist.

## XI.

### *INTERFERENCE WITH JURY SELECTION.*

#### A.

■ Defendant also argues that he is entitled to either a new penalty phase trial or, at the least, a remand for a taint hearing because of a claimed interference with "defendant's right to a fair and impartial jury[.]" At its core, defendant argues that there was an informal, social contact between a secretary in the Prosecutor's Office and a member of the jury panel that resulted in that potential juror being excused, and that "due process and fundamental fairness were violated by such blatant and unethical conduct[.]" In response, the State notes that the potential juror was excused by consent after he explained that his judgment "might be [a] little steered differently" because the social interaction he had could impact his ability to judge the testimony of one of the prosecution witnesses. The State also notes that, once that potential juror was excused, there simply was no basis on which to strike the entire jury panel.

During jury selection, one of the prosecution witnesses, Det. Joseph McFadden, was shot in the face during an unrelated homicide investigation and was hospitalized in critical condition. Due to McFadden's unavailability as a witness, the State sought an adjournment. Although the trial court initially denied the State's application, it later granted an adjournment of three months. During that hiatus, one of the potential jurors continued to coach youth sports; among his charges was the son of a secretary employed by the Prosecutor's Office. The child missed a game the day McFadden was shot. Speaking to the mother on a later date, she explained to the potential juror that her son's absence was due to the fact that one of her friends—McFadden— had been shot and she was quite upset as a result. According to the potential juror, he did not relate the shooting to defendant's case because he did not realize that McFadden was a witness in defendant's case. During a later conversation with the mother,

the potential juror told her that he was among the jury pool in defendant's case and she told the juror that she had worked on defendant's case in the Prosecutor's Office.

When jury selection recommenced, all prospective jurors were asked to complete a supplemental questionnaire. In response to that questionnaire, this potential juror indicated that someone "had spoken with [him] about the case since the date of [his] jury interview;" that he had "heard [someone] discuss or [he had] discussed the case or the people involved in it ... since the date of [his] jury interview;" and that he knew or had heard something "about this case or any of the people involved in it, since the date of [his] jury interview[.]" The trial court then examined this potential juror and ascertained the contacts described above. The trial court also invited both counsel to examine the potential juror; only defense counsel elected to examine the potential juror.

Once the examination of the potential juror was completed, all parties agreed that he should be excused. Defendant then complained about the actions of the secretary, alleging that, after she was aware of the potential juror's status in respect of this case, she should not have told the potential juror that she had worked on this case. Claiming that this potential juror was one defendant specifically wished to retain on the jury, defendant sought to examine the secretary under oath, a request the trial court granted. Both the trial court and defense counsel questioned her. There were some differences between her recollection of the events and the potential juror's testimony; however, the trial court credited her recall.

Conceding that no juror tampering had occurred, defendant nonetheless moved to dismiss the entire jury panel. Defendant's focus was on the loss of that potential juror, a juror defendant insisted he wished to retain. The State resisted that application, arguing that defendant was entitled to fair, impartial and death-qualified jurors, precisely what had been empanelled. The State noted that defendant could have, but did not, request that the jury venire be expanded and that defendant's complaints about the

composition of the jury as empanelled were belied by the fact that defendant exercised only fifteen of his allotted twenty peremptory challenges.

The trial court denied defendant's motion. Its complete reasoning is informative and, for that reason, is set forth in full:

Before the Court is a motion to strike the panel and implicit[ ] in that application [is] to commence selection of the panel anew. For [the] reasons which follow, I deny the application. My reasons are these: While clearly the defense does not consent and had to deal with the situation as it unfolded, the Court did adjourn this case for an initial period and a short subsequent period and that arose out of the absence of Detective McFadden. McFadden was shot in the face while involved in another matter at times material to this case. Needless to say, that was not a plan or strategy of anyone involved.

The defense isn't arguing it, but I merely note [that] what we have is an unforeseen set of circumstances. The unforeseen set of circumstances is superimposed on another unforeseen set of circumstances which was the death by heart attack of Sergeant Henry Carr, one of the other participants in the initial two statements of the defendant.

A trial, all things being equal, is a search for [the] truth. And subject [to] counter-veiling considerations which may affect that, the Court[ ]—should be ... permitted to structure a matter so that the fact-finder can have the best available information from the respective sides as to what occurred[,] and that is the dynamic of the adjournment.

While things happen in the passage of time, and I'll get to the [potential juror] matter in a moment, but the mere inadvertent dynamics of the passage of time are not such as to require this Court to start anew with another panel.

Now, with respect to the [potential juror] issue. There are some differences between the testimony of what [the potential juror] said and what we just heard from [the Prosecutor's Office secretary]. Having said that, I am satisfied to find for the purpose of this hearing that the contact was inadvertent. It was not designed but rather, arose out of community activity, sports related with respect to their children involving both [the secretary] and [the potential juror]. It was not where someone set out to contact or set out to do something.

Now, with respect to the first aspect of the distinctions between [the potential juror] and [the secretary], there may or may not be a distinction in their testimony. I say that because it is clear and I accept the witness today was quite upset when she learned of what transpired with respect to McFadden and was talking about it to those who were at the sporting event which she described. Apparently [the potential juror] was one of those present there at the sporting event. From her perspective it was not directed specifically at [the potential juror] or even at [the potential juror], although he was probably there to either hear or learn of it secondhand.

Somewhat more problematic is the issue with respect to what occurred thereafter. It's his testimony that she was aware that he was a member of the panel.

She said she didn't know that. What one remembers and another may or may not [may be] material distinctions, but what occurred here again is through inadvertence as opposed to any type of effort to in any way influence the jury. Her testimony is necessarily totally contradictory to [the potential juror]. In any event, it is clear that when he became aware of her friendship, this was one with McFadden, this was one of the things that ... caused him to reflect on his ability to be fair and impartial. What we have I think is an inadvertent series of contacts and by reason of his excusal I think for the purposes of this it ends the issue, so I do deny the motion with respect to the panel.

## B.

Because the trial court examined both the potential juror and the secretary, and thereafter made factual findings based on that testimony, our review of the trial court's findings is guided by

[c]ertain broad principles [that] are paramount and helpful in an appellate court's approach to this aspect of the decision-making process.... It must review the record in the light of the contention, but not initially from the point of view of how it would decide the matter if it were the court of first instance. It should give deference to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.

The aim ... is rather to determine whether the findings made could reasonably have been reached on sufficient credible evidence present in the record. This involves consideration of the proofs as a whole.... When the reviewing court is satisfied that the findings and result meet this criterion, its task is complete and it should not disturb the result, even though it has the feeling it might have reached a different conclusion were it the trial tribunal. ....

But if the appellate tribunal is thoroughly satisfied that the finding is clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction, then, and only then, it should appraise the record as if it were deciding the matter at inception and make its own findings and conclusions. While this feeling of "wrongness" is difficult to define, ... it can well be said that that which must exist in the reviewing mind is a definite conviction that the judge went so wide of the mark, a mistake must have been made. This sense of "wrongness" can arise in numerous ways—from manifest lack of inherently credible evidence to support the finding, obvious overlooking or under-evaluation of crucial evidence, a clearly unjust result, and many others. This, then, is when and how the permissive power of [R. 2:10–5] should be utilized by the first appellate tribunal and is what our prior cases mean no matter how they have expressed it. [State v. Johnson, 42 N.J. 146, 161–62, 199 A.2d 809 (1964) (citations omitted).]

Accord State v. Locurto, 157 N.J. 463, 470–71, 724 A.2d 234 (1999); Beck v. Beck, 86 N.J. 480, 496, 432 A.2d 63 (1981). Because this

issue arises in the context of the jury selection process, the principles that govern the *voir dire* of the jury in a capital case further inform our analysis:

> It is axiomatic that an impartial jury is a necessary condition to a fair trial. "This requirement of fairness—and particularly jury impartiality—is heightened in cases in which the defendant faces death."
>
> In order to insure the impartiality of the jury, we have emphasized the critical importance of the *voir dire* in exposing potential and latent bias. Under our single jury capital trial system, jury selection must serve double duty as a time to death qualify jurors and to enable counsel to exercise the valuable constitutional prerogative of selecting a fair and impartial jury. In that dual setting, *voir dire* acts as a discovery tool. It should be like a conversation in which, without manipulation or delay of trial, the parties are able to discern the source of attitudes that would substantially interfere with the jurors' ability to follow the law. In order for this discovery procedure to be effective, potential jurors must have a full comprehension of their legal duties.
>
> [*State v. Papasavvas (I)*, 163 *N.J.* 565, 584, 751 A.2d 40 (2000) (citations omitted).]

Ultimately, we observe that *"[v]oir dire* procedures and standards are traditionally within the broad discretionary powers vested in the trial court [and] its exercise of discretion will ordinarily not be disturbed on appeal." *Id.* at 595, 751 A.2d 40 (citations and internal quotation marks omitted). *See also State v. Williams*, 113 *N.J.* 393, 410, 550 A.2d 1172 (1988) (same); *State v. Singletary*, 80 *N.J.* 55, 62, 402 A.2d 203 (1979) (same).

Gauged against these standards, there was no error in respect of either the procedure utilized by the trial court in dealing with what the trial court aptly termed "an inadvertent series of contacts" or the findings it reached. On the contrary, by immediately questioning the potential juror and determining whether there was a taint and, if so, whether it extended beyond that single potential juror, the trial court hewed to the procedure we explicitly endorsed in respect of mid-trial juror taint, *State v. R.D.*, 169 *N.J.* 551, 557–61, 781 A.2d 37 (2001), one we now extend to allegations of taint in the pre-trial jury selection process.

Under *R.D.*, the overarching relevant inquiry is not whether the trial court committed error, but whether it abused its discretion. *Id.* at 559, 781 A.2d 37 ("The abuse of discretion standard of review should pertain when reviewing such determinations of a

trial court."). That is so because "[a]pplication of that standard respects the trial court's unique perspective [and w]e traditionally have accorded trial courts deference in exercising control over matters pertaining to the jury." *Id.* at 559–60, 781 *A.*2d 37. When we apply the abuse of discretion standard to the trial court's actions, we are well satisfied that the trial court properly exercised its discretion in denying defendant's motion to strike the jury panel. For that reason, we reject defendant's challenge to the trial court's refusal to strike the jury panel.

## XII.

### *CONSTITUTIONALITY OF THE DEATH PENALTY.*

Defendant and *amicus curiae* the Association of Criminal Defense Lawyers of New Jersey argue that New Jersey's death penalty statute, *N.J.S.A.* 2C:11–3c, contravenes the Eighth Amendment to the United States Constitution, *U.S. Const.* amend. VIII, and Article I, Paragraphs 1 and 12 of the New Jersey Constitution, *N.J. Const.* art. I, ¶¶ 1, 12. We disagree.

We reaffirm the views we expressed in *State v. Josephs,* 174 *N.J.* 44, 138, 803 *A.*2d 1074 (2002) (citations omitted): "We have upheld the constitutionality of New Jersey's death penalty statute in each and every year since we last examined the issue in 1987 in *[State v.] Ramseur[,* 106 *N.J.* 123, 524 *A.*2d 188 (1987)]. Nothing submitted in this appeal warrants departure from that uninterrupted chain of decisional law." That said, we add only the following.

In light of what may be evolving community standards, however, the continued vitality of the death penalty in New Jersey has been questioned. During the pendency of this appeal, the Legislature adopted *P.L.* 2005, *c.* 321, §§ 1 to 5, effective January 12, 2006, which established the New Jersey Death Penalty Study Commission. That commission was charged with the responsibility to "study all aspects of the death penalty as currently administered in the State of New Jersey[,] ... propose new legislation, if

appropriate[, and] report its findings and recommendations to the
Governor and the Legislature, along with any legislation it desires
to recommend for adoption by the Legislature[.]" *Id.* at §§ 2b, 2c,
and 2k. The Act also imposed a moratorium on the execution of
any death sentence until "60 days after the issuance of the
commission's report and recommendations." *Id.* at § 3.

On January 2, 2007, the Commission filed its report with the
Governor, the President of the State Senate and the Speaker of
the State Assembly. *New Jersey Death Penalty Study Commis-
sion Report* (Jan. 2, 2007). It "recommend[ed] that the death
penalty in New Jersey be abolished and replaced with life impris-
onment without the possibility of parole, to be served in a maxi-
mum security facility." *Id.* at 2. That recommendation is both
prospective and retroactive in its application. *Id.* at 75–76 (pro-
posing, among several statutory amendments, that "[a]n inmate
sentenced to death prior to the date of the passage of [the] bill
[abolishing the death penalty], upon motion to the sentencing
court and waiver of any further appeals related to sentencing,
shall be resentenced to a term of life imprisonment during which
the defendant shall not be eligible for parole"). Bills implement-
ing that recommendation have been introduced in both the Senate
and the Assembly. *See* S.B. 163, 212th Leg. (N.J.2007); Assemb.
B. 1732, 212th Leg. (N.J.2007). Neither Bill has been adopted to
date.

## XIII.

### *PROPORTIONALITY REVIEW.*

#### A.

According to defendant, his death sentence is disproportionate
and, therefore, cannot be sustained. The State, on the other hand,
asserts that "defendant cannot show that his death sentences are
disproportionate" because "he was not singled out for capital
prosecution and ... his death sentences are not a freakish aberra-
tion."

## B.

Our task in determining whether a death sentence is disproportionate is statutorily mandated:

> Upon the request of the defendant, the Supreme Court shall also determine whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Proportionality review under this section shall be limited to a comparison of similar cases in which a sentence of death has been imposed under subsection c. of this section.
>
> [*N.J.S.A.* 2C:11-3e.]

We comply with that mandate by engaging in a progressive analysis. As a threshold matter, the statute requires that a death penalty defendant first request that we conduct a proportionality review of his death sentence. *Ibid.* Once a request for proportionality review has been made, we define our task as follows:

> [W]e engage in proportionality review "to ensure that the death penalty is being administered in a rational, non-arbitrary, and evenhanded manner, fairly and with reasonable consistency." To that end, proportionality review focuses on whether a specific defendant's death sentence is inconsistent with the penalty imposed in comparable cases. The defendant must demonstrate that his or her death sentence is aberrant, arbitrary, or otherwise anomalous.
>
> [*State v. Timmendequas (II)*, 168 *N.J.* 20, 34, 773 *A.2d* 18 (2001) (citations omitted).]

In our graduated review of the proportionality of a defendant's death sentence, we first define the cohort of cases against which we must compare defendant's death sentence. *Ibid.* ("In order to compare this case with similar death-eligible cases, we must first determine the 'universe' of cases from which we draw the comparison cases."). We cast a wide net, as we

> consider all death-eligible cases, rather than only death-sentenced cases. We also consider death-eligible cases "whether or not they were capitally prosecuted," because the decision not to seek the death penalty "is not necessarily a reflection of [the] defendant's lack of deathworthiness." Thus, all cases in which the defendant was eligible for the death penalty comprise the universe under consideration.
>
> [*Id.* at 35, 773 *A.2d* 18 (citations omitted).]

The process of determining the correct "universe" of cases for proportionality review is greatly aided by the database of all death-eligible cases maintained by the Administrative Office of the Courts (AOC). We have explained that

[t]he AOC has subdivided the cases into thirteen distinct categories of comparison cases. The AOC assigns cases for comparison to the following categories:[21]

(A) Victim is a Public Servant;

(B) Prior Murder Conviction without A above;

(C) Contract Killing without A–B above;

(D) Sexual Assault without A–C above (subdivided into (1) aggravated and (2) other);

(E) Multiple Victims without A–D above (subdivided into (1) aggravated and (2) other);

(F) Robbery without A–E above (subdivided into (1) home, (2) business, and (3) other);

(G) Torture/Depravity without A–F above;

(H) Abduction without A–G above;

(I) Arson without A–H above;

(J) Escape Detection without A–I above;

(K) Burglary without A–J above;

(L) Grave Risk without A–K above;

(M) Victim Under 14 Years Old without A–L above.

[*Id.* at 35–36, 773 *A.*2d 18.]

Once the relevant "universe" of cases has been defined, we "compare defendant's case to similar cases within the [appropriate] category." *Id.* at 37, 773 *A.*2d 18. We do so by "first conduct[ing] frequency analysis, and then we apply precedent-seeking review." *Ibid.* (citations omitted).

We have explained that frequency analysis "consists exclusively of the salient-factors test." *Ibid.* We have limited our frequency analysis to the salient-factors test because

[t]he salient-factors test allows us to measure the relative frequency of a defendant's sentence by comparing it to sentences in factually-similar cases. Its purpose is to help us determine whether the death sentence is imposed in a category of comparable cases often enough to create confidence in the existence of a societal consensus that death is the appropriate remedy.

---

[21] These categories track, although not sequentially, most of the statutory aggravating factors. *See N.J.S.A.* 2C:11–3c(4).

[*Id.* at 38, 773 *A.*2d 18 (quoting *State v. Martini (II)*, 139 *N.J.* 3, 33, 651 *A.*2d 949 (1994)).]

We have noted that

the objective is to determine whether the frequency of death sentences in similar cases involving defendants with similar culpability supports a determination that the death penalty in the case before us is or is not aberrational. The process compares a defendant's culpability with that of other death-eligible defendants. We measure the relative frequency of a defendant's sentence by determining the rate at which factually-similar cases culminate in a death sentence. The salient-factors test, demystified, is largely deductive, involving a simple "if-then" method of reasoning. If, in similar cases, the ratio of death sentences to penalty-trial cases or the ratio of death sentences to death-eligible cases is high, then the Court may interpret the relatively high rate of death sentencing as "strong evidence of the reliability of [the] defendant's death sentence."

[*Ibid.* (citations omitted).]

After the frequency analysis is performed, we turn to precedent-seeking review, where " 'we [have] examine[d] death-eligible cases similar to defendant's case to determine whether his death sentence is aberrant when compared to the sentences received by defendants in those other cases.' This is 'the traditional, case-by-case form of review in which we compare similar death-eligible cases.' " *Id.* at 40, 773 *A.*2d 18 (citations omitted). Our purpose in engaging in precedent-seeking review is to

determine whether a defendant's criminal culpability exceeds that of similar life-sentenced defendants and whether it is equal to or greater than that of other death sentenced defendants, such that the defendant's culpability justifies the capital sentence; or whether a defendant's culpability is more like that of similar life-sentenced defendants and less than that of death-sentenced defendants, such that the defendant's culpability requires a reduction of sentence to a life term. We note that statutory proportionality does not require identical verdicts even in closely-similar cases. It merely requires that the defendant was not singled out unfairly for capital punishment.

[*Ibid.* (quoting *State v. Martini (II)*, *supra*, 139 *N.J.* at 47, 651 *A.*2d 949 (citations omitted)).]

We have described the process of precedent-seeking review as

one familiar to us as judges and is not vulnerable to the concerns about reliability that burden frequency analysis. We have consistently placed our reliance on this form of review because of the analytic difficulties we have encountered in applying frequency analysis. Precedent-seeking review is less empirical and more analytical than frequency analysis. The exercise is more inductive, less formulaic.

[*Ibid.* (citations and internal quotation marks omitted).]

Precedent-seeking review requires that "we first examine the criminal culpability of the defendant." *Ibid.* We have divided that examination into "three components: the moral blameworthiness of the defendant, the degree of victimization, and the character of the defendant." *Ibid.* (citations omitted).

Addressing each of those components in turn, we have explained that "[b]lameworthiness requires consideration of motive, premeditation, justification or excuse, evidence of mental defect or disturbance, knowledge of helplessness of the victim, defendant's age or maturity level, and defendant's involvement in planning the murder." *Id.* at 41, 773 *A.*2d 18 (citations and internal quotation marks omitted). We have described the victimization component as "concern[ing] the relative violence and brutality of the murder [including any] injury to non-decedent victims." *Id.* at 42, 773 *A.*2d 18 (citations and internal quotation marks omitted). Finally, the last category "in determining overall culpability, defendant's character, is a catchall category that warrants consideration of defendants prior criminal history, unrelated acts of violence, cooperation with authorities, remorse and capacity for rehabilitation." *Id.* at 43, 773 *A.*2d 18 (citations and internal quotation marks omitted).

After the defendant's criminal culpability is examined, we have "review[ed] the comparison cases to determine if those similarly culpable to or more culpable than defendant generally receive life sentences rather than death sentences." *Id.* at 44, 773 *A.*2d 18 (citation omitted). That exercise was deemed necessary because "[s]uch a finding would support a claim of disproportionality, because it would provide evidence of a societal consensus that the death penalty is not imposed in cases similar to this one." *Ibid.* We engage in that exercise by

consider[ing] each comparison defendant's motive, premeditation, justification or excuse, evidence of mental disease, defect, or disturbance, knowledge of the victim's helplessness, age, involvement in planning the murder, violence and brutality of the murder, injury to nondecedent victims, prior record, other unrelated acts of violence, cooperation with authorities, remorse, and capacity for rehabilitation. With regard to the actual mechanics, we analyze each case to determine if defendant is more or less deathworthy than the

comparison defendant. If defendant is less deathworthy than a life-sentenced defendant, that conclusion supports defendant's claim of disproportionality. If, however, defendant is more deathworthy than a life-sentenced defendant, that detracts from defendant's claim. After we compare defendant to all of the comparison cases, we determine if the results demonstrate that cases more deathworthy than defendant's generally receive life sentences, which would strongly indicate disproportionality.
[*Id.* at 44–45, 773 *A.*2d 18 (citation omitted).]

Throughout our system of proportionality review, we remain mindful that "[t]he results of proportionality review may not obtain with syllogistic precision." *Id.* at 56, 773 *A.*2d 18. We view this as an "evolving process," having concluded, "[f]or the present, [that our] principles of proportionality review reflect and preserve a capital jurisprudence that is fair and just to all parties." *Ibid.* With those principles firmly in mind, we turn to the application of proportionality review in respect of defendant's death sentence.

### 1. *Universe of Cases.*

The AOC assigned defendant to the "E1" cell, a category of cases that involve multiple homicide victims which are "aggravated" by the commission of an additional felony. Excepted from the E1 cell are intra-family and rage killings, as well as killings that involve some sort of drug transaction between the defendant and the victim. The Attorney General agrees with, and the Public Defender has no comment on, the AOC's assignment.

### 2. *Frequency Analysis—Salient Factor Test.*

The following table reflects the outcome of the salient factors test of the E1/aggravated multiple-victims murders category; it includes the percentages for the E1 category both with and without defendant included.

| Category | Death-sentencing rate, all eligible cases | Cases advancing to sentencing | Death-sentence rate after sentencing |
|---|---|---|---|
| E1 | 23% (7/30) | 60% (18/30) | 39% (7/18) |
| E1 without Wakefield | 18% (5/28) | 57% (16/28) | 31% (5/16) |

In respect of the death sentencing rate for all eligible cases, the E1 category has a higher rate than all but the A (public servant), B (prior murder conviction), C (contract killing), and D1 (aggravated sexual assault) categories. We have observed that "the greater the frequency of death sentences in a class of cases, the more certain we are that a given death sentence is proportionate for any member of that class." *State v. Martini(II), supra,* 139 *N.J.* at 30, 651 *A.*2d 949. The following table shows the death-sentencing rate among all death-eligible cases in the five categories (two of which, categories D and E, contain two subcategories each) with the highest rates.

| Principal Salient Factor | Death-sentencing rate/all eligible cases [22] |
|---|---|
| A - Victim is a public servant | 50% (5/10) |
| B - Prior murder conviction | 35% (14/40) |
| C - Contract killing | 19% (5/27) |
| D - Sexual assault | 16% (10/64) |
| D1 - Aggravated sexual assault | 20% (10/51) |
| D2 - Other sexual assault | 0% (0/13) |
| E - Multiple victims | 9% (7/76) |
| E1 - Aggravated multiple victims | 18% (5/28) |
| E2 - Other multiple victims | 4% (2/48) |
| **All factors (including F-Q)** | 10% (57/570) |

Referencing the AOC report in respect of defendant's death sentence, defendant claims it is "noteworthy—in fact, striking—that every previous death sentence imposed in the E–1 category has been vacated and the defendant has received a sentence of life." Although reversed death sentences previously were not excluded from the statistical universe used in frequency analysis, *State v. Chew (II),* 159 *N.J.* 183, 198, 731 *A.*2d 1070, *cert. denied,* 528 *U.S.* 1052, 120 *S.Ct.* 593, 145 *L.Ed.*2d 493 (1999), "a reversed death penalty is a less persuasive indicator of deathworthiness

---

[22] Defendant's case is not part of the case universe because the universe only contains cases from 1983–2003.

than one that is affirmed." *State v. Bey (IV)*, 137 *N.J.* 334, 348, 645 *A*.2d 685 (1994). Defendant points out that he "is the only person currently assigned to the E–1 classification who *could* emerge from prosecution with an ultimate sentence of death." Moreover, defendant contends that because less than one-fifth of cases in the E1 subcategory resulted in death sentences, society has not indicated a consensus that death is the appropriate punishment in cases of this sort.

· The State responds that the overall death rate for E1 murders is significantly greater than the overall death sentencing rate of ten percent. Because "a greater percentage of aggravated multiple victim murderers advanced to a capital sentencing phase, received the death sentence after the penalty phase, and received the death sentence overall, than did all death-eligible murderers ... the statistics belie defendant's contention that his death sentences are an aberration." The State contends that the statistics prove that both prosecutors and juries view aggravated multiple murderers as particularly deathworthy.

We concur with the State's analysis of the salient factors test. The death sentencing rate for defendants assigned the E1 category is nearly double that of the entire universe of cases. The rate is not a statistically significant amount less than the rate for defendants in the D1 category, concerning whom we have rejected claims of disproportionality. *See, e.g., State v. Timmendequas (II), supra,* 168 *N.J.* at 39, 773 *A*.2d 18; *State v. (Ambrose) Harris (II),* 165 *N.J.* 303, 319–20, 757 *A*.2d 221 (2000). Because defendants in the E1 category advance to penalty trials and receive death sentences at a greater rate than all death-eligible defendants, defendant has failed to establish that his death sentences are disproportionate under the frequency analysis prong of proportionality review.

### 3. *Precedent–Seeking Review.*

In precedent-seeking review, the less empirical, but arguably more critical half of proportionality review, we compare

defendant's case with those of similarly situated defendants select-
ed from the category to which defendant was assigned for fre-
quency analysis. Again, the focus of precedent-seeking review is
on defendant's culpability, and the goal is to ensure that a
"defendant's criminal culpability exceeds that of similar life-sen-
tenced defendants and . . . is equal to or greater than that of other
death-sentenced defendants." *State v. Martini (II), supra,* 139
*N.J.* at 47, 651 *A.*2d 949. A defendant need not be equally
culpable as the other death-sentenced defendants, or more culpa-
ble than all the life-sentenced defendants. Rather, we engage in
precedent-seeking review only to eliminate the possibility that
defendant's death sentence is irrational or aberrant in light of the
sentences imposed in similar cases. *Id.* at 48, 651 *A.*2d 949.

The methodology employed in precedent-seeking re-
view is to conduct a case-by-case evaluation of a defendant's case
relative to statistically comparable cases. Those cases are select-
ed from the same universe of cases used in frequency review,
based on relevant statutory and non-statutory aggravating and
mitigating factors that are "rooted in traditional sentencing guide-
lines." *State v. Marshall (II), supra,* 130 *N.J.* at 159, 613 *A.*2d
1059. When considering non-statutory factors, we may only con-
sider factors that are objective, have been clearly submitted to the
jury, and are likely to have influenced the jury's decision. *State v.
Martini (II), supra,* 139 *N.J.* at 50, 651 *A.*2d 949; *State v. Bey
(IV), supra,* 137 *N.J.* at 368, 645 *A.*2d 685. Therefore, even if a
particular fact known to the trial court or to the jury because of
improper admission of evidence makes a defendant more "death-
worthy," that fact may not be invoked in precedent-seeking review
because it could not have been used either in the process of
finding or rejecting statutory factors or in the decision to impose
the death penalty. *See State v. Martini (II), supra,* 139 *N.J.* at
50, 651 *A.*2d 949.

Evidence bearing on a defendant's culpability can only
be considered to the benefit, not to the detriment of a defendant.
We do not consider aggravating circumstances that were not

clearly presented to the jury and thus not included in its delibera-
tive process. *See State v. Cooper (II),* 159 *N.J.* 55, 88, 731 *A.*2d
1000 (1999). However, we may consider mitigating factors, such
as age, that were rejected by the jury, *State v. Bey IV, supra,* 137
*N.J.* at 368, 645 *A.*2d 685, because even if a jury has rejected a
specific mitigating factor, it may still have been influenced by the
evidence in support of that mitigating factor in finding the catch-
all factor, *State v. Loftin (II),* 157 *N.J.* 253, 336, 724 *A.*2d 129
(1999). When considering the catch-all mitigating factor, we have
recognized that, although the defendant's jury may have rejected
a given enumerated mitigating factor, it may nevertheless have
been influenced by the evidence presented in support of that
mitigating factor. *See id.; State v. DiFrisco (III), supra,* 142 *N.J.*
at 185, 662 *A.*2d 442; *State v. Bey (IV), supra,* 137 *N.J.* at 368, 645
*A.*2d 685.

A defendant's culpability is measured according to factors fall-
ing under three general headings: moral blameworthiness, degree
of victimization, and character. *See State v. Martini (II), supra,*
139 *N.J.* at 48–49, 651 *A.*2d 949. In *State v. Papasavvas (II),* 170
*N.J.* 462, 790 *A.*2d 798 (2002), we described culpability analysis in
detail:

> We divide criminal culpability into three categories: the defendant's moral blame-
> worthiness, the degree of victimization, and the defendant's character. The
> components by which we measure a defendant's culpability are not disputed. In
> fact, they are catalogued in minute detail in our cases:
>
> 1. Defendant's moral blameworthiness
> a. Motive
> b. Premeditation
> c. Justification or excuse
> d. Evidence of mental disease, defect or disturbance
> e. No Knowledge of victim's helplessness
> f. No Knowledge of effects on nondecedent victims
> g. Defendant's age
> h. Defendant's involvement in planning the murder
> 2. Degree of victimization
> a. Violence and brutality of the murder
> b. Injury to nondecedent victim

3. Character of defendant
 a. Prior record
 b. Other unrelated acts of violence
 c. Cooperation with authorities
 d. Remorse
 e. Capacity for rehabilitation.

It would be fair to say that the foregoing list is a manifesto of the matters that are at the heart of a judgment regarding culpability—the assessment of good versus evil.

[*Id.* at 480–81, 790 *A.*2d 798 (citations omitted).]

Applying that framework, we analyze defendant's relative culpability as follows.

### a. *Moral blameworthiness.*

■ "Blameworthiness requires consideration of 'motive, premeditation, justification or excuse, evidence of mental defect or disturbance, knowledge of helplessness of the victim, defendant's age or maturity level, and defendant's involvement in planning the murder." *State v. Timmendequas (II), supra,* 168 *N.J.* at 41, 773 *A.*2d 18 (quoting *State v. Loftin (II), supra,* 157 *N.J.* at 336, 724 *A.*2d 129). We address those factors in order.

### (i) *Motive.*

Defendant concedes that the " 'escape detection' motivation has been termed 'highly blameworthy,' " *State v. Timmendequas (II), supra,* 168 *N.J.* at 41, 773 *A.*2d 18, but contends that it is less heinous than the desire to experience pleasure from killing—as in *State v. Ramseur, supra,* 106 *N.J.* at 209–11, 524 *A.*2d 188—or to obtain money by means of a contract killing—as in *State v. Marshall (II), supra,* 130 *N.J.* at 170, 613 *A.*2d 1059. Defendant also notes that "the contemporaneous killing of victims of an initial crime[ ] is in fact a common scenario, and entails a motivation qualitatively different from, and far less heinous than, the calculated killing of a witness who is not a victim of the crime, or returning to eliminate such a witness."

The State suggests that defendant's motive for robbery was greed, but stresses that the motive for killing—witness elimina-

tion—was unanimously found by the jury. The State suggests that the witness elimination element in this case was especially contemptible because both victims were totally incapacitated before defendant returned to the basement to kill them.

Although common logic would indicate that witness elimination is a relatively common motive for murder, it has nonetheless been found it to be "highly blameworthy." *State v. Morton*, 165 *N.J.* 235, 249–50, 757 *A.*2d 184 (2000). Thus, a defendant's "cold, calculating presence of mind" to attempt to "clean" the crime scene increases his blameworthiness. *State v. Harvey (III)*, 159 *N.J.* 277, 313, 731 *A.*2d 1121 (1999). Defendant's blameworthiness is further heightened by the fact that he likely could have completed the robbery without committing the murder. *State v. Feaster (II)*, 165 *N.J.* 388, 404, 757 *A.*2d 266 (2000), *cert. denied*, 532 *U.S.* 932, 121 *S.Ct.* 1380, 149 *L.Ed.*2d 306 (2001). Although there may be more blameworthy motivations, they do not serve as an excuse. Defendant's conduct and motive substantially exacerbate his moral blameworthiness.

### (ii) *Premeditation.*

Defendant suggests that while he may have premeditated the robbery, there is no evidence that he premeditated the murder. According to defendant, even the State's rebuttal psychiatrist could not say with certainty that the murder was not a robbery-gone-awry. Defendant contends that the relevant inquiry in respect of premeditation pertains to the murder and not to the underlying robbery.

In response, the State asserts that, despite discrepancies in defendant's statements owing to his attempts to blame an alleged accomplice, defendant admitted to planning the robbery at least ninety minutes prior to the time he actually committed the crimes. The State points out that defendant had sufficient time to consider his plan and retreat, but instead he chose to go forward. Finally, the State notes that, in at least one of defendant's statements, he

stated that he had brought the knife with him to the Hazards' home.

The evidence that defendant planned to rob the Hazards was overwhelming. He entered the Hazards' home—a home occupied by two elderly persons—armed with a knife. Shortly after gaining entry into the Hazards' home, defendant murdered Richard Hazard, a seventy-year-old man who represented no physical threat to him. Defendant then lay in wait until Shirley Hazard returned from her food shopping trip, and brutally murdered her. In the aggregate, these facts establish his premeditation, one that significantly increases defendant's moral blameworthiness.

(iii) *Justification or excuse.*

Defendant does not contend that his murders were justified, but "submits that a degree of 'excuse' is provided by his longstanding and severe mental problems." He suggests that those mental problems, combined with his troubled childhood, "underlay [defendant's] apparent loss of control and inhibition that resulted in the instant murders." The State, however, suggests that there is no evidence that the Hazards provoked defendant in any way so as to justify his killing them.

We need not abandon caution to conclude beyond any doubt that defendant had no justification whatsoever to kill the Hazards. If at all relevant, defendant's reference to his childhood and his mental problems is more appropriately considered as evidence of mental disease, defect or disturbance, not as a justification for his actions.

(iv) *Evidence of mental disease, defect or disturbance.*

Defendant submits that his "history of psychological problems, as probably caused, and certainly exacerbated, by his horrific childhood unquestionably explains, to the extent that they can be explained, [his] actions in this case." Defendant points out that three jurors found that he suffers from "neurologic dysfunction," and the State's rebuttal psychiatrist found that defendant suffered

from "Bipolar II disorder." Also, defendant points out that, in proportionality analysis, we "consider mitigating evidence 'even if the jury found it insufficient to establish a statutory mitigating factor.' " (citing *State v. Feaster(II)*, *supra*, 165 *N.J.* at 403, 757 *A.*2d 266).

The State acknowledges that three jurors found that defendant suffered from a neurological dysfunction. However, the State emphasizes that the jury unanimously rejected the mitigating factors relating to emotional disturbance and mental disease or defect. Although the State agrees that defendant did present evidence of a troubled upbringing and that some jurors found that evidence mitigating, the State suggests that, as in *State v. Timmendequas (II)*, *supra*, 168 *N.J.* at 42, 773 *A.*2d 18, "[d]espite this poor childhood and resulting debilitating effects on defendant, the evidence was not persuasive that defendant should be relieved of his culpability."

There indeed was some evidence that defendant suffered from an emotional disease or defect, and the jury heard a good deal of evidence recounting the questionable parenting techniques of defendant's parents. Although that evidence does not relieve defendant of culpability, it does tend to "reduce his moral blameworthiness." *State v. Timmendequas (II)*, *supra*, 168 *N.J.* at 42, 773 *A.*2d 18. In the end, however, the evidence of mental defect was contested by the State, thereby reducing its impact on defendant's blameworthiness.

### (v) *Knowledge of victim's helplessness.*

Defendant suggests that, while he knew that the male victim was old, he had no knowledge that he was disabled or enfeebled. Defendant therefore suggests that the factor "would appear to be at most average." The State points out that not only were the victims vulnerable because of their age, but defendant's method of attack made certain that they would be especially defenseless. By the time defendant delivered the fatal blows, both victims "had

been so severely assaulted that they were totally physically incapacitated, and utterly defenseless."

The particular vulnerability of elderly victims has been a matter of concern to us before. *State v. Papasavvas (II), supra,* 170 *N.J.* at 482, 485, 790 *A.*2d 798 (noting that victim was vulnerable due to advanced age and listing cases where victims were vulnerable because they were elderly). It cannot be disputed that victims of the ages of Richard and Shirley Hazard are less able to defend themselves than younger, adult victims. As a result, defendant's suggestion that this factor is "at most average" is contrary not only to the well-established principle that children and older victims are more vulnerable, but also contrary to plain common sense. Defendant knew Mr. and Mrs. Hazard were "old," yet he incapacitated both victims before he killed them. That adds to his moral blameworthiness.

(vi) *Knowledge of effects on nondecedent victims.*

Our case law is clear: we impute knowledge to a defendant that his murderous actions will "eliminate a unique person and destroy a web of familial relationships." *State v. Loftin (II),* 157 *N.J.* 253, 337, 724 *A.*2d 129 (1999) (quoting *State v. Muhammad, supra,* 145 *N.J.* at 46, 678 *A.*2d 164). Defendant urges that we adopt the reasoning from Justice Long's dissent in *State v. Timmendequas (II), supra,* 168 *N.J.* at 83, 773 *A.*2d 18, suggesting that the factor is "universal and thus cannot serve as a basis to distinguish between defendants." Using that logic, defendant argues that the victim impact statements concerning the effect of the loss on the Hazards' family should not carry substantial weight.

The State stresses that this Court has determined that the effect of the murders on the families of the victims is a proper consideration on proportionality review, even where defendant did not have specific knowledge of the surviving family members. In the State's view, because the Hazards' loved ones "must live each day with the ache of [their] absence and their awareness of the

terror [they] endured in the final moments of [their lives,]" defendant's blameworthiness is increased.

We reject defendant's invitation to adopt the reasoning of the dissent in *State v. Timmendequas (II)*. We consider this factor although we acknowledge that its presence in all, or nearly all, of the comparison cases may reduce its significance. *Id.* at 42, 773 *A.*2d 18. Even on that reduced basis, however, defendant's moral blameworthiness is increased by the suffering of his victims' family members.

(vii) *Defendant's age.*

Defendant submits that, despite the jury's rejection of age as a mitigating factor, the fact that he was twenty-three years old at the time of the crime reduces his blameworthiness. He suggests that the value of the factor is increased by the fact that there is no evidence that he "lived as an adult with adult responsibilities." (citing *State v. Loftin (II), supra,* 157 *N.J.* at 337, 724 *A.*2d 129). Defendant acknowledges that we effectively rejected "emotional deficits" and a "highly abusive childhood" as mitigating factors in respect of this element. *State v. Timmendequas (II), supra,* 168 *N.J.* at 42, 773 *A.*2d 18. Defendant again advances the logic of the dissent in *State v. Timmendequas (II)* regarding the defendant's stunted emotional development. *Id.* at 82, 773 *A.*2d 18 (Long, J., dissenting) (citations omitted). Accordingly, defendant submits that, on the basis of chronological age alone, his blameworthiness on this factor is low, and it is lower still if defendant's maturity level is taken into account.

In opposition, the State argues that defendant's age and level of maturity do not reduce his moral blameworthiness. The State reasons that, at over twenty-three years old, defendant was "a mature, full-grown man who was 'old enough to know right from wrong.'" (quoting *State v. Timmendequas (II), supra,* 168 *N.J.* at 42, 773 *A.*2d 18). The State points out that we already have determined that a defendant's blame was not diminished by his age where he was twenty-five years old and the jury rejected the

age mitigating factor. *State v. Morton, supra,* 165 *N.J.* at 251, 757 *A.*2d 184.

▮▮▮ The jury's rejection of age as a mitigating factor does not preclude its consideration on proportionality review. *See State v. Bey (IV), supra,* 137 *N.J.* at 360–61, 645 *A.*2d 685 (despite jury's rejection of age as stand-alone mitigating factor, it may have considered age as part of "catch-all" mitigating factor). We attach no substantive difference to the fact that defendant was chronologically younger than the defendant in *State v. Morton.* Although there is little evidence of defendant's maturity, under current precedent, defendant's stunted emotional development does not decrease his culpability in respect of this factor. Moreover, even if defendant's moral blameworthiness is decreased by his age, he was not so young—or so emotionally underdeveloped—to make the decrease significant.

(viii) *Defendant's involvement in planning the murder.*

Defendant claims that he consistently maintained that he acted at his alleged accomplice's behest. He submits that, even if that contention is rejected, the robbery demonstrates so little planning that his culpability as to this factor is not above average. Defendant contrasts the haphazardness of his crime with other, meticulously-planned crimes. The State does not address this factor.

Even granting defendant's claim that his planning may have been minimal, the evidence that defendant acted alone is overwhelming, thus rendering defendant solely liable for his acts, however conceived. The police were able to establish an alibi for defendant's alleged accomplice, one that was confirmed by two testifying witnesses. To the extent that defendant likely acted alone, his moral blameworthiness ranks at least above average in respect of this factor.

In sum, while defendant is relatively young, his childhood was marred by abuse and neglect, and he was no more aware of the suffering by the families of his victims than other murderers, his degree of moral blameworthiness is quite high as a result of his

premeditation, his motive of witness elimination, his knowledge of the victims' vulnerability, and his lack of justification.

b. *Degree of victimization.*

We evaluate victimization by examining the "violence and brutality of the murder, and injury to nondecedent victims." *State v. Chew (II), supra,* 159 *N.J.* at 211, 731 *A.*2d 1070. The "extent of mutilation of the victim" is relevant in considering the first component. *State v. Bey (IV), supra,* 137 *N.J.* at 366, 645 *A.*2d 685.

(i) *Violence and brutality of the murder.*

Defendant correctly acknowledges that this factor carries a great deal of weight, but claims that evidence of intentional torture is absent and that the State did not charge the depravity aggravating factor. For that reason, defendant contends that "this factor has high, although not extreme, value in this case."

On the other hand, the State details the extreme level of physical brutality defendant inflicted on Richard and Shirley Hazard. The State points out that the victims suffered stab wounds, broken bones, and serious cuts. In addition, the State notes that Mr. Hazard must have suffered immense mental anguish knowing that his wife would either find him dead or be killed herself; and Mrs. Hazard saw her husband murdered and knew that a similar fate awaited her. The State points out that, to the victim, it does not matter whether a defendant's motive is torture; it was a defendant's extreme violence that caused severe pain and suffering.

It is unquestionable that the Hazards suffered a prolonged, brutal death characterized by intense physical and mental pain. Defendant's culpability in respect of this factor is very high.

(ii) *Injury to nondecedent victim.*

Defendant does not discuss this factor, while the State notes that the victims' family members delivered victim impact statements detailing how the murders harmed their family.

We do not diminish the pain and anguish the Hazards' family has suffered by the tragic, brutal and senseless loss of their cherished ones. However, this factor does not contemplate that a victim's family members are to be considered nondecedent victims. This interpretation is consistent with other cases where there were families who suffered great losses, but where we made no mention of this factor in the victimization analysis. *See, e.g., State v. Cooper (II)*, 159 *N.J.* 55, 91, 731 *A.*2d 1000 (1999); *State v. Timmendequas (II), supra,* 168 *N.J.* at 42–43, 773 *A.*2d 18. Thus, because there were no nondecedent victims, we cannot give this factor any weight.

In sum, while there were no nondecedent victims, the brutality of this crime renders the victimization very high in this case.

### c. *Character of defendant.*

The third factor considered is the character of the defendant, which includes the defendant's prior criminal history, other acts of violence, cooperation with authorities, remorse, and capacity for rehabilitation. *State v. Bey (IV), supra,* 137 *N.J.* at 366, 645 *A.*2d 685. We have designated these factors as a "catchall category." *State v. Timmendequas (II), supra,* 168 *N.J.* at 43, 773 *A.*2d 18.

### (i) *Prior record.*

Defendant acknowledges his extensive juvenile and adult criminal history. He explains, however, that prior to these murders he had never been convicted of a crime of violence as an adult and that, while his juvenile record contains forty-four adjudications of delinquency, it does not refer to a single crime of violence. Defendant does not claim a capacity for rehabilitation, but suggests he cannot be classified as a predator or sociopath. Finally, defendant argues that his history of criminality is hardly surprising in light of his childhood, which included being taken by family members to grocery stores to steal food.

The State points out that defendant's record includes a large number of juvenile adjudications of delinquency, including burgla-

ry, shoplifting, theft by unlawful taking, criminal mischief, escape, attempt, improper behavior (fighting), receiving stolen property, criminal trespass, possession of a weapon, robbery, and attempt to kill. As a twenty-three-year-old adult, he already had five adult convictions for offenses including receiving stolen property, unlawful possession of a weapon (handgun), and improper behavior. Also, at the time of his arrest, defendant had two additional criminal indictments pending: one for possession of cocaine, and the other for armed robbery and aggravated assault.

Defendant's criminal record is more expansive than many defendants for whom we have conducted comparative proportionality review. *See, e.g., State v. Cooper (II), supra,* 159 *N.J.* at 91, 731 *A.*2d 1000; *State v. Feaster (II), supra,* 165 *N.J.* at 406–07, 757 *A.*2d 266. We acknowledge that defendant's record contains fewer crimes of violence than some defendants. *See, e.g., State v. Harris (II),* 165 *N.J.* 303, 325–26, 757 *A.*2d 221 (2000); *State v. Harvey (III), supra,* 159 *N.J.* at 314, 731 *A.*2d 1121. That said, defendant cannot claim that this is his first "brush with the law." Even without any prior convictions for crimes of violence, defendant's pending armed robbery and aggravated assault charges, coupled with the sheer breadth of his criminal record, make his culpability in respect of this factor significant.

(ii) *Other unrelated acts of violence.*

Neither party mentions, nor does our search of the record indicate, any other unrelated acts of violence.

(iii) *Cooperation with authorities.*

Defendant submits that he cooperated with authorities. Although he did not turn himself in, he disingenuously suggests that "any possibility of his doing so was essentially foreclosed by his arrest early in the morning following the crime." He also contends that, once in custody, he virtually immediately gave a statement in which he admitted participation in the crimes, albeit disguising the extent of his participation. By way of explanation,

he argues that "it is hardly unique that a defendant would admit the depth of his involvement in a particularly severe crime in stages." As to defendant's statements implicating an alleged accomplice, defendant maintains that it has remained his position throughout that his alleged accomplice was involved.

The State stresses that "[s]ince the moment defendant was [arrested], he has continuously attempted to minimize his responsibility and thwart the investigation." It suggests that it was the overwhelming evidence against him, " 'rather than any pang of conscience,' [that] prompted defendant's incomplete admissions." (quoting *State v. Timmendequas (II), supra,* 168 *N.J.* at 44, 773 *A.*2d 18).

Although we credit defendant with the statements he provided to the police, his request that his mother cooperate with the authorities, and his unconditional plea to all of the crimes for which he stood charged, the degree to which that credit affects the calculation of his character is slight because each such form of cooperation was designed to better his own plight, and not out of any sense of correctness.

(iv) *Remorse.*

Defendant suggests that his sentencing allocution, while brief, demonstrated his remorse. Defendant contrasts his statement in allocution with that delivered by Ambrose Harris, where he "blame[d] society and the victim's family for being prosecuted." (quoting *State v. Harris (II), supra,* 165 *N.J.* at 326, 757 *A.*2d 221). Defendant further submits that much of the evidence submitted to rebut the mitigating factor of remorse was improperly admitted in the State's direct case, and that the pertinent time for considering remorse is not the immediate aftermath of the crime, but after the defendant has had time for reflection.

The State points out that the first time defendant delivered an apology for the murders was just before the jury retired to deliberate on his fate. It notes that, when the police asked defendant at the end of each of his statements whether he wanted

to add anything, he never availed himself of that opportunity to express any remorse for his actions. The State also suggests that defendant's post-crime casual meal at the fast-food restaurant, his leisurely shopping spree, and the party that he hosted, complete with drugs, alcohol, and sex, further evidence of his lack· of remorse.

Defendant's evidence of remorse is weak at best. Even if we ignore defendant's post-crime activities, defendant presents precious little evidence of remorse. We do not place much credit in defendant's apology during his sentencing allocution. We have viewed other late apologies as simply a last minute fear of punishment. Evidence of remorse is diminished when a defendant waits until the last possible moment—the sentencing phase—to express it. *See State v. Bey (IV), supra,* 137 *N.J.* at 385, 645 *A.*2d 685 (noting that belated apology at sentencing phase does not distinguish defendant's character from that of other defendants).

### (v) *Capacity for rehabilitation.*

The parties agree that defendant has presented no evidence evincing a capacity for rehabilitation.

In sum, defendant's lengthy and serious, albeit mostly non-violent, criminal record and his lack of capacity for rehabilitation outweigh his lukewarm cooperation with authorities and his belated expressions of remorse.

### d. *Precedent-seeking review—Overall culpability.*

Defendant's moral blameworthiness is quite high, the victimization in the case was severe, and his character, while not uniformly bad, does not weigh in his favor. On the basis of the foregoing discussion, defendant's criminal culpability does not render this death sentence irrational or aberrant. *State v. Martini (II), supra,* 139 *N.J.* at 47, 651 *A.*2d 949. Nor does it indicate that defendant was singled out unfairly for capital punishment. *Ibid.* None of the considerations that underlie this analysis "clearly support" defendant. *See State v. Papasavvas (II), supra,* 170 *N.J.*

at 484, 790 *A.*2d 798. He is slightly less culpable under some considerations than others, but none of the considerations clearly offend the proportionality of a death sentence for this defendant and his crime.

### e. *Precedent-seeking review—Case comparisons.*

■ The final component of precedent-seeking review compares defendant's case to those of other people convicted of capital murder in his salient factor group. Our search is not for identical outcomes in all the comparison cases; to the contrary, we "expect that juries may decide similar cases differently. Disparity alone does not demonstrate disproportionality." *State v. Bey (IV), supra,* 137 *N.J.* at 386, 645 *A.*2d 685. As we explained in *State v. Marshall (II), supra,* 130 *N.J.* at 181, 613 *A.*2d 1059, "[o]ur search should be for some impermissible or invidious factor or pattern that has been broken. That the [other defendants] were spared their lives does not establish a pattern of life-sentencing for such killings." We select comparison cases from the same salient-factor group used in the salient-factors comparison, *State v. Harris (II), supra,* 165 *N.J.* at 326, 757 *A.*2d 221, to "ensure[ ] that the two analyses are complementary and can confirm each other." *State v. Chew (II), supra,* 159 *N.J.* at 214, 731 *A.*2d 1070.

Which cases should be included in the case comparisons is a matter in dispute. Defendant suggests a group of twenty-one comparison cases, drawn primarily, but not exclusively from the statistically limited E1/aggravated multiple-victims murders category. He submits that his case is "appropriately compared to cases in which multiple homicides occurred in conjunction with other crimes, and force beyond that necessary to cause death was used." The State counters that eighteen cases are appropriate for comparison, based on the following characteristics:

1) the victims were killed in their home; 2) defendant used multiple means of attack and extreme brutality; 3) the victims were particularly vulnerable because of their ages; 4) defendant desecrated the victims' bodies post-mortem; 5) defendant committed the murders to escape detection or apprehension within the meaning of aggravating favor (4)(f); 6) defendant committed the murders within

the course of committing multiple felonies of a non-sexual nature within the meaning of aggravating factor (4)(g); and 7) a stranger upon stranger crime.

Although the State's proposed criteria are broader than those suggested by defendant, we do not require that a case satisfy all of the above characteristics to be considered for inclusion. That, of course, would provide far too limited a universe.

■ The parties recommend cases for comparison purposes. The ultimate decision concerning which cases will be considered for comparison, however, rests squarely with this Court. *In Re Proportionality Review Project (I)*, 161 *N.J.* 71, 91, 735 *A.*2d 528 (1999). Cases within the E1 subcategory are presumptively included in defendant's comparison group; conversely, cases outside the E1 subcategory are presumptively excluded. *State v. Timmendequas (II)*, *supra*, 168 *N.J.* at 52, 773 *A.*2d 18 (citing *State v. Morton (II)*, 165 *N.J.* at 256–57, 757 *A.*2d 184).

The relevant cases are categorized as follows: [23] (1) cases agreed to by the parties [Bobby Lee Brown (T1, V1), Bobby Lee Brown (T1, V2), Bobby Lee Brown (T2, V1, V2), Louis Crumpton, Felix Díaz, Walter Johnson (T1, V1), Walter Johnson (T1, V2), Walter Johnson (T2, V2), Frank Masini [24] (M2), Ronald Mazique, Anthony McDougald (T1, V1), Anthony McDougald (T1, V2), Anthony McDougald (T2, V1), Peter Regan, and Roy Watson]; (2) cases proposed only by defendant [William Menter, Clarence Reeves, George Booker (V1) [B1] George Booker (V2)[B1], and Josh Pompey [D1]]; (3) cases proposed only by the State [Thomas Koskovich (T1), and Thomas Koskovich (T2) ]; and (4) cases withdrawn by both parties [David Cullen [25] [E2]]. In addition, the

---

[23] Victims are indicated with a "V", the distinct murders with an "M", and the trials or pleas with a "T." All cases fall within the E1 subcategory, unless otherwise noted in brackets.

[24] The State does not include Masini on either its own list or on its list of cases about which the parties disagree. The State nonetheless discusses that case.

[25] The State originally included Cullen in its list of comparable cases, but later withdrew that submission. The State suggests that Cullen does not share "several defining characteristics" with defendant's case. Defendant concurs.

AOC lists several other cases that, although suggested by the parties, ultimately were not relied on by them. These are: Richard Farrow, Gerald Klatzkin, Angel Melendez, Maria Montalvo (V1), Maria Montalvo (V2), Thomas Patterson, Reginald Scott III, Adonis Thomas, Joseph Harris (M2, V1)[B1], Joseph Harris (M2, V2)[B1], Joseph Harris (M2, V3)[B1], Joseph Harris (M2, V4)[B1], Daron Josephs (T1, V1)[B1], Daron Josephs (T1, V2)[B1], Daron Josephs (T2, V1 and V2)[B1], John Lee Allen [E2], David Hester [E2], James Lawrence Lopez [E2], Donald Naples [E2], and Darryl Pitts [E2]. We, therefore, do not include them for comparison purposes.

There remain, then, seven cases on which the parties do not agree: Booker (V1), Booker (V2), Koskovich (T1), Koskovich (T2), Menter, Pompey, and Reaves. Of those, only Koskovich, Menter, and Reeves were categorized as E1, and are thus presumptively comparable to defendant. Each one, however, is marked by characteristics that may substantially differentiate it from defendant. Neither Menter nor Reeves was a stranger-upon-stranger killing; in both cases, the killings were spurred by defendants' rejection by a woman. Although both cases involved brutal multiple murders, neither shares "several defining characteristics" with defendant's case and, therefore, both are excluded from the case-comparison portion of precedent seeking review.

Koskovich (T1 and T2) was a stranger-on-stranger robbery/murder. However, his crimes also had so many unique characteristics that his case defies comparison with defendant's case. Koskovich was only guilty of "own-conduct" murder as to one of the two victims. As such, although Koskovich's cases are coded in the E1 subcategory, they differ, at their core, from many multiple-victim murders. More importantly, Koskovich's case appears to be a "thrill-killing," which was its essential characteristic. While admittedly a very close question, Koskovich's cases are not included for comparison with defendant's case.

Booker and Pompey were both coded outside the E1 subcategory, and are therefore presumptively not comparable to defendant.

Pompey, like Menter and Reeves, was a case of unrequited love gone horribly wrong: Pompey killed his victims because one of them refused to reconcile with him. Pompey does not share enough essential characteristics with defendant to overcome the presumption that it is not comparable. *See State v. Morton (II), supra,* 165 *N.J.* at 256–57, 757 *A.*2d 184.

George Booker, who had a prior murder conviction, raped and killed two women as part of a crime-spree. The crime-spree, sexual assault, and prior murder all make this case sufficiently distinct from defendant's and, thus, is excluded from comparison.

In sum, we have determined to engage in case comparisons only in respect of the agreed upon cases: an aggregate of sixteen cases involving nine unique defendants. A very brief summary of each, followed by a comparison analysis, follows.

### (i) *Bobby Lee Brown.*

*Summary*: Brown, who has been honorably discharged from the armed forces, and his girlfriend followed through on a plan to rob her eighty-two-year-old great aunt and her sixty-four-year-old great uncle. The great aunt was shot to death and the great uncle was shot and stabbed over ten times with a pair of scissors.

The jury found aggravating factors 4(f), escape detection, (as to the female victim) and 4(g), robbery murder, (as to both victims). The jury also found mitigating factors 5(c), defendant's age, and 5(h), the catch-all factor. The jury sentenced Brown to death for the murder of the great aunt and, because the jury could not unanimously agree on a sentence for the killing of the great uncle, Brown also received a life sentence. On appeal of the death sentence, we reversed for flaws in the instruction on the option of a non-unanimous vote on "own conduct." The conviction was affirmed, but would be vacated if the State again sought the death penalty. *State v. Brown,* 138 *N.J.* 481, 651 *A.*2d 19 (1994). The State opted not to seek the death penalty a second time. Brown received two life sentences, with a sixty-year period of parole ineligibility.

*Comparison:* Defendant acknowledges that the victimization in his case was greater than that of the great aunt and likely greater than that of the great uncle. But, defendant suggests that the differences are vitiated by the planning apparent in Brown's crime and Brown's lack of psychiatric history, lack of suggestion of drug influence, and maturity, as evidenced by his successful military service. Defendant also points out that, although originally sentenced to death, Brown ultimately received a life sentence.

The State suggests that Brown and defendant are equally blameworthy, insofar as both selected elderly defendants whom they knew to be vulnerable. The State stresses that the jury in defendant's case rejected any psychological mitigating factors. Also, the State sees Brown's military service as evidence of his rehabilitative potential. The State also points to the increased victimization in defendant's case.

Although defendant's case in mitigation may have been slightly more compelling than Brown's, the difference is not meaningful enough to suggest that defendant's death sentence is disproportional, particularly in light of the increased victimization in defendant's case. We conclude that defendant's criminal culpability is equal to or greater than Brown's.

(ii) *Louis Crumpton.*

*Summary:* Crumpton, a thirty-six year old man living with AIDS, broke into a home to steal items. He was surprised by the victims, aged eighty-six and eighty-one. He beat the victims over the face, most likely with a blunt object. One victim was found dead and the other died four months later. After the State served its notice of aggravating factors, he pled guilty to two counts of felony murder and was sentenced to two consecutive life terms, with more than sixty-three years of parole ineligibility on each count.

*Comparison:* Defendant suggests that Crumpton's life sentences indicate that defendant's sentence is disproportionately harsh. Defendant points out that the victims in Crumpton's case

were older, and therefore more vulnerable. Defendant further suggests that there was no indication that Crumpton, while ill with AIDS, suffered any psychiatric disease. The State points out that Crumpton did not know his victims would be home, and that Crumpton suffered from AIDS and drug addiction.

Defendant's entry into the Hazards' home knowing someone was home increases his moral blameworthiness sufficiently to justify the difference in result between Crumpton and defendant, a distinction further highlighted by the fact that Crumpton suffered from AIDS and drug addiction.

### (iii) *Felix Díaz.*

*Summary:* Díaz and his co-defendant went to the home of the co-defendant's ex-lover seeking money for drugs. Díaz and the co-defendant beat, shot, and stabbed two members of the ex-lover's family, including his eight-year-old niece. The defendants then waited for the ex-lover to return home and also killed him. That victim's body was burned and a pet dog also was killed.

The jury found the escape detection and felony murder aggravating factors. The jury also found Díaz's age (twenty-seven), lack of significant prior criminal history, and assistance to the State, in addition to the catch-all factor, to be mitigating. Díaz received consecutive life sentences; after the non-capital charges were added, his total term of parole ineligibility was more than one hundred years.

*Comparison:* Defendant suggests that Díaz's case is simply a more aggravated version of his, save that Díaz received a life sentence. Defendant points out that the victimization in Díaz's case was about the same as in his own, except Díaz killed three people and, as to the last victim, Díaz lay in wait. Defendant concedes that Díaz was "mildly retarded," but notes that defendant scored an eighty-one on a full-scale IQ test. Unlike Díaz, defendant suffered from bipolar disorder and had an abusive childhood. Defendant suggests that Díaz's case presents more criminal culpability than his, but in no event presents sufficiently

less to justify Díaz's life sentence as opposed to defendant's death sentence. In contrast, the State points out that Díaz's jury found four mitigating factors: his age, his lack of significant criminal history, his assistance to the State, and the "catch-all" factor.

This comparison is closely poised. Díaz's crime, with its additional victim and the fact that they waited for the final victim to return home, is more blameworthy than defendant's, but Díaz's character shows fewer indicia of culpability. The similarities in the cases are not dispositive of the issue of proportionality. We "expect that juries may decide similar cases differently. Disparity alone does not demonstrate disproportionality." *State v. Bey (IV)*, *supra*, 137 *N.J.* at 386, 645 *A.*2d 685. Here, while there are disparate results in potentially similar cases, those differences, standing alone, are insufficient to suggest that defendant was unfairly singled-out for death.

### (iv) *Walter Johnson.*

*Summary:* Johnson had done some carpentry work for a married couple. He went to their home and asked to use the phone. After the female victim caught Johnson stealing jewelry, he shot the male victim and beat the female victim to death with a poker.

The jury found the murder involved extreme suffering, was committed to escape detection, and occurred contemporaneous to other felonies. As to the male victim the jury found only the catch-all mitigating factor; as to the female victim the jury found that Johnson was under extreme mental or emotional disturbance. Although Johnson received a death sentence for the killing of the female victim, the jury determined that the aggravating factors did not outweigh the mitigating factor for the male victim. We reversed Johnson's convictions after determining that his confession had been illegally obtained. *State v. Johnson*, 120 *N.J.* 263, 576 *A.*2d 834 (1990). He ultimately pled guilty to two counts of non-capital murder and was sentenced to consecutive life terms.

*Comparison:* Defendant concedes that his case may present slightly more culpability than Johnson, but contends that any

difference is sufficient to justify the fact that Johnson, after a reversed death sentence, ultimately received a life sentence. The State points out that a jury determined that Johnson, unlike defendant, was affected by mental defect or disturbance.

Johnson's initial death sentence, despite the jury's determination that he suffered from a mental defect or disturbance, is an indicator that defendant's death sentence is not disproportionate to Johnson's sentence. Other than that finding, these cases have similar degrees of moral blameworthiness, victimization, and character.

### (v) *Frank Masini.*

*Summary:* Masini killed an elderly couple that employed him as a handyman. He stabbed the male victim in the neck with a letter opener. When the female victim responded to the commotion, Masini also stabbed her to death. Both victims had defensive wounds on their hands. The female victim was nude from the waist down. Masini was also linked to the murder of his elderly aunt and another woman, both of whom were stabbed in the neck and found partially nude. Masini claimed to have had "detachments from reality" in the months leading up to the other murders.

He pled guilty to the four murders and was sentenced to two consecutive terms of life imprisonment and a concurrent term of life imprisonment, with a thirty-year parole bar.

*Comparison:* Defendant points out that, while there may have been slightly less victimization in Masini's cases, his victims were older and more numerous, and there may have been sexual assaults involved. According to defendant, although Masini claimed to have experienced a detachment from reality, there was no evidence that he ever sought treatment, and, while he may have been drinking heavily that night, there was no evidence of a sustained substance abuse problem. The State suggests that Masini's culpability is reduced by his intoxication on the night of the murders.

This comparison, again, poses a close question. There are aspects of Masini's case that make it more aggravated than defendant's—most importantly, that he killed four people in three separate incidents—and aspects that make it less so, that is, the fact that he was drinking heavily. Both defendant and Masini exhibited a high level of blameworthiness, a large amount of victimization, and their characters are not universally mitigating.

(vi) *Ronald Mazique.*

*Summary:* Mazique went to the forty-one-year old female victim's house to obtain money; purportedly he intended to steal her income tax refund. He killed the victim and her six-year-old grandson by striking them over thirty times each with a hammer. In an effort to cover up the crime, Mazique turned on the gas in an attempt to explode the apartment. Mazique was also a suspect in a double homicide in his home-state of South Carolina.

Mazique was convicted of a number of crimes, including capital murder. The jury found that the murder involved an aggravated assault of the victim, was committed to escape detection, and was committed in the course of a robbery. The jury also determined that eight of the ten catch-all mitigating factors presented by Mazique were present, including factors related to childhood abuse. The jury could not reach a unanimous decision on sentencing. As a result, Mazique received consecutive life sentences for the murders and additional terms of imprisonment for other crimes.

*Comparison:* Defendant suggests that his case and Mazique's case "present roughly equal degrees of culpability." Defendant points out that although Mazique suffered sexual abuse as a child, he had no documented psychiatric history. Defendant also notes that Mazique was a suspect in two South Carolina homicides. The State, however, asserts that the level of brutality of defendant's crime exceeded that of Mazique. The State further differentiates between these cases by noting that Mazique was a drug and

alcohol addict, who had been physically and sexually abused by his father.

Whether Mazique was suspected of other killings does not enter into our calculus. For example, in *State v. Martini (II), supra,* 139 *N.J.* at 75–76, 651 *A.*2d 949, the defendant had pleaded guilty to a double homicide in Arizona, was awaiting trial for murder in Pennsylvania, and was a suspect in four other killings. Nonetheless, we did not consider that information in assessing the defendant's character because the jury had heard "neither of his prior record nor evidence of unrelated acts of violence." *Id.* at 76, 651 *A.*2d 949. Here, too, we consider only that evidence heard by the jury in comparing the cases.

The jury in Mazique's case accepted eight catch-all mitigating factors related to his traumatic upbringing. Although defendant, too, suffered a troubled childhood, the jury did not credit that evidence to any appreciable extent. Although the cases are quite similar, that distinction likely and rationally explains the difference between defendant's death sentence and Mazique's life sentence.

### (vii) *Anthony McDougald.*

*Summary:* McDougald and a thirteen-year-old accomplice killed the parents of another thirteen-year-old, with whom he had been having sex. He attacked the parents in their bedroom, cutting the man's throat, stabbing him, and hitting him with a baseball bat. When the co-defendant proved unable to kill the woman quickly enough, McDougald hit the woman with a cinderblock, hit her with the bat, and then cut her throat. He then pulled off her underpants and violated her with the bat.

For each victim, the jury found aggravating factors 4(c), [intent to cause suffering], 4(f), [escape detection (to cover up his statutory rape of their daughter) ], and 4(g) [murder within the course of burglary]. The jury also found that McDougald acted under extreme mental or emotional disturbance and the catch-all mitigating factor. Because the jury determined that the aggravating

factors outweighed the mitigating factors, he was sentenced to death. We overturned the death sentences because the instruction on the 4(c) "intent to cause suffering" aggravating factor was flawed. *State v. McDougald*, 120 *N.J.* 523, 577 *A.2d* 419 (1990).

In the penalty phase re-trial, the jury found that, as to the male victim, the murder was committed to escape detection; and, as to the female victim, that the murder was committed to escape detection and that the murder involved an aggravated battery and depravity of mind. The jury also found that McDougald was under extreme mental or emotional disturbance, suffered from mental disease, defect or intoxication, and had established some catch-all mitigating factors. The jury also found that while in the Marines, McDougald spent time in a Japanese prison and that he had sought help before the offense. The jury could not decide whether the aggravating factors outweighed the mitigating factors. Accordingly, McDougald was sentenced to consecutive life terms, with sixty years of parole ineligibility, to run consecutive to his sentences on the non-capital crimes.

*Comparison:* Defendant contends that McDougald's case, although characterized by rage and lacking robbery as a motive, is similar to his case, except with more victimization. According to defendant, there is no rational reason McDougald ultimately received a life sentence while defendant remains on death row. The State freely acknowledges that the brutality in McDougald's case was equal to that of defendant's. However, the State argues that defendant is more blameworthy for having intentionally selected older—and, hence, more vulnerable—victims. The State also argues that because McDougald's murders were "essentially motivated by rage, jealousy, and passion[,]" he is less blameworthy, although the jury's finding that McDougald committed the murders to escape detection belies the State's claim in this regard. The State further points out that the jury found two mitigating factors in McDougald's case that were not found in defendant's case: extreme mental or emotional disturbance and mental disease, defect, or intoxication.

McDougald's crime was horrifying. But, because McDougald was initially sentenced to death and because the jury found the existence of two important mitigating factors that defendant's jury rejected, it cannot be said that McDougald's ultimate life sentence indicates that defendant was unfairly singled out for capital punishment.

### (viii) *Peter Regan.*

*Summary:* Regan left his girlfriend at a bar and went to her house to rob it. When a fifteen-year-old girl entered the home, Regan hit her five times with an aluminum baseball bat, killing her. When his girlfriend's twelve-year-old daughter entered the apartment, Regan hit her six times in the head and face with the bat, also killing her. Regan then removed the second victim's clothing so the incident would appear to be a rape. Regan had a prior record of assaults and a robbery, along with a history of drug and alcohol abuse.

Regan pleaded guilty to two counts of purposeful, knowing murder and one count of robbery. He was sentenced to two concurrent life terms, with thirty years of parole ineligibility for the murder and a twenty-year term with a ten-year parole bar for the robbery.

*Comparison:* Defendant concedes that Regan may be slightly less culpable than defendant, but suggests the difference is insufficient to justify Regan being allowed to plead guilty and avoid a penalty trial. In defendant's view, there was no evidence that Regan suffered abuse or had any mental impairment. Defendant also concedes that the victimization in Regan's case, though exacerbated by the undressing of one victim, was somewhat less than in his case, and that Regan may not have expected the house to be occupied.

The State argues that the victimization in Regan's case was less than in defendant's case. The State further notes that Regan's moral blameworthiness is diminished because he did not know the victims would be there. Finally, the State argues that Regan had

drug and alcohol problems, and was drinking on the night of the crime.

The central differences between Regan and defendant are that defendant decided to commit his crime in a home he knew would be occupied by elderly victims, and that Regan's attack was not as prolonged as defendant's. In comparison, this reduces the victimization in Regan's case. As a result, Regan's case does not suggest that defendant's death sentence was disproportionate.

(ix) *Roy Watson.*

*Summary:* Armed with a pipe, Watson broke into the home of an elderly couple. He went into their bedroom and severely beat them both. He then drank scotch while they died. He stole jewelry, furs, and money. He had an extensive, violent criminal record. He had been admitted to a mental hospital after his acquittal of the scalding death of his sister. At the time of the murder, he was a fugitive from a New York assault charge. Watson was addicted to barbiturates and crack cocaine.

After convicting him, a jury found that the murder was committed within the course of a burglary. The jury also found his age (he was forty-four and his attorneys argued that his age meant he would likely never leave prison) and his impaired capacity were mitigating factors. Because the jury deadlocked on whether to impose death, Watson received consecutive life sentences.

*Comparison:* Defendant concedes that the victimization in Watson's case, while severe, may have been less than in his case. But, defendant notes, Watson presented "no personal mitigation whatsoever." Defendant contends that Watson had no "indication of addiction, as opposed to use, of substances[.]" The State, on the other hand, notes that the degree of victimization in defendant's case was greater than Watson's. The State also suggests that Watson was surprised by his victims in the midst of his crimes. Finally, the State argues that Watson's culpability is diminished by the fact that he "was a severe and chronic drug abuser who was addicted to barbiturates and crack cocaine, and he was using

drugs and alcohol at the time of the crimes." This conclusion is supported by the jury's finding that Watson suffered from mental disease, defect, or intoxication.

Both parties include information about Watson that is unsupported in the AOC summary. Contrary to defendant's claim, Watson was a drug addict. Likewise, contrary to the State's assertion, there is no support in the summary for the idea that Watson was surprised by his victims: he entered the house armed and went directly to their bedroom, where he killed them. Nevertheless, Watson's addiction and intoxication may account for the disparate sentences he and defendant received.

### f. *Proportionality Review—Conclusion.*

Given Defendant's high degree of culpability, as determined by the procedure explained in *State v. Papasavvas (II)*, *supra*, 170 *N.J.* at 480–81, 790 *A.*2d 798, as well as the results of the frequency analysis, we hold that defendant has failed to establish that his death sentence is disproportionate. We do so recognizing that no other member of defendant's statistical cohort—Category E1—is presently on death row. However, our task in proportionality review is not to slavishly adhere to blind statistical analyses. We are mindful that defendant has been placed in Category E1 (Aggravated multiple victims) largely by default: although defendant murdered multiple victims, none of his victims was a public servant (Category A), defendant did not have a prior murder conviction (Category B), defendant's murders were not contract killings (Category C), and the murders did not involve sexual assaults (Category D). In short, when confronted with so limited a sample, the scope of our proportionality review cannot be bounded solely by a mechanical comparison of sentences ultimately imposed within any given statistical category.

In the final analysis, we complete our proportionality review by engaging in a more detailed comparison between defendant and the remaining nine murderers within his E1 statistical cohort. As points of comparison, we distinguish between defendant and

Crumpton, Johnson, Masini and Regan because their life sentences were the result of negotiated plea agreements, whereas defendant chose instead to place his fate in the hands of a jury. We also differentiate between defendant and Díaz, Mazique, McDougald and Watson because the juries in each of those latter cases either found that the aggravating factors did not outweigh the mitigating factors or they deadlocked on that issue, automatically resulting in the imposition of a life sentence. Thus, of the Category E1 group, only Brown remains as a meaningful point of comparison.

Like defendant, Brown murdered two elderly victims. Also like defendant, the jury found that the aggravating factors outweighed the mitigating factors and sentenced Brown to death. At present, however, Brown is serving a life sentence for reasons unrelated to his culpability: on appeal, we affirmed his conviction but reversed his death sentence because of an erroneous jury instruction. That affirmance came with a catch: if the State on retrial sought the death penalty, the conviction would have been vacated and the State would have been required to retry both the guilt and penalty phases of Brown's trial. Given that stark choice, the State bargained for, and Brown accepted, two consecutive life terms. In that latter respect, then, even Brown is dissimilar to defendant and is closer to the negotiated plea cases.

Taking into account the nature of defendant's crimes, the jury's finding that the aggravating factors outweighed the mitigating factors, and the fact that defendant's circumstances are different from, and more blameworthy than, those of the other members of Category E1, we conclude that defendant's death sentence is not disproportionate.[26]

---

[26] We reject our dissenting colleague's view that, because no one else in the E1 Category has been sentenced to death, defendant's death sentence must, by definition, be disproportionate. *Post*, 190 *N.J.* at 553–68, 921 *A.2d* at 1051–60 (2007). We do not believe that the discharge of our responsibilities in respect of proportionality review requires a slavish adherence to statistical abstracts when, as here, they lead to absurd results: if the view advanced by the dissent were

## XIV.

## EFFECT OF RACE ON THE IMPOSITION
## OF THE DEATH PENALTY.

### A.

Defendant, an African–American, claims that his death sentence is unconstitutional because of the "the pernicious effect race has on capital cases." The State, on the other hand, points to *In Re Proportionality Review Project II*, 165 *N.J.* 206, 226, 757 *A.2d* 168 (2000), where we accepted Special Master David Baime's conclusion that there was no reliable evidence of race of victim or race of defendant discrimination in New Jersey's capital sentencing scheme. The State adds that the same conclusion was subsequently reached by the Special Master in *Report to the New Jersey Supreme Court: Systematic Proportionality Review Project, 2002–2003 Term*, at 54–55, and again in the *Interim Report to Special Master David Baime: Applying the 2003 Race Monitoring System to May 2004 Proportionality Review Date*, at 2 (*"Interim Report 2004"*). The State submits that, in the aggregate, there simply is no evidence to conclude that the race of either the defendant or his victims resulted in or caused discrimination in respect of the imposition of death sentences in New Jersey.

### B.

Without fail, we have required that a defendant "relentlessly document[ ] the risk of racial disparity in the imposition of the

---

correct, single-victim murderers—those who may be eligible for the death penalty in a category other than the limited E1/aggravated multiple-victim murder—can remove all doubt by murdering yet another victim so as to qualify for inclusion in Category E1, thus avoiding the death penalty. No rational system of justice can reward a multiple murderer with immunity from the death penalty, while exposing a single-victim murderer to the ultimate penalty. Neither our procedures for proportionality review nor our system of jurisprudence as a whole countenance such a result.

death penalty." *State v. Loftin (II)*, 157 *N.J.* 253, 315, 724 *A.*2d 129 (1999) (internal quotation marks omitted). We have made that requirement stringent because such a showing would invalidate an otherwise valid death sentence. *State v. Marshall (II)*, 130 *N.J.* 109, 213, 613 *A.*2d 1059 (1992). Whether based on the race of the victim or of the defendant, racial disparity is patently unacceptable:

> We have no doubt that the people of New Jersey would not tolerate a system that condones disparate treatment for black and white defendants or a system that would debase the value of a black victim's life. Whether in the exercise of statutory proportionality review or our constitutional duty to assure the equal protection and due process of law, we cannot escape the responsibility to review any effects of race in capital sentencing.
>
> [*Id.* at 214, 613 *A.*2d 1059.]

We have not yet been presented with persuasive evidence of such disparity. *See, e.g., State v. Papasavvas (II), supra*, 170 *N.J.* at 534, 790 *A.*2d 798 (Coleman, J., dissenting) (rejecting defendant's claims of racial bias and geographic disparity); *State v. Morton*, 165 *N.J.* 235, 267–68, 757 *A.*2d 184 (2000), *cert. denied*, 532 *U.S.* 931, 121 *S.Ct.* 1380, 149 *L.Ed.*2d 306 (2001) (same); *In Re Proportionality Review Project II, supra*, 165 *N.J.* at 226, 757 *A.*2d 168 (concluding that evidence presently available did not support finding of racial bias or discrimination in administration of death penalty).

Special Master Baime's latest report on the impact of race on capital sentencing discerns no solid evidence that the race or ethnicity of defendants affects whether the cases progress to the penalty phase or whether the death penalty is imposed. *Interim Report 2004* at 1. The Special Master noted that, although two-variable analysis might indicate some disproportionality, that effect was not sustained when multi-variable analysis was utilized. *Ibid.* Likewise, the Special Master found no statistically significant relationship between race of victim and imposition of the death penalty. *Ibid.* Some evidence exists that White-victim cases are more likely to advance to a penalty trial than African–American-victim cases; however, when county variability was taken into account, the discrepancy largely disappears. *Id.* at 2.

The Special Master is confident that the administration of capital punishment in New Jersey is not infected with racial or ethnic bias. *Ibid.* He concludes that "we do not find consistent, statistically significant evidence of racial or ethnic prejudice in the administration of our death penalty statutes." *Id.* at 3. In the absence of any persuasive evidence from defendant to the contrary—and we underscore that, other than policy statements, defendant has tendered no evidence at all in support of this claim—we reject defendant's assertion that his death sentence is unconstitutionally tainted as a result of racial discrimination.

## XV.

### CUMMULATIVE ERROR.

We address defendant's final point: that the aggregate of his complaints suffices to vitiate his death sentence. The State, in response, claims that we "should reject defendant's request because no error occurred below and defendant received a fair trial."

▆ The standard for review of a trial is neither as stringent nor as unforgiving as defendant asserts. We repeatedly have made clear that

[t]he proper and rational standard [for the review of claimed trial errors] is not perfection; as devised and administered by imperfect humans, no trial can ever be entirely free of even the smallest defect. Our goal, nonetheless, must always be fairness. "A defendant is entitled to a fair trial but not a perfect one." *Lutwak v. United States*, 344 *U.S.* 604, 619, 73 *S.Ct.* 481, 97 *L.Ed.* 593 (1953); *accord, State v. Marshall*, 123 *N.J.* 1, 169–70, 586 *A.2d* 85 (1991), *cert. denied*, 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.2d* 694 (1993).

[*State v. R.B.*, 183 *N.J.* 308, 333–34, 873 *A.2d* 511 (2005).]

That principle applies equally in death penalty cases. *See State v. Koskovich*, 168 *N.J.* 448, 540, 776 *A.2d* 144 (2001) ("[W]e still adhere to the general principle that a defendant is entitled to a fair trial but not a perfect one." (quoting *State v. Feaster*, 156 *N.J.* 1, 84, 716 *A.2d* 395 (1998) (internal quotation and editing marks omitted)); *State v. Timmendequas (I)*, 161 *N.J.* 515, 639, 737 *A.2d* 55 (1999), *cert. denied*, 534 *U.S.* 858, 122 *S.Ct.* 136, 151 *L.Ed.2d* 89 (2001) (same, explaining that "[t]his is true even in capital cases,

where we subject the record to intense scrutiny, recognizing that a defendant's very life is at stake." (citations and internal quotation marks omitted)). Thus, although it is a fundamental tenet of our system of justice that where "legal errors ... in their aggregate have rendered the trial unfair, our fundamental constitutional concepts dictate the granting of a new trial before an impartial jury[,]" *State v. Orecchio,* 16 *N.J.* 125, 129, 106 *A.*2d 541 (1954), the predicate for relief for cumulative error must be that the probable effect of the cumulative error was to render the underlying trial unfair.

Defendant has made repeated assertions of trial error. However, our close scrutiny of defendant's penalty phase trial discloses that, in all material respects, no appreciable error was present. More fundamentally, it was fair. Therefore, we reject defendant's claim of cumulative error.

## XVI.

### CONCLUSION.

Our review of defendant's penalty phase trial, a review conducted under the stringent guidelines we apply in capital cases, leads us to the firm conclusions that the proceedings were fair, that defendant's death sentence was properly imposed, and that his death sentence is not disproportionate.

The judgment of conviction and sentence, including defendant's death sentence, are affirmed.

Justice ALBIN, concurring.

Defendant received a fair, not a flawless, penalty hearing. Unlike the majority, however, I would not downplay or excuse the errors made by the prosecutor, particularly those made in his opening remarks. Prosecutors must be reminded of the high standards expected of them in capital cases. Nevertheless, even by the exacting standards that we apply to capital proceedings, we do not reverse unless a prosecutorial error had the capacity to

alter the outcome. Because I do not believe that the errors committed here would have affected the jury's judgment, I cannot join the dissent.

Next, this is my first opportunity to speak to this Court's proportionality jurisprudence. I believe that our proportionality review has become a macabre and overly complex social science exercise that artificially classifies into distinct categories savage murders, many of which are hardly distinguishable from one another in their unspeakable cruelty and gruesomeness. Public confidence cannot be sustained in a system that people of ordinary intelligence cannot comprehend. The purpose of proportionality review is not to ensure uniformity in capital sentencing—an impossible goal given the myriad variables that lead to the imposition of life sentences in most death-eligible cases—but rather to ensure that the few death sentences meted out are not aberrational. Under this Court's proportionality jurisprudence, I cannot find that defendant's death sentence is aberrational when comparing his case to similar cases of defendants sitting on death row. For those reasons, I am compelled to affirm defendant's sentence.

## I.

I do not believe that we should mince words when a prosecutor's remarks exceed the bounds of propriety, even if those remarks do not warrant the reversal of a conviction or sentence. Here, perhaps innocently, the prosecutor in his opening statement placed an irrelevant factor not in the record before the jury—the claimed good faith of the State in pursuing a capital prosecution. The prosecutor stated that "[t]he State does not seek the death penalty on a routine basis. It is not something that we do lightly. The State seeks the death penalty when the State believes the facts call for it."

Whether the State seeks the death penalty routinely or not, lightly or not, or only so when "the facts call for it," were not relevant considerations for the jury. The jury had only one purpose—to determine whether the State proved beyond a reason-

able doubt an aggravating factor or factors and, if so, whether any such factor or factors outweighed beyond a reasonable doubt any mitigating factors found by any juror. Not only was there nothing in the record to support his statements, but the prosecutor in essence improperly vouched for the credibility of the State's case. The prosecutor suggested that his case was more worthy of belief because the State only sought the death penalty when a defendant really deserved it. By insinuating that the State reserved death penalty prosecutions only for special cases, the prosecutor, in effect, stated that he and "the State" believed that defendant's case was deserving of the death penalty. It makes no difference that the jury may have been able to deduce as much on the basis that the State was pursuing a death verdict.

Although the prosecutor's brief comments were clearly improper and offensive, I cannot conclude that the trial court abused its discretion in denying defendant's motion for a mistrial. Significantly, the court immediately gave a curative instruction, advising the jury to disregard any "personal opinion or personal belief" expressed by counsel. In light of the court's prompt corrective action, I do not believe that the prosecutor's limited comments had the capacity to lead to an unjust sentence. Moreover, I do not find the other issues raised by defendant "have substantially prejudiced defendant's fundamental right to have a" fair penalty hearing. *See State v. Timmendequas,* 161 *N.J.* 515, 575, 589, 737 *A.*2d 55 (1999) (*Timmendequas I*), *cert. denied,* 534 *U.S.* 858, 122 *S.Ct.* 136, 151 *L.Ed.*2d 89 (2001).

## II.

I also do not find that Wakefield's death sentence violates principles of proportionality set forth in our capital jurisprudence. Our current system of proportionality review has become an overly complex and inscrutable social science project that defies easy understanding and allows honorable jurists reading the same statistics and cases to reach diametrically opposite results. Our proportionality review must return to first principles.

The "primary objective" of proportionality review is to " 'detect[ ] and prevent[ ] . . . aberrational sentences' "—not to " 'insure symmetry, or even a high degree of correlation, in the sentences imposed on comparable defendants.' " [1] *State v. Feaster,* 165 *N.J.* 388, 418, 757 *A.*2d 266 (2000) (*Feaster II* ) (quoting *State v. Cooper,* 159 *N.J.* 55, 107, 731 *A.*2d 1000 (1999) (*Cooper II*), *cert. denied,* 532 *U.S.* 932, 121 *S.Ct.* 1380, 149 *L.Ed.*2d 306 (2001)). Thus, if a particular death sentence falls so far out of the heartland of comparable cases that it stands as an isolated quirk among the sentences of similar death-eligible defendants, it cannot survive proportionality review. Uniformity, therefore, is not the aim of proportionality review and, indeed, is not even possible in our current capital punishment system.

When this Court compares a death-sentenced defendant to a non-death sentenced defendant, we attempt to compare their levels of culpability: moral blameworthiness, degree of victimization, and defendant's character. *State v. Timmendequas,* 168 *N.J.* 20, 40, 773 *A.*2d 18 (2001) (*Timmendequas II*). However, whether a capital murder defendant is tried, convicted, and sentenced to death depends on a number of vagaries in the process. *See Feaster II, supra,* 165 *N.J.* at 455, 757 *A.*2d 266 (Long, J., dissenting) (noting that "it is much more likely that a host of factors other than culpability, moral blameworthiness and character are determinative of who is sentenced to life and who is sentenced to death"). One such variable is whether a particular county prosecutor will proceed with or forgo a capital prosecution. That decision may be conditioned on such factors as the prosecutor's philosophical leanings, the relative strength of the case, or

---

[1] Although not required by the Federal Constitution, our capital system provides that a death-sentenced defendant is entitled to a "proportionality review" to "determine whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *N.J.S.A.* 2C:11–3e; *see also Pulley v. Harris,* 465 *U.S.* 37, 50–51, 104 *S.Ct.* 871, 879, 79 *L.Ed.*2d 29, 40–41 (1984) (holding that proportionality review not constitutionally required in state capital-sentencing scheme).

the likelihood of obtaining a conviction in a county where the jurors may or may not be disposed to return a death verdict.

Inter-county disparity may be "one of the most significant variables in terms of death sentencing." David S. Baime, *Report to the New Jersey Supreme Court: Systemic Proportionality Review Project 2004–2005 Term* 54 (Dec. 15, 2005). For example, in October 2005 in Cumberland County (population 150,000) the Public Defender's Office had seventeen defendants charged with murder and six defendants facing the death penalty, whereas in Essex County (population 800,000) it had eighty defendants charged with murder and none facing a capital prosecution. As of December 2005, only sixteen percent of death-eligible cases in Essex and Union Counties advanced to penalty trials, whereas fifty-seven percent of death eligible cases in Monmouth County and fifty-four percent in Middlesex County progressed to the penalty stage. *Id.* at 41–42.[2]

Imposition of the death penalty also depends on whether the grand jury returns a capital indictment, *State v. Fortin,* 178 *N.J.* 540, 646, 843 *A.2d* 974 (2004) (*Fortin II* ), and whether the prosecutor offers and the defendant accepts a plea bargain that will spare him the potential of a death sentence. Of course, we also recognize that consistency between different juries, even if they heard the same case, cannot be expected.

We must be mindful as well that jurors bring to the courtroom their own moral codes through which the evidence will be filtered as they proceed to decide, subjectively, the strength of the State's case. In the penalty phase, if a single juror determines that the State has failed to prove the existence of an aggravating factor, the defendant cannot be sentenced to death. *See N.J.S.A.* 2C:11–3c(3). Even when the jury unanimously agrees that the proofs establish the presence of one or more aggravating factors, if a

---

[2] This Court has heard oral arguments on the issue of inter-county disparity in capital sentencing and eventually will have to decide to what degree it is present and whether any significant disparity is constitutionally tolerable.

single juror does not find that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt, a sentence of life rather than death must be imposed. *Ibid.* Thus, because a single juror has the power to nullify the imposition of a death sentence, it is difficult to conclude that the jury's failure to return such a sentence necessarily reflects a community consensus of the appropriate punishment.

Next, capital convictions are subjected to an exacting scrutiny by this Court to ensure the fairness of the guilt and penalty-phase proceedings and the correctness of the sentence. Because of the high stakes in a capital prosecution, we have accorded capital defendants heightened procedural protections to minimize the potential for the wrongful imposition of a death sentence. *See State v. Feaster,* 184 *N.J.* 235, 250, 877 *A.*2d 229 (2005) (*Feaster III* ). The result has been the reversal of most death penalty convictions and sentences. Thereafter, the State's decision to decline a capital re-prosecution may reflect less the so-called "death-worthiness" of the defendant than the availability of witnesses or desire to conserve financial resources. *State v. Martini,* 139 *N.J.* 3, 27, 651 *A.*2d 949 (1994) (*Martini II*), *cert. denied,* 516 *U.S.* 875, 116 *S.Ct.* 203, 133 *L.Ed.*2d 137 (1995).

Due to the host of variables that allow the channeling of discretion toward a life sentence, it should be no wonder that there are few inmates on death row today. Since 1982, when our current death penalty statute was enacted, there have been 455 death-eligible defendants. N.J. Death Penalty Study Comm'n, *New Jersey Death Penalty Study Commission Report* 24 (Jan. 2007). Of those, 228 were tried capitally and, although sixty death sentences have been returned, through the reversal of convictions and sentences only nine persons are presently on death row. *Ibid.*

By surveying the multiple variables that determine whether death is imposed, I do not suggest that more death sentences would make the system a better one. The structure of our capital laws apparently represents a societal judgment that it is better to

err on the side of life, better to let a hundred death-worthy persons receive life sentences than wrongly impose a death sentence on even one person. That being said, such a system will never allow for uniformity in sentencing.

Our task here, therefore, is not vainly to look for consistency, but to determine whether Wakefield's death sentence is aberrational. This Court's proportionality analysis involves two approaches, frequency review and precedent-seeking review, *see Cooper II, supra,* 159 *N.J.* at 70, 731 *A.*2d 1000, which are discussed at length in both Justice Rivera–Soto's and Justice Long's opinions. Central to proportionality review is setting the relevant universe of cases to which defendant's sentence is compared. Since this Court's first proportionality review, we have compared a defendant's case to that of all death-eligible homicides, even if a death sentence was not imposed or the prosecutor decided not to seek the death penalty. *See State v. Marshall,* 130 *N.J.* 109, 137, 613 *A.*2d 1059 (1992) (*Marshall II*), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993).

The Administrative Office of the Courts (AOC) has divided the universe of death-eligible cases into thirteen major categories and assigns each defendant to one of those categories. *Timmendequas II, supra,* 168 *N.J.* at 35, 773 *A.*2d 18; *Cooper II, supra,* 159 *N.J.* at 71, 731 *A.*2d 1000.[3] In conducting proportionality review, we *generally* limit our analysis to other cases that are in the same category as defendant. *See State v. Harris,* 165 *N.J.* 303, 326, 757

---

[3] The AOC assigns cases for comparison to the following categories, which track, although not sequentially, most of the statutory aggravating factors. *See N.J.S.A.* 2C:11–3c(4). Those categories are: (A) Victim is a Public Servant; (B) Prior Murder Conviction without A above; (C) Contract Killing without A–B above; (D) Sexual Assault without A–C above (subdivided into (1) aggravated and (2) other); (E) Multiple Victims without A–D above (subdivided into (1) aggravated and (2) other); (F) Robbery without A–E above (subdivided into (1) home, (2) business, and (3) other); (G) Torture/Depravity without A–F above; (H) Abduction without A–G above; (I) Arson without A–H above; (J) Escape Detection without A–I above; (K) Burglary without A–J above; (L) Grave Risk without A–K above; (M) Victim Under 14 Years Old without A–L above. *State v. Timmendequas,* 168 *N.J.* 20, 35–36, 773 *A.*2d 18 (2001) (*Timmendequas II*).

*A.*2d 221 (2000) (*Harris III*), *cert. denied,* 532 *U.S.* 1057, 121 *S.Ct.* 2204, 149 *L.Ed.*2d 1034 (2001). The thirteen categories, however, are not air-tight compartments, and cross-over comparisons are permitted. The characteristics of a defendant's crime may fit into more than one category, and even if not, the crime nevertheless may be similar to crimes assigned to other categories.

In the past, we have "maintain[ed] a certain tolerance and openness to cross-category comparisons." *State v. Morton,* 165 *N.J.* 235, 256, 757 *A.*2d 184 (2000) (*Morton II*), *cert. denied,* 532 *U.S.* 931, 121 *S.Ct.* 1380, 149 *L.Ed.*2d 306 (2001). In *Morton II,* we commented that we would compare a defendant's case to one that falls outside of his classification if the cases shared "several defining characteristics." *Ibid.* For example, we have expressed a willingness to compare two gas-station-robbery-murders even though one has been placed into cell B (prior murder conviction) and the other placed into cell F–2 (business-robbery). *Id.* at 256– 57, 757 *A.*2d 184; *see also Feaster II, supra,* 165 *N.J.* at 408, 757 *A.*2d 266 (comparing defendant who committed murder in course of robbery of business to defendants in prior murder conviction and other-robbery categories); *Martini II, supra,* 139 *N.J.* at 51, 651 *A.*2d 949 (comparing defendant whose murders spanned several different categories to defendants assigned to several different cells).

With those proportionality principles in mind, I now evaluate whether Wakefield's death sentence is aberrational. Defendant was assigned to the E–1 cell, a category of cases that involve the murder of multiple victims in the course of an additional felony. In preparation for defendant's proportionality review, the AOC identified twenty-eight other cases in the E–1 cell, comprised of nineteen individual defendants.[4] Six of those defendants pled guilty to non-capital murder or a lesser charge; two went to trial

---

[4] A defendant may count as more than one case if he or she underwent a penalty trial for more than one victim, or if his or her death sentence was reversed and then tried again.

after the prosecutor declined to capitally charge them; two entered into plea agreements after the State served a notice of aggravating factors; and seven proceeded to trial but the jury declined to impose the death penalty. Of the nineteen, four defendants were convicted of capital murder and received death sentences. In all four cases, this Court reversed either the conviction or the sentence. In the aftermath, Walter Johnson pled guilty to non-capital murder. Thomas Koskovich and Anthony McDougald received new penalty trials, but in both cases their juries were deadlocked and therefore life sentences were imposed. Last, Bobby Lee Brown received a life sentence because the State elected not to seek the death penalty again.[5]

Given the many variables favoring a life sentence and the small number of defendants in the E–1 cell, it is not completely surprising that Wakefield is the only remaining death-sentenced individual in his category. For the majority and the dissent the battleground is the E–1 cell, with the majority arguing that Wakefield's crime and moral culpability are not truly comparable to his cohort class and the dissent claiming just the opposite.

Ultimately, the majority's considerable efforts to distinguish Wakefield from his cohorts are not convincing. For example, the majority contends that Wakefield is more deserving of death than thirty-six year old Louis Crumpton who savagely beat to death two women, aged eighty-six and eighty-one, during a home invasion that began as a garden-variety burglary. Crumpton pled guilty to non-capital murder. Unlike Wakefield, Crumpton suffered from AIDS and apparently was surprised by the presence of his victims, and, based on those factors, the majority concludes Wakefield's "moral blameworthiness" was sufficiently different to justify his death sentence and Crumpton's life sentence. *See ante* at 524–25, 921 *A.*2d at 1034–35.

---

[5] Johnson and Brown received life sentences for the murder of one of their victims and death sentences for the other. Therefore, the number of life and death decisions is twenty-one, rather than nineteen.

The majority also strains to find that Wakefield is more deserving of death than Ronald Mazique. At the time that he broke into the home of a forty-one-year old woman to steal her income tax return, Mazique was twenty-one years old. Mazique killed the woman and her six-year old grandson, striking each victim at least thirty times with a hammer. To conceal the crime, Mazique attempted to blow-up the apartment by turning on the gas jets in an oven. A penalty-phase jury could not return a unanimous death verdict and therefore Mazique was sentenced to consecutive life terms. Although both Mazique and Wakefield had troubled childhoods, the majority hypothesizes that Wakefield's jury did not "credit [his] evidence to any appreciable extent." *Ante* at 529, 921 A.2d at 1037. The majority concedes that both "cases are quite similar," but it nevertheless speculates that the differing ways that separate juries viewed the traumatic upbringings of the two defendants "likely and rationally explains the difference between defendant's death sentence and Mazique's life sentence." *Ibid.*

Without engaging in hairsplitting distinctions, it is difficult to conclude that Wakefield is more death-worthy than Crumpton or Mazique or many of the other defendants in the E–1 category. The divergent outcomes cannot rationally be explained by distinguishing the heinousness of the murders they committed, their psychological impairments, or their dysfunctional childhoods. The system's vagaries, more than the relative moral blameworthiness of the defendants in the relatively small E–1 class, go much further toward explaining why Wakefield stands apart from the other defendants. Therefore, I cannot affirm Wakefield's death sentence based on the proportionality review conducted by the majority.

Nor do I agree with the approach taken by Justice Long in her dissent. Justice Long quite reasonably finds Wakefield's crime and moral blameworthiness characteristics indistinguishable from those of other members of the E–1 class, who are serving prison terms. *Post* at 565–67, 921 A.2d at 1058–59. From that premise,

she finds that Wakefield's death sentence cannot be upheld because, viewing the relevant factors, he is "no better or worse than the members of his band," and therefore he too should receive a life sentence. *See post* at 568, 921 *A*.2d at 1060. Justice Long's logic might be irrefutable if there were a statistically larger number of defendants in the E–1 group and if no cross-group comparisons were permitted.

If this Court were to hold that the death sentence in this case— where defendant assaulted and killed an elderly couple in their own home, set fire to their bodies, and went on a shopping spree with the money he stole—is disproportionate, it is unlikely that any multiple homicide death sentence would ever survive proportionality review. Indeed, the Wakefield case would become the impossible standard to meet in all future multiple-homicide proportionality review cases and the E–1 group would be shut forever. In short, the paradigm suggested by the dissent would render our proportionality review scheme a farce.

We must remember that the AOC categories are artificial constructs—not statutory mandates—and that the overall object of proportionality review is comparison to similar cases, in whatever categories those cases may be designated. *See N.J.S.A.* 2C:11–3e. The AOC categories were created to facilitate, not to thwart review. As an alternative to the analysis employed by the majority and the dissent, I would compare defendant's culpability to factually similar cases outside the E–1 group. Rigid comparison within a specific category is not required by *N.J.S.A.* 2C:11–3e or our case law. *See Morton II, supra,* 165 *N.J.* at 256–57, 757 *A*.2d 184. There is no point to strictly confining a defendant to one category when the facts and circumstances of a defendant's crime transcend multiple categories. Wakefield's crime is not only a "multiple victim" homicide (category E), but also a homicide in the course of committing a robbery (category F).

Accordingly, I will compare Wakefield's case to single-murder robbery (category F) cases in which this Court has upheld death sentences on proportionality review. Surely, Wakefield should not

be better situated because he murdered more than one person. The case of Nathaniel Harvey, who now sits on death row for a robbery-murder, provides a useful point of comparison.

Late at night or early in the morning, Harvey broke into the apartment of a woman he did not know and, while armed with a hammer and another blunt-force object, struck his victim fifteen times in the head, fracturing her skull. *State v. Harvey,* 159 *N.J.* 277, 309–10, 731 *A.*2d 1121 (1999) (*Harvey III*). After the brutal murder, Harvey, then age forty-four, washed the blood off the victim's body, changed the sheets, and then left her naked on the floor. *Id.* at 297, 310, 731 *A.*2d 1121.

As in the Wakefield case, the jury found that Harvey committed the murder while engaged in the commission of a burglary and a robbery, and that he did so to escape detection and apprehension. *Id.* at 288, 731 *A.*2d 1121. As in the Wakefield case, various jurors found as mitigating factors that Harvey endured a traumatic and abusive childhood. *See id.* at 312, 731 *A.*2d 1121. Neither Wakefield nor Harvey posited any justification for the murder. *See id.* at 313, 731 *A.*2d 1121.

This Court found that Harvey was moderately culpable with respect to the degree of victimization. *Id.* at 315, 731 *A.*2d 1121. In comparison, Wakefield's murder is notable not only because of the brutality inflicted on his elderly victims, but also because of the mental anguish suffered both by Mr. Hazard, who probably knew his wife would find him dead or be killed herself, and by Mrs. Hazard, who probably saw the body of her murdered husband. *See ante* at 515, 921 *A.*2d at 1029. Last, Harvey's character is distinguished by his extensive prior record, which included convictions for violent crimes, and by the lack of any remorse expressed in his allocution statement. *Harvey III, supra,* 159 *N.J.* at 314, 731 *A.*2d 1121. Defendant also has an extensive, though nonviolent, criminal record, and while he did apologize during his sentencing allocution, his post-crime shopping and partying spree evidenced a callous indifference to the horrors he had perpetrated. In short, I cannot conclude that Wakefield who

killed two elderly people in their home is less morally culpable than Harvey, who killed only one. Because this Court determined that Harvey's death sentence was not disproportionate, *id.* at 320, 731 A.2d 1121, then, it follows, as a matter of inexorable logic, that defendant's sentence should stand too.

That conclusion is bolstered by looking at the universe of comparable murder-robberies cases and, in particular, the case of Richard Feaster. In that case, Feaster was convicted of the robbery-murder of a gas station attendant from whom he stole $191.32, and sentenced to death. *Feaster II, supra,* 165 *N.J.* at 393–98, 757 A.2d 266. This Court upheld his death sentence after conducting proportionality review. *Id.* at 420, 757 A.2d 266. The victimization caused by Feaster's crime—a single gunshot wound—was significantly lower than Wakefield's. *See id.* at 406, 757 A.2d 266. Moreover, Feaster was raised by an emotionally and physically abusive father and his intellectual capacity placed him in the borderline mentally retarded category. *Id.* at 405, 757 A.2d 266. Feaster had a fairly minor criminal history, compared to Wakefield's lengthier one. *See id.* at 406–07, 757 A.2d 266. It seems impossible to find that Wakefield's culpability is not at least equal to that of Feaster.

Therefore, when comparing Wakefield's death sentence to other "similar cases" in which the death sentences passed this Court's proportionality review, I necessarily conclude that Wakefield's sentence is neither aberrational nor disproportionate.[6]

### III.

Last, I want to respond to Justice Long's suggestion that this Court should revisit *State v. Ramseur,* in which this Court upheld

---

[6] In comparing defendant's case to similar cases where death has been imposed, we are simply following what is required by the statute. *See N.J.S.A.* 2C:11–3e ("Proportionality review under this section shall be limited to a comparison of similar cases in which a sentence of death has been imposed. . . .").

the constitutionality of the death penalty. 106 *N.J.* 123, 170–73, 524 *A.*2d 188 (1987). In *Ramseur*, the Court specifically determined that the death penalty did not violate Article I, Paragraph 12, of our Constitution, which prohibits cruel and unusual punishment. *Ibid.* In doing so, the Court applied the "contemporary standards of decency" standard found in federal jurisprudence, *Trop v. Dulles*, 356 *U.S.* 86, 101, 78 *S.Ct.* 590, 598, 2 *L.Ed.*2d 630, 642 (1958). The Court determined in *Ramseur, supra*, decided in 1987, that the death penalty conformed to those standards under our State Constitution. 106 *N.J.* at 174, 524 *A.*2d 188.

Justice Long notes that attitudes have changed in twenty years and that "evolving standards of decency," as reflected in opinion polls and studies, indicate that the citizens of New Jersey are no longer enamored with the death penalty and would be happy to be rid of it. *Post* at 568, 921 *A.*2d at 1060. On that basis, Justice Long would consider declaring our death penalty unconstitutional. *Ibid.* I cannot subscribe to that approach because I do not believe that this Court has the constitutional authority to strike down the death penalty in its entirety under the "evolving standards of decency" test.[7] That is so because in 1992, the voters of New Jersey approved a constitutional amendment providing that the death penalty was not cruel and unusual punishment when imposed on a person who purposely and knowingly caused death or serious bodily injury resulting in death, if he committed the act himself or paid another to do it. *See N.J. Const.* Art. 1, ¶ 12. Applying "contemporary standards of decency" may have been

---

[7] We may, however, as the United States Supreme Court has done, apply the "evolving standards of decency" standard in determining the constitutionality of the death penalty when applied to certain classes of defendants, such as juvenile offenders or the mentally retarded, and certain classes of crimes. *See, e.g., Roper v. Simmons*, 543 *U.S.* 551, 560–61, 578, 125 *S.Ct.* 1183, 1190, 1200, 161 *L.Ed.*2d 1, 16, 28 (2005); *Atkins v. Virginia*, 536 *U.S.* 304, 321, 122 *S.Ct.* 2242, 2252, 153 *L.Ed.*2d 335, 350 (2002). This Court also may insist that the death penalty comply with other constitutional provisions, such as the guarantees of due process and equal protection under Article I, Paragraph 1 of our State Constitution, and the fundamental fairness doctrine rooted in our common law. *See Doe v. Poritz*, 142 *N.J.* 1, 94, 99, 108–09, 662 *A.*2d 367 (1995).

appropriate in 1987 when *Ramseur* was decided because then Article I, Paragraph 12 made no reference to the death penalty. Now, however, our State Constitution proclaims that the death penalty is not cruel and unusual punishment.

There is no firmer expression of public opinion than a constitutional amendment. Although opinion polls may suggest that an increasing number of New Jersey residents are opposed to the death penalty, *see post* at 568, 921 *A.*2d at 1060, the only poll that will truly count in our representative democracy is if the popularly elected members of our Legislature vote to repeal the death penalty. In short, our Court cannot declare the death penalty to be cruel and unusual punishment when our Constitution states otherwise.

Last, I have a few observations about the current state of our capital punishment system. Although the few defendants currently on death row may fairly be described as the "worst-of-the-worst," sadly they are no worse than many of those who have been spared death sentences. Since the recent advent of modern capital punishment in 1982, hundreds of death-eligible defendants have entered the system, but only nine currently await execution. We must come to grips with the fact that the fates of the few death-slated inmates, however morally culpable they are for their crimes, are the product of what may appear to be a random selection. How else to explain that that so many depraved defendants who have committed heinous murders are serving ordinary prison sentences while only nine bide their time on death row. I am not suggesting that the machinery of our capital system is churning out too few death sentences, but given the perfect vision of a quarter-century of hindsight, the few death sentences meted out might appear arbitrary when compared to the life sentences imposed on so many other seemingly death-worthy defendants. The strange irony of our capital jurisprudence is that it runs counter to one of the primary purposes of the Code of Criminal Justice—uniformity in sentencing. *See State v. Natale,* 184 *N.J.* 458, 485, 878 *A.*2d 724 (2005) (identifying unifor-

mity in sentencing as " '[t]he dominant, if not paramount, goal of the Code' " (quoting *State v. Kromphold*, 162 *N.J.* 345, 352–53, 744 *A.*2d 640 (2000)). But that is so not because of some evil design, but because of the multitude of procedural safeguards that favor the imposition of sentences other than death.

The people have the right to choose laws that reserve the ultimate punishment for the worst offenders. However, the people ultimately will have to decide whether a capital system that yields such widely disparate outcomes serves a legitimate penological purpose, whether it is any longer worth the financial expense and cost in lost expectations, and whether it is more harmful than healing to the innocent families who have lost loved ones.

Justice LONG, dissenting.

For proportionality review purposes, Brian Wakefield's cohort is made up of a motley crew of life-sentenced multiple murderers, who laid in wait for their victims and bludgeoned, shot, stabbed, and scissored to death men, women, and children of all ages. Wakefield's crimes, execrable as they were, were in fact not "worse" than those of his comparators and the personal stories of those in his group were not "better" than his. Yet alone among his cohort, Wakefield awaits lethal injection while every other defendant will live out his days in prison. Advancing inconsequential and unprecedented distinctions, or no distinctions at all, the majority declares Wakefield's sentence of death to be proportional. Such a result cannot be countenanced in a system of laws.

I.

Because we believe that "death is different," *Gregg v. Georgia*, 428 *U.S.* 153, 188, 96 *S.Ct.* 2909, 2932, 49 *L.Ed.*2d 859, 883 (1976), we have developed a proportionality review methodology that provides a "more expansive source of protections against the arbitrary and nonindividualized imposition of the death penalty" than does the United States Constitution. *State v. Ramseur*, 106 *N.J.* 123, 190, 524 *A.*2d 188 (1987).

Proportionality review is unique in that it is not a "just deserts" analysis of one defendant's deathworthiness. Indeed, we presume that "the death sentence is not disproportionate to the crime in the traditional sense." *Pulley v. Harris,* 465 *U.S.* 37, 43, 104 *S.Ct.* 871, 876, 79 *L.Ed.*2d 29, 36 (1984). We "inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime." *Ramseur, supra,* 106 *N.J.* at 326, 524 *A.*2d 188 (quoting *Pulley, supra,* 465 *U.S.* at 43, 104 *S.Ct.* at 876, 79 *L.Ed.*2d at 36). The role of proportionality review "is to place the sentence imposed for one terrible murder on a continuum of sentences imposed for other terrible murders to ensure that the defendant "has not been 'singled out unfairly for capital punishment.' " " *State v. Timmendequas,* 168 *N.J.* 20, 76, 773 *A.*2d 18 (2001) (Long, J., dissenting) (citations omitted).

Proportionality review is not a numbers game. Rather, it is the difficult substantive measurement of one defendant's character and crime against those of similarly-situated defendants. Indeed, even if every defendant in a cohort has been spared, a death sentence will not be disproportionate if the details of the subject defendant's crime or of his character warrant different treatment than the life-sentenced group. The polestar in each case is whether a defendant's culpability is greater than that of similarly-situated, life-sentenced defendants and whether "it equals or exceeds that of other death-sentenced defendants." *State v. Loftin,* 157 *N.J.* 253, 335, 724 *A.*2d 129 (1999) (*Loftin II* ) (quoting *State v. DiFrisco,* 142 *N.J.* 148, 184, 662 *A.*2d 442 (1995) (*DiFrisco III*), cert. denied, 516 *U.S.* 1129, 116 *S.Ct.* 949, 133 *L.Ed.*2d 873 (1996)).

Because of the complexities of human nature and the enormously different details of individual crimes, the task of proportionality review is a difficult and, sometimes, macabre one. However, as Justice Brennan noted in *Pulley,*

 although clearly no panacea, such review often serves to identify the most extreme examples of disproportionality among similarly situated defendants. At least to

this extent, this form of appellate review serves to eliminate some of the irrationality that currently surrounds imposition of a death sentence.

[*Supra*, 465 *U.S.* at 71, 104 *S.Ct.* at 890, 79 *L.Ed.*2d at 53 (Brennan, J., dissenting).]

## II.

Many of the deficiencies in our proportionality review scheme have been detailed previously. *See In re Proportionality Review Project*, 161 *N.J.* 71, 99–106, 735 *A.*2d 528 (1999) (*Proportionality Review I*) (Handler, J., concurring in part and dissenting in part) (criticizing Court's standard for assessing disproportionality); *Di-Frisco III, supra*, 142 *N.J.* at 224–31, 662 *A.*2d 442 (Handler, J., dissenting) (criticizing principle of unique assignment); *State v. Martini*, 139 *N.J.* 3, 90–91, 651 *A.*2d 949 (1994) (*Martini II*) (Handler, J., dissenting) (discussing lack of statistical standard to measure disproportionality under frequency review); *State v. Marshall*, 130 *N.J.* 109, 249–50, 263–65, 613 *A.*2d 1059 (1992) (*Marshall II*) (Handler, J., dissenting) (criticizing coding of reversed death sentences as death sentences; inconsistency and inherent subjectivity of proportionality tests; inclusion of the defendant's own case in frequency analysis; and abandonment of generally-imposed standard for proportionality), *cert. denied*, 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993).

Indeed,

the permeable boundaries of the process; its flaccidity; the constant change in standards from case to case; the utterly subjective way in which even legitimate standards are applied; and the consistent practice of the Court to focus only on the aggravating aspects of the case under review while underscoring the mitigating factors of the comparison cases allows the Court to conclude that virtually any death sentence is proportional.

[*Timmendequas, supra*, 168 *N.J.* at 78, 773 *A.*2d 18 (Long, J., dissenting).]

This case is emblematic of those problems.

## III.

### *Frequency Analysis*

In frequency analysis, a statistical modality, we attempt to determine the relative proportionality of a death sentence by

comparing it numerically with the universe of cases to which it is factually similar. *State v. Morton*, 165 *N.J.* 235, 245, 757 *A.*2d 184 (2000) (*Morton II*), *cert. denied.*, 532 *U.S.* 931, 121 *S.Ct.* 1380, 149 *L.Ed.*2d 306 (2001). Here, Wakefield has been assigned to the E–1 cell, which consists of cases that involve multiple homicide victims killed during the commission of an additional felony. In rejecting Wakefield's frequency-based claim of disproportionality, the majority points out that in the E–1 aggravated multiple victim category, without Wakefield,[1] 5/28, or 18%, of the defendants were sentenced to death. *Ante* at 503, 921 *A.*2d at 1022. According to the majority, that augers poorly for Wakefield because it reflects a societal consensus that death is appropriate for E–1 offenders. *Ante* at 504–505, 921 *A.*2d at 1023.

Nothing could be further from the truth. The actual percentage is zero. Indeed, all five death sentences that constitute the numerator in the majority's fraction were reversed because of errors that rendered the trials in which they were imposed unfair. The four defendants comprising the five death sentences (Bobby Lee Brown (T1, V2), Walter Johnson (T1, V2), Anthony McDougald (T1, V1), (T1, V2), and Thomas Koskovich (T1)) have since been resentenced to life. To suggest that death sentences that were imposed in wrongful proceedings should somehow count against Wakefield in a societal consensus analysis is chilling. "The unfathomable irony of the Court's holding today is that although the Court found the reversed verdicts too untrustworthy for use in sentencing the individual defendants subject to them, it now finds them sufficiently trustworthy for use in sentencing other defendants who were not subject to them." *Marshall II, supra*, 130 *N.J.* at 254, 613 *A.*2d 1059 (Handler, J., dissenting).

---

[1] Obviously, a defendant cannot be included in the salient factors statistics against which his sentence is to be compared. Otherwise his sentence would "confirm its own propriety." *Morton II*, supra, 165 *N.J.* at 289, 757 *A.*2d 184 (Long, J., dissenting) (quoting *Marshall II*, supra, 130 *N.J.* at 263, 613 *A.*2d 1059 (Handler, J., dissenting)).

In short, a real calculation of death sentencing frequency demonstrates no societal consensus that death is an appropriate penalty for defendants in the E–1 category. On that backdrop, precedent-seeking review is of particular importance.

[T]he higher the frequency of life sentences in the pool of similar cases, the more searching will be the inquiry to test whether comparison with the life-sentenced cases (or more culpable death-sentenced cases) suggests that [a defendant's death] sentence was disproportionate in the sense of his having been singled out unfairly for capital punishment.

[*Id.* at 159, 613 *A.*2d 1059.]

## IV.

### *Precedent–Seeking Review*

#### A. Moral Blameworthiness

This case is a textbook example of the Court changing its standards on a case-by-case basis in order to achieve a foreordained outcome. For example, although Wakefield admitted to planning the robbery of the Hazards, no evidence was presented to prove that the murder itself was premeditated. In *State v. Papasavvas,* where the defendant broke into a home in order to steal possessions therein and eventually murdered the owner, we noted that "the murder was not premeditated, at least not in advance of [defendant's] entry into the [victims'] home." 170 *N.J.* 462, 481–82, 790 *A.*2d 798 (2002). Based at least in part on that factor, we found "Papasavvas's moral blameworthiness to be moderate," and determined that his death sentence was disproportionate. *Id.* at 482, 495, 790 *A.*2d 798. Similar consideration was not given to Wakefield.

Further, the majority does not find Wakefield's age (twenty-three at the time the crime was committed) to reduce his blameworthiness. *Ante* at 513, 921 *A.*2d at 1028. Yet, in assessing Papasavvas, who was also twenty-three years old when he committed murder, we assigned "some mitigating weight to his age." *Papasavvas, supra,* 170 *N.J.* at 482, 790 *A.*2d 798.

The other side of that coin is that in upholding death sentences on proportionality review, we have found defendants more death-worthy than those in their cohort, in part because those in the comparison group were *only* twenty-two or twenty-three years old when they committed murder. *See, e.g., State v. Harvey* 159 *N.J.* 277, 298, 731 *A.*2d 1121 (1999) (*Harvey III* ) ("Age was a mitigating factor for Dollard, Wolfe and Hart who were all twenty-two years or younger when they committed the murders for which they were charged."), *cert. denied.*, 528 *U.S.* 1085, 120 *S.Ct.* 811, 145 *L. Ed.*2d 683 (2000); *State v. Harris*, 165 *N.J.* 303, 341, 757 *A.*2d 221 (2000) (*Harris II* ) ("Unlike Harris, Marrero was relatively young when he committed murder, twenty-three years old."), *cert. denied.*, 532 *U.S.* 1057, 121 *S.Ct.* 2204, 149 *L.Ed.*2d 1034 (2001); *Loftin II, supra,* 157 *N.J.* at 341, 724 *A.*2d 129 ("Feaster . . . was only twenty-two-years old at the time of his offense"). Yet, Wakefield's age plays little part in the majority's evaluation.

Further, although Wakefield has an extensive prior record, it is significant that he has never been convicted of a crime of violence. That is yet another characteristic that he shares with Papasavvas, whose death sentence we overturned on proportionality review. *Papasavvas, supra,* 170 *N.J.* at 495, 790 *A.*2d 798. As we said in *Papasavvas,* "[h]is criminal history increases his culpability. However, that is offset by the absence of violent offenses prior to this offense." *Id.* at 483, 790 *A.*2d 798. If we found Papasavvas's culpability diminished based on his lack of premeditation, his age, and his non-violent prior record, it is inconsistent that we not do the same when evaluating Wakefield's character.

The majority opinion is also paradigmatic of the Court's consistent practice of focusing our attention on a single feature of the case under review without recognizing its ubiquity. For example, Wakefield's motive to escape detection and the fact that he "likely could have completed the robbery without committing the murder" are declared by the majority "to substantially exacerbate his moral blameworthiness." *Ante* at 509, 921 *A.*2d at 1025. Those

factors, however, are nearly universally present in the comparison cases and yet are never considered in assessing the culpability of those defendants. Moreover, to the extent that a consideration is universal, it cannot be used to differentiate the culpability of one defendant from others.

Likewise, the majority concludes that the vulnerability of the Hazards adds to Wakefield's moral blameworthiness. *Ante* at 511–12, 921 *A.*2d at 1027. Again, vulnerable victims are a hallmark of the cases in Wakefield's cell. Ronald Mazique killed a six year old; Felix Díaz an eight year old; Peter Regan two adolescents. Brown, Masini, and Crumpton killed very elderly people, some older than the Hazards, one stroke-ridden. Thus vulnerability, as a universal characteristic, cannot be used to ratchet up Wakefield's culpability but not that of the others.

For the same reason, the majority's inclusion of the notion of family victimization in this analysis, *ante* at 512–13, 921 *A.*2d at 1027–28, is analytically unsound,

not because it is not terribly real, but because it is universal and thus cannot serve as a basis to distinguish between defendants. *Morton II, supra,* 165 *N.J.* at 293 [757 *A.*2d 184] (Long, J., dissenting) (criticizing Court's application of the "non-decedent victim factor" to "every case in which the victim was a 'unique person' with a 'web of familial relations'—in other words, to every single murder case") (citation omitted).

[*Timmendequas, supra,* 168 *N.J.* at 83, 773 *A.*2d 18 (Long, J., dissenting).]

## B. Victimization

I agree that the victimization in this case was high and that the Hazards suffered intense physical and mental pain. Where I part from the majority is in its concomitant suggestion that Wakefield's victimization of the Hazards exceeded that of the other criminal comparators. *See ante* at 515–16, 921 *A.*2d at 1029. The horrific details of the comparison crimes, laid bare in Part V., *infra,* plainly underscore the wrongness of that conclusion. In the E-1 category, all victims suffered unimaginable deaths including beatings, stabbings, burnings, shootings, and bludgeonings. Victims had their skulls fractured, their dentures split, or their throats slit.

Some were murdered while attempting to crawl away. One lived on in a chronic vegetative state long after the assault. Several victims were older than the Hazards. Several were children, one as young as six. Some defendants actually laid in wait to murder their victims. One victim was stroke-impaired. Several defendants performed sexual acts on their victims post-mortem. Some defendants killed three or four victims. In the face of those facts, there is no rational basis from which to conclude that Wakefield's victimization of the Hazards exceeded that of his compatriots in crime. That is very important because the majority bases most of its justifications regarding Wakefield's sentence on that flawed sentiment. *E.g., ante,* at 524, 531–32, 921 *A.*2d at 1034, 1038–39.

### C. Character

In terms of Wakefield's character, I find extraordinary the majority's conclusion that, although there was "evidence that Wakefield suffered from emotional disease or defect" and a troubled upbringing, (conditions we have always recognized as mitigating, *e.g., Marshall II, supra,* 130 *N.J.* at 155, 613 *A.*2d 1059; *Papasavvas, supra,* 170 *N.J.* at 482, 790 *A.*2d 798), it "was contested by the State, thereby reducing its impact on defendant's blameworthiness." *Ante* at 512, 921 *A.*2d at 1027. This is the first time that mere State opposition is viewed as somehow affecting the quality of a mitigator.

Further, with respect to cooperation with the authorities, the majority recognizes defendant's statements to the police, his request that his mother cooperate, and his unconditional plea to all the crimes for which he stood charged. *Ante* at 518, 921 *A.*2d at 1030–31. That kind of cooperation has always been considered important mitigation in proportionality review cases. *See, e.g., Papasavvas, supra,* 170 *N.J.* at 491, 790 *A.*2d 798 (distinguishing Papasavvas from life-sentenced defendant based on latter's confession to "everything except stealing the homeowner's jewelry"); *Harris II, supra,* 165 *N.J.* at 339, 757 *A.*2d 221 (noting life-sentenced defendant's willingness to plead guilty as mitigating

factor); *State v. Cooper,* 159 *N.J.* 55, 104, 731 *A.*2d 1000 (1999) (*Cooper II* ) (distinguishing Cooper's death sentence from similarly-situated, life-sentenced defendant who, while initially denying involvement in murder, ultimately confessed), *cert. denied.,* 528 *U.S.* 1084, 120 *S.Ct.* 809, 145 *L.Ed.*2d 681 (2000); *State v. Chew* 159 *N.J.* 183, 217, 731 *A.*2d 1070 (1999)(*Chew II* ) (crediting another defendant with cooperation with authorities because, while sporadic, he confessed to killing the victim and implicated principal in murder-for-hire scheme), *cert. denied,* 528 *U.S.* 1052, 120 *S.Ct.* 593, 145 *L.Ed.*2d 493 (1999); *DiFrisco III, supra,* 142 *N.J.* at 207–08, 662 *A.*2d 442 (distinguishing defendant from similarly-situated, life-sentenced defendant who offered unconditional confession and voluntarily turned State's evidence). Yet, Wakefield receives no benefit because the majority concludes his cooperation was "designed to better his own plight, and not out of any sense of correctness." *Ante* at 518, 921 *A.*2d at 1031. Other than adopting the State's view, the majority's wholly subjective conclusion has no basis whatsoever. Moreover, even if it were true, we do not dice a defendant's cooperation so finely in assessing its bearing on culpability.

Again, with its failure to adhere to standards by which we have lived in prior cases, the majority effectively cuts the heart out of our proportionality review process.

## V.

### Comparison Cases [2]

Because all E–1 offenders ultimately received life sentences, in order for the Court to uphold Wakefield's death sentence it must

---

[2] I accept the majority's determination to engage in comparisons of the cases agreed upon by the parties. *Ante* at 521–23, 921 *A.*2d at 1032–33. Those include: Bobby Lee Brown (T1, V1), Bobby Lee Brown (T1, V2), Bobby Lee Brown (T2, V1, V2), Louis Crumpton, Felix Díaz, Walter Johnson (T1, V1), Walter Johnson (T1, V2), Walter Johnson (T2, V2), Frank Masini (M2), Ronald Mazique, Anthony McDougald (T1, V1), Anthony McDougald (T1, V2), Anthony McDougald (T2, V1), Peter Regan, and Roy Watson.

conclude that Wakefield is worse than, not merely as culpable as, his cohorts. Who are those comparison defendants that the majority concludes deserve to live while Wakefield awaits death?

Felix Díaz and a co-defendant broke into Díaz's ex-lover's house, awakening a male family member. They beat him and an eight year-old niece. Then they cut the man's throat and bludgeoned the eight year old to death before setting their bodies on fire. Díaz and his co-defendant then laid in wait for several hours for the ex-lover, rigging a light switch "so that the [victim] would be in a specific position for the murder." Hon. David S. Baime, *Report of the Special Master on Proportionality Review: State v. Brian Wakefield* B–12 (Oct. 21, 2004) [hereinafter *Wakefield Report*]. When the victim, a sixty-three year-old man, arrived home, Díaz shot him repeatedly and set his body on fire. A pet dog was also killed. Díaz's culpability is actually greater than Wakefield's. The majority recognizes the similarity between Díaz and Wakefield, and acknowledges the sentences are "disparate." *Ante* at 526, 921 *A*.2d at 1035.

Frank Masini murdered four people, including an elderly couple for whom he had worked as a handyman. He repeatedly stabbed the couple in the neck with a letter opener. When found, both were covered in blood, and the woman's girdle and underpants had been cut off. The victims had a number of defensive wounds on their hands. While investigating those murders, the police discovered similarities with the earlier murders of two elderly women (one Masini's eighty-five year-old aunt), each of whom had been stabbed repeatedly and found partially nude. Masini's culpability, as a middle-aged man with no psychological, alcohol, or drug abuse problems, who killed four people, is plainly greater than Wakefield's. Grudgingly, the majority characterizes them as equal. *Ante* at 528, 921 *A*.2d at 1036.

Walter Johnson, a twenty-four year old with a record of burglaries, shot a man and bludgeoned the man's wife to death with a poker as she attempted to escape after the gun misfired. The majority recognizes that Johnson's character, degree of blamewor-

thiness, and the victimization were "similar" to Wakefield's. *Ante* at 527, 921 *A*.2d at 1036.

Roy Watson, a forty-four year-old man with a long criminal history, beat an elderly couple to death, drinking scotch while watching them die and later stealing their belongings. His life sentence is recognized by the majority as "disparate." *Ante* at 532, 921 *A*.2d at 1039. However, his drug addiction is declared as a mitigating factor, whereas Wakefield's neurological impairment is not. *See ante* at 532–33, 921 *A*.2d at 1039. The majority also apparently does not consider the post-murder scotch drinking conduct as evidence of a lack of remorse although it concludes otherwise with respect to Wakefield's consumption of fast food after the commission of his crime. *See ante* at 532–33, 921 *A*.2d at 1039.

Ronald Mazique killed a woman and her six year-old grandson by striking them over thirty times each with a hammer, and then attempted to blow up their apartment by turning on the gas. Although recognizing his case as "quite similar" to Wakefield's, the majority simply distinguishes them on the ground of Mazique's "traumatic upbringing," while discounting the jury's findings of emotional and physical neglect and domestic violence by Wakefield's family. *Ante* at 529, 921 *A*.2d at 1037.

Peter Regan, a twenty-eight year old with a history of robbery and assault, was burglarizing his girlfriend's house when a fifteen year old entered the residence. He picked up an aluminum baseball bat and hit her in the head. When she started screaming and tried to get up from the floor, he continued to hit her in the head until she died. When his girlfriend's twelve year-old daughter entered the home, Regan killed her by hitting her six times in the head with the aluminum bat. He then removed the victims' clothing from the waist down to make it look as if a rape had occurred. How the majority can conclude that the victimization in this case is less than Wakefield's is unfathomable. *Ante* at 531–32, 921 *A*.2d at 1038.

Anthony McDougald was twenty-seven years old when he enlisted the help of a thirteen year-old girl, with whom he was romantically involved, in murdering the parents of another thirteen year-old girl, with whom he had had a sexual relationship. McDougald first slit the father's throat and stabbed him in the chest multiple times. When the victim began crawling away, McDougald hit him on the head with a bat, crushing his left ear and fracturing his skull on both sides. The Medical Examiner estimated that the father continued to survive for approximately ten to fifteen minutes. McDougald then entered the bedroom and hit the mother on the head with a cinder block and the bat before cutting her throat. He also pulled down her underpants and inserted the bat three inches into her vagina. McDougald came from a deprived, abusive background and was involved with drugs when he committed murder. Nevertheless, the sheer brutality of his crime, along with the fact that he persuaded a thirteen year-old girl to be his accomplice, renders him more culpable than Wakefield. Yet, despite its assessment that McDougald's crimes were "horrifying," the majority concludes, without discussing Wakefield's own mitigators, that because McDougald had two mitigators that Wakefield did not (extreme mental disturbance and intoxication), Wakefield's death sentence is not disproportionate. *Ante* at 530, 921 *A.*2d at 1038.

Louis Crumpton's case, especially, suggests the disproportionality of Wakefield's sentence, because of the similarity of the facts. Crumpton, like Wakefield, brutally killed two elderly people in the course of a burglary. In Crumpton's case, one of his victims, an eighty-six year-old woman, was discovered with severe trauma to her head and face, blackened eyes, and dentures split in two. The other victim, an eighty-one year-old woman was found sitting upright against a couch, covered in blood and with severe trauma to her face. She did not die immediately but lived in a vegetative state for several months. Crumpton, a thirty-six year-old man, had perpetrated numerous burglaries in the area. The majority justifies Wakefield's death sentence on the ground that he entered the Hazard's home knowing it was occupied. *Ante* at 525, 921

*A*.2d at 1034. How could that be the difference between life and death given the extraordinary violence of Crumpton's crimes against elderly victims and the absence of standard psychological mitigators in his case?

Bobby Brown, a twenty-three year old, killed his paramour's eighty-two year-old, stroke-impaired aunt and sixty-four year-old uncle. The uncle was stabbed ten times with scissors and was "hard to kill" according to Brown. Baime, *supra, Wakefield Report*, at B–6. The aunt was shot. Brown had no psychiatric history or drug influence. The majority recognizes Wakefield's mitigation as greater than Brown's but justifies Wakefield's death sentence based solely on "increased victimization." *Ante* at 524, 921 *A*.2d at 1034.

The details of those comparison cases underscore that there is no real distinction between Wakefield and the others that justifies his death over their lives.

## VI.

Perhaps recognizing that the subjective distinctions in its comparisons do not justify a lethal injection for Wakefield and a life sentence for everyone else, the majority adopts a new scheme of comparisons,

> *by engaging* in a more detailed comparison between defendant and the remaining nine murderers within his E1 statistical cohort. As points of comparison, we *distinguish between defendant and* Crumpton, Johnson, Masini and Regan because their life sentences were the result of negotiated plea agreements, whereas defendant chose instead to place his fate in the hands of a jury. We also *differentiate between defendant and* Díaz, Mazique, McDougald and Watson because the juries in each of those latter cases either found that the aggravating factors did not outweigh the mitigating factors or they deadlocked on the issue, automatically resulting in the imposition of a life sentence. Thus, of the Category E1 group, only Brown remains as a meaningful point of comparison.
>
> [*Ante* at 533–34, 921 *A*.2d at 1039–40.]

The problems with that approach are legion. First, we have never made the distinctions in death penalty cases that the majority here adopts. For example, it distinguishes Crumpton, Johnson, Masini, and Regan from Wakefield, on the basis of the former having been

subject to plea agreements. *Ante* at 533–34, 921 *A.*2d at 1039–40. Defendant thus stands as the only individual in the history of this Court's proportionality review to be deprived of the benefit of comparison to defendants who have pled guilty, thereby avoiding capital prosecution.[3] As prior cases make clear, the Court has never before used a plea bargain, in itself, as a distinguishing characteristic among death-eligible cases.

The majority's error in distinguishing cases where a jury "either found that the aggravating factors did not outweigh the mitigating factors or they deadlocked on that issue," is even graver. *Ante* at 534, 921 *A.*2d at 1040. A jury verdict that the aggravating factors do not outweigh the mitigating factors is a *unanimous* determination that the defendant is not deathworthy under *N.J.S.A.* 2C:11–3c(3)(b). Further, where a jury is deadlocked on the ultimate balance of the aggravating and mitigating factors, this Court has, without fail, treated such cases as life sentences for the purposes of proportionality review comparisons.[4]

---

[3] *See Papasavvas, supra,* 170 *N.J.* at 496–510, 790 *A.*2d 798 (comparing the defendant's sentence to life-sentences of defendants who pled guilty); *Timmendequas, supra,* 168 *N.J.* at 57–68, 773 *A.*2d 18 (same); *State v. Feaster,* 165 *N.J.* 388, 433–41, 757 *A.*2d 266 (2000) *(Feaster II)* (same), *cert. denied,* 532 *U.S.* 932, 121 *S.Ct.* 1380, 149 *L.Ed.*2d 306 (2001); *Harris II, supra,* 165 *N.J.* at 331–33, 757 *A.*2d 221 (same); *Morton II, supra,* 165 *N.J.* at 270–87, 757 *A.*2d 184 (same); *Harvey III, supra,* 159 *N.J.* at 320–43, 731 *A.*2d 1121 (same); *Chew II, supra,* 159 *N.J.* at 226–49, 731 *A.*2d 1070 (same); *Cooper II, supra,* 159 *N.J.* at 97–107, 731 *A.*2d 1000 (same); *Loftin II, supra,* 157 *N.J.* at 348–71, 724 *A.*2d 129 (same); *DiFrisco III, supra,* 142 *N.J.* at 187–203, 662 *A.*2d 442 (same); *Martini II, supra,* 139 *N.J.* at 54–74, 651 *A.*2d 949 (same); *State v. Bey,* 137 *N.J.* 334, 369–82, 645 *A.*2d 685 (1994) *(Bey IV)* (same), *cert. denied,* 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995); *Marshall II, supra,* 130 *N.J.* at 175–88, 613 *A.*2d 1059 (same).

[4] *See Papasavvas, supra,* 170 *N.J.* at 496–510, 790 *A.*2d 798 (comparing the defendant's sentence with life-sentences of defendants whose juries were non-unanimous); *Timmendequas, supra,* 168 *N.J.* at 57–68, 773 *A.*2d 18 (same); *Feaster II, supra,* 165 *N.J.* at 420–33, 757 *A.*2d 266 (same); *Harris II, supra,* 165 *N.J.* at 334–41, 757 *A.*2d 221 (same); *Morton II, supra,* 165 *N.J.* at 270–87, 757 *A.*2d 184 (same); *Chew II, supra,* 159 *N.J.* at 226–49, 731 *A.*2d 1070 (same); *Cooper II, supra,* 159 *N.J.* at 116–32, 731 *A.*2d 1000 (same); *Loftin II, supra,* 157

In treating a plea, a verdict, and a jury's inability to decide whether a defendant is deathworthy as characteristics distinguishing between cases, the Court essentially creates distinctions where there should be none. *Ante* at 533–34, 921 *A.2d* at 1039–40. Those invalid distinctions reduce the universe of cases to a point where proportionality review is no longer meaningful. To be sure, the majority is free to jettison our scheme or to retool it for future cases. What it is not free to do is to rely on distinctions that confound our prior jurisprudence to justify Wakefield's death. Wakefield is no better or worse than the members of his band. Yet, he alone awaits death and they have been spared. That outcome cannot stand.

## VII.

One final note. The death penalty was declared constitutional over twenty years ago in *Ramseur, supra,* 106 *N.J.* at 154, 524 *A.2d* 188, and we have continued perfunctorily to give that declaration lip service. *See, e.g., State v. Josephs,* 174 *N.J.* 44, 138–40, 803 *A.2d* 1074 (2002). Nevertheless, it is time to revisit the issue because *Ramseur, supra,* relied on "evolving standards of decency" to uphold that ultimate sanction. 106 *N.J.* at 171, 524 *A.2d* 188 (quoting *Trop v. Dulles,* 356 *U.S.* 86, 101, 78 *S.Ct.* 590, 598, 2 *L.Ed.2d* 630, 642 (1958)). If those standards applied then—they apply now. I have previously detailed some changes that have taken place since *Ramseur* was decided.

> Indeed, ... a recent survey by the highly respected Eagleton Center for Public Interest Polling, a project of the Institute of Politics of Rutgers University, provides compelling evidence that community consensus against the death penalty is continuing to evolve. Eagleton Institute of Politics, New Jerseyans' Opinions on a Death Penalty Moratorium (May 2002) [hereinafter Eagleton Survey].
>
> The study, based on interviews conducted with 803 New Jersey residents in May 2002, evinces a significant decrease in support for the death penalty. It shows that

---

*N.J.* at 348–71, 724 *A.2d* 129 (same); *DiFrisco III, supra,* 142 *N.J.* at 187–203, 662 *A.2d* 442 (same); *Martini II, supra,* 139 *N.J.* at 54–74, 651 *A.2d* 949 (same); *Bey IV, supra,* 137 *N.J.* at 369–82, 645 *A.2d* 685 (same); *Marshall II, supra,* 130 *N.J.* at 175–88, 613 *A.2d* 1059 (same).

60 percent of New Jersey residents support the death penalty as punishment for murder. Id. at 1. Sixty-three percent supported it when the issue was studied in 1999. Id. at 2. When we last considered the constitutionality of the death penalty, the then most recent surveys, conducted in 1977 and 1981 by the Eagleton Poll, showed public support for this State's death penalty at 72 percent.

When presented with the alternative of life in prison without parole, the public's support for the death penalty dropped to 36 percent, down from 44 percent in 1999. Eagleton Survey at 3. Moreover, as in prior years, New Jersey residents are less likely than other Americans to prefer the death penalty over life in prison without parole. *Ibid.* In addition, 66 percent of New Jersey residents—including 60 percent of those who favor the death penalty overall—favor a temporary halt to executions while a study is conducted to ascertain whether the death penalty is being administered accurately, fairly, and economically. *Id.* at 4.

The majority's reliance on our legislature's inaction regarding the death penalty as "the best and most reliable indicator" of contemporary values is mysterious in light of its citation to the recent United States Supreme Court decision in *Atkins v. Virginia*, 536 *U.S.* 304, 122 *S.Ct.* 2242, 153 *L.Ed.2d* 335 (2002), which held, among other things, that a national consensus has developed in the last thirteen years against the execution of mentally retarded persons. Despite that national consensus, our capital legislation still authorizes the execution of the mentally retarded, indicating that, at least as far as the United States Supreme Court is concerned, our legislature is out of synchronicity with "evolving standards of decency." *Id.* at 311, 122 *S.Ct.* at 2247, 153 *L.Ed.2d* at 344.

[*Josephs, supra*, 174 *N.J.* at 162–64, 803 *A.2d* 1074 (Long, J., concurring in part and dissenting in part) (citations omitted).]

The majority's citation to the *New Jersey Death Penalty Study Commission Report* that reinforces my view of the changing moral climate, renders more curious its adamant refusal even to consider the issue. *Ante* at 498, 921 *A.2d* at 1018. I remain, as I was in *Josephs:*

[M]ystified by the Court's resistance to revisiting a fifteen [now twenty] year-old opinion that, by its very terms, was rooted in conclusions about the public's appetite for the death penalty that appear to have changed. The suggestion that the Court's past perfunctory rejection of equally perfunctory challenges to *Ramseur* over the years gives currency to that opinion is neither jurisprudentially sustainable nor an appropriate response to a case involving the ultimate sanction of death.

[*Id.* at 164–65, 524 *A.2d* 188 (Long, J., concurring in part and dissenting in part).]

For those reasons, as well as the reasons expressed by Justice Wallace in his dissenting opinion on the merits, I dissent.

Justice WALLACE, JR., dissenting.

When life hangs in the balance, error has no place. Indeed, "the nature of the death penalty, which leaves no room for the error tolerable in other cases, requires 'a level of error-free process that is commensurate with the criminal sanction of death.' " *State v. Papasavvas*, 163 *N.J.* 565, 636, 751 *A.*2d 40 (2000) (Long, J., dissenting) (quoting *State v. Bey*, 112 *N.J.* 45, 119, 548 *A.*2d 846 (1988) (Handler, J., concurring)), *remanded by* 170 *N.J.* 462, 790 *A.*2d 798 (2002).

In defendant's penalty phase trial, the process was far from error-free. In fact, there were numerous errors which, when considered cumulatively, served to deprive defendant of the right to a fair trial. Because I cannot place confidence in the death sentence imposed under such circumstances, I must dissent.

I.

This Court has previously recognized that it must exercise particular vigilance in reviewing prosecutorial misconduct claims in capital cases, dismayed as it was "by the frequency of prosecutor's comments that lay 'beyond the bounds of propriety.' " *Papasavvas, supra,* 163 *N.J.* at 622, 751 *A.*2d 40 (citation omitted). Moreover, this Court has expressed a willingness to find prejudice resulting from prosecutorial misconduct in a capital case more readily than in other criminal matters "[b]ecause death is a uniquely harsh sanction." *State v. Ramseur*, 106 *N.J.* 123, 324, 524 *A.*2d 188 (1987).

To be sure, prosecutors have a special duty to seek justice. *See, e.g., State v. Reddish*, 181 *N.J.* 553, 641, 859 *A.*2d 1173 (2004) (noting that "prosecutors are charged not simply with the task of securing victory for the State but, more fundamentally, with seeing that justice is served"). "Prosecutors may fight hard, but they must also fight fair." *State v. Pennington*, 119 *N.J.* 547, 577, 575 *A.*2d 816 (1990), *overruled on other grounds by State v. Brunson*, 132 *N.J.* 377, 625 *A.*2d 1085 (1993), *and superseded by*

statute, *N.J.S.A.* 2C:11–3i, *as recognized in State v. Cruz*, 163 *N.J.* 403, 412, 749 *A.*2d 832 (2000).

In my view, the prosecutor overstepped the bounds of fairness on several occasions, beginning with the invocation of the authority of the State in the opening statement and later in casting unjustified aspersions on defense counsel and witnesses during the trial.

### A.

Where a prosecutor has invoked the authority of the State, courts have not hesitated to find a deprivation of a defendant's right to a fair sentencing hearing. The United States Court of Appeals for the Eleventh Circuit explained that "[s]uch arguments are objectionable because their effect is to assure the jurors that someone with greater experience has already made the decision that the law imposes on them." *Tucker v. Zant,* 724 *F.*2d 882, 889 (11th Cir.1984), *vacated and remanded sub nom. Tucker v. Kemp,* 474 *U.S.* 1001, 106 *S.Ct.* 517, 88 *L.Ed.*2d 452 (1985).

In his opening statement, the prosecutor clearly invoked the authority of the State when he told the jury, "[t]he State does not seek the death penalty on a routine basis. It is not something that we do lightly. The State seeks the death penalty when the State believes the facts call for it." In response to defense counsel's motion for a mistrial, which was denied, the trial court issued the following instruction to the jury:

> If during the course of either opening any counsel referred to their personal opinion or personal belief, that is not a proper aspect of presentation and counsel's belief or counsel's opinion is not evidence and is indeed not proper argument either. So to the extent there was any such argument or presentation made, it should be disregarded by you and you should allow that to play no role in any determination which you make.

That instruction fell short of curing any prejudice stemming from the prosecutor's statements. Indeed, the instruction was conditional, and thus diluted. By referring to the expression of a personal opinion, the instruction did not directly address the true problem of the prosecutor's invocation of the experience of the

State. As this Court explained in a similar context, "only a clear and precise instruction referring specifically to the improprieties and disapproving them could possibly have eliminated the harm already done to the defendant's rights." *State v. Farrell,* 61 *N.J.* 99, 107, 293 *A.*2d 176 (1972). The failure to give a clear and precise instruction to disregard the prosecutor's references to the State not seeking the death penalty on a routine basis, and the like, was error.

### B.

Additionally, the prosecutor overstepped the bounds of propriety on several other occasions throughout the penalty phase trial. It is well-established that prosecutors may not cast "unjustified aspersions on the defense or defense counsel." *State v. Nelson,* 173 *N.J.* 417, 461, 803 *A.*2d 1 (2002) (citing *State v. Smith,* 167 *N.J.* 158, 177, 770 *A.*2d 255 (2001)). Here, when the prosecutor implied that defense counsel was not forthcoming in providing discovery materials and asking questions of defense experts that went beyond the proper scope of cross-examination, the prosecutor violated that fundamental maxim.

Further, the prosecutor's unwarranted comments and questions that impugned the integrity of various defense witnesses were not appropriate. This Court in *Nelson* set aside the defendant's death sentence because of the improper comments by the prosecutor, which included implications that defense witnesses were not credible because they were part of the "defense team." *Id.* at 461–63, 803 *A.*2d 1. Here, the prosecutor's comments similarly gave the impression that defense experts were biased, if not worse. The prosecutor asked a defense medical expert, "[y]ou were hired for court purposes. And once you are done here, your work is done with Mr. Wakefield, correct?" He then asked that expert, "[a]s a physician, your job and your oath requires you to help and treat patients, correct?" That series of questions was meant to imply that the doctor was merely a mercenary who violated his oath by evaluating defendant strictly for the purposes of trial.

When the defense social worker who was presenting defendant's social history testified on cross-examination, she told the prosecutor, in response to his comment that a specific quote did not appear in a report, "I don't feel comfortable relying on what you're saying." The prosecutor responded, "[w]ell, the feeling is mutual, ma'am." Such a personal attack on the witness's veracity was completely improper and undermined the witness's testimony. Because the social worker was a critical witness for defendant, the prosecutor's comment served to violate defendant's right to a fair trial.

Along with the instances discussed above, the prosecutor engaged in other improper behavior throughout the trial, such as, in his summation, likening defendant to a wolf, a tactic that this Court has criticized. *See State v. Williams*, 113 *N.J.* 393, 455–56, 550 *A.*2d 1172 (1988).

## C.

Under the rules of professional responsibility, the prosecutor must "exercise reasonable care to prevent investigators, law enforcement personnel, employees or other persons assisting or associated with the prosecutor in a criminal case from making an extra judicial statement that the prosecutor would be prohibited from making." *RPC* 3.8(f).

At trial, prospective juror, Paul Trinkle, who was selected to serve during the initial voir dire process, was later excused when he revealed after a three month adjournment before the trial began that he and a secretary in the prosecutor's office had talked about a witness in the case. When questioned by the trial court, Trinkle stated that what the secretary told him about the witness could impact his ability to fairly judge that witness's testimony.

Defense counsel wanted Trinkle as a juror on the panel, but the conduct of the prosecutor's employee deprived counsel of the opportunity to do so. That deprivation, caused by the actions of the prosecutor's secretary, can be attributed to the prosecutor under basic agency principles. *See State v. Baker*, 310 *N.J.Super.*

128, 133, 708 *A.2d* 429 (App.Div.1998) (attributing knowledge to State where head of prosecutor's office, rather than prosecutor on case, invaded secrecy of jury deliberation process). In failing to ensure that its employees did not taint the jury pool, the State denied defendant a juror who might have provided the single vote that could have made the difference between life and death—for in a capital case, if even one juror finds the aggravating factors do not outweigh the mitigating ones, death cannot be imposed.

### D.

As this Court has stated, "[i]n the highly emotional setting of the penalty phase of a capital murder case, we cannot conclude that multiple violations of prevailing standards of prosecutorial conduct had no impact on th[e] jury's deliberations." *State v. Rose*, 112 *N.J.* 454, 523–24, 548 *A.2d* 1058 (1988). In my view, the cumulative effect of the prosecutor's errors committed throughout defendant's penalty phase proceeding deprived him of his constitutional right to a fair trial. Therefore, I cannot support the majority's decision to affirm defendant's conviction and death sentence.

### II.

The trial court further denied defendant's right to a fair trial by failing to heed this Court's instruction that, in the penalty phase of a capital proceeding, "doubts must be resolved in favor of admission when evidence of a mitigating factor is offered by the defendant." *State v. Davis*, 96 *N.J.* 611, 620, 477 *A.2d* 308 (1984) (footnote omitted), *superseded by statute, N.J.S.A.* 2C:11–3i, *as recognized in Cruz, supra*, 163 *N.J.* at 412, 749 *A.2d* 832.

Defendant sought to introduce two photographs—one of his mother and one of the man who raised him and may be his father—which had been sent to him while he was in jail awaiting his capital murder trial. In the photograph of his mother, she is smoking something and written on the back is the following: "Fla/Got/Smokin to/ do. It ain't/ nothing nice / Love/ mommy."

The other photograph depicts the man smoking what appears to be a cigar and written on it is: "The Real Puff Daddy/ Fla Style." The trial court refused to admit the pictures, ruling that they were ambiguous as to the substance being smoked, prejudicial, largely irrelevant as post-homicidal, and cumulative.

In seeking to offer the pictures, defendant wished to demonstrate his parents' indifference to his situation. In my view, the photographs could have supported three of defendant's proffered mitigating factors: (1) that he was raised in an environment where domestic violence, criminal activity, and substance abuse were pervasive (found by seven jurors); (2) that he was raised in a home without structure, boundaries, or positive role models (found by six jurors); and (3) that he suffered physical and emotional neglect from his family (found by three jurors).

In *Lockett v. Ohio,* the United States Supreme Court held that a sentencer may "not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 *U.S.* 586, 604, 98 *S.Ct.* 2954, 2964–65, 57 *L.Ed.2d* 973, 990 (1978). The Legislature codified that proposition under *N.J.S.A.* 2C:11–3c(2)(b), which allows a defendant at a capital penalty phase trial to "offer, without regard for the rules governing the admission of evidence at criminal trials, reliable evidence relevant to any of the mitigating factors."

Given the guidance from both the United States Supreme Court and this Court, as well as the statutory framework, the trial court should have admitted the photographs into evidence. This is especially so because the prosecutor contested the fact that the photographs would have helped to prove that defendant had a horrendous upbringing. When discussing the evidence defendant offered regarding his mother, the prosecutor argued that "things were exaggerated." Although the jurors might have disbelieved the social worker who presented defendant's background, it would have been more difficult for them to ignore physical evidence such as the photographs. Thus, had the photographs been offered, it is

possible that more than three jurors might have found that defendant suffered neglect from his family and more than six jurors might have found that he was raised in a home without positive role models. In the context of a capital penalty phase trial, where a necessarily subtle and subjective weighing process might lead one juror to vote for life, thus removing the death penalty as an appropriate sentence, I conclude that such an error is substantial.

This Court has "acknowledged that in the sentencing phase of a capital proceeding—a life or death contest—a defendant is entitled to the use of all reliable, helpful information." *Davis, supra,* 96 *N.J.* at 619, 477 *A.*2d 308. Because the trial court did not adhere to that standard, defendant's case was unfairly hampered. It is impossible for me to conclude with confidence that not one juror would have weighed the aggravating and mitigating factors differently and voted to spare defendant's life if the jury had been presented with photographs showing such blatant and disturbing indifference on the part of defendant's parents to the fate of their son.

### III.

One other factor might not, independently, warrant granting defendant a new penalty phase trial, but when considered in combination with the other errors discussed above, I believe contributed to the denial of his right to a fair trial.

The trial court's instruction to the jury on reasonable doubt failed to follow the instruction set forth by this Court in *State v. Medina,* 147 *N.J.* 43, 685 *A.*2d 1242 (1996), *cert. denied,* 520 *U.S.* 1190, 117 *S.Ct.* 1476, 137 *L.Ed.*2d 688 (1997). In particular, the trial court omitted the last two sentences from the *Medina* charge:

If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If, on the other hand, you are not firmly convinced of defendant's guilt, you must give the defendant the benefit of the doubt and find him not guilty.

[*Id.* at 61, 685 *A.*2d 1242.]

Because a capital penalty phase jury must find that aggravating factors outweigh mitigating factors beyond a reasonable doubt, the omitted language could have been adapted to this setting, with the last sentence reading: "If, on the other hand, you are not firmly convinced that the aggravating factors outweigh the mitigating factors, you must give the defendant the benefit of the doubt and return a life sentence."

While this error might, at first blush, seem inconsequential, the omission of the "benefit of the doubt" language represented a significant harm to defendant as the jury was not reminded of the essential presumption for life. The simple, straightforward quality of the "benefit of the doubt" language cannot be discounted, for a layperson on the jury can much better understand the nature of the balancing required when presented with such language. Without it, the State's burden was unfairly lessened.

## IV.

Defendant contends that he was further denied his right to a fair trial because the trial court did not charge the jury that he was entitled to a presumption of life. Although I agree with the majority that the court's failure to issue such an instruction *sua sponte* was not error, I part company with the majority when it states that a presumption of life charge is never required.

In *Rose, supra,* we held that a defendant is not entitled to a presumption against the death penalty charge. 112 *N.J.* at 545, 548 *A.*2d 1058. However, at the time *Rose* was decided, aggravating factors were not treated as the functional equivalent of elements of a crime. Because they now are, *State v. Fortin,* 178 *N.J.* 540, 646, 843 *A.*2d 974 (2004), the legal landscape has changed sufficiently that the presumption of life charge must be reconsidered.

"The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." *Estelle v. Williams,* 425 *U.S.* 501, 503, 96 *S.Ct.* 1691, 1692, 48 *L.Ed.*2d 126, 130 (1976). The presumption

operates as a safeguard against the dilution of the State's burden to prove all elements of a crime beyond a reasonable doubt. *Taylor v. Kentucky*, 436 *U.S.* 478, 485–86, 98 *S.Ct.* 1930, 1935, 56 *L.Ed.2d* 468, 475 (1978). Thus, the presumption is inextricably linked to the State's burden to prove the elements.

Because, after *Fortin*, the aggravating factors necessary to make a defendant eligible for the death penalty are treated like elements of a crime and must therefore be proven beyond a reasonable doubt, I conclude that a presumption of life instruction should be given.

## V.

In sum, defendant received a death sentence based on a proceeding that was not fair. The majority is convinced that the jury would have returned a verdict of death even if none of those errors occurred. I am not. Because I cannot place such confidence in the outcome of an unfair proceeding, I would vacate defendant's death sentence and remand for imposition of a sentence of life imprisonment.

*For affirmance*—Justices LaVECCHIA, ZAZZALI, ALBIN and RIVERA–SOTO—4.

*For reversal*—Justices LONG and WALLACE—2.